**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| BETTY JO PHEIFFER, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** |
| VOLKSWAGEN AG, VOLKSWAGEN GROUP OF AMERICA, INC., SCOTT KEOGH, and MARK GILLIES, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Betty Jo Pheiffer ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, announcements made by Defendants, wire and press releases published by and regarding Volkswagen AG ("Volkswagen" or together with its subsidiaries the "Company") and its wholly-owned subsidiary Volkswagen Group of America, Inc. ("VWoA"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

---

[1] Emphases in this Complaint are added unless otherwise noted.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Volkswagen American depositary receipts ("ADRs") between March 29, 2021 and March 30, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violation of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), because Defendant Volkswagen conducts substantial business in this District.  Moreover, the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements from and within this District.

5.      In connection with the acts alleged in this Complaint, Volkswagen, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchanges.

**PARTIES**

6.     Plaintiff, as set forth in her Certification, acquired Volkswagen ADRs during the Class Period, at artificially inflated prices, and was damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

7.     Defendant Volkswagen AG (known internationally as the Volkswagen Group) is one of the world's leading automobile manufacturers and the largest carmaker in Europe.  The Group comprises twelve brands from seven European countries: Volkswagen Passenger Cars, Volkswagen Commercial Vehicles, Audi, SEAT, ŠKODA, Bentley, Bugatti, Lamborghini, Porsche, Ducati, Scania, and MAN. Each brand has its own character and operates as an independent entity on the market.  The product spectrum ranges from motorcycles to small cars and luxury vehicles.  Defendant Volkswagen AG operates 118 production plants in 20 European countries and 10 countries in the Americas, Asia and Africa.  Volkswagen AG sells its vehicles in 153 countries.

8.     Defendant Volkswagen AG is a German corporation with its principal executive offices in Wolfsburg, Lower Saxony, Germany. Volkswagen's ADRs trade on the OTC under the ticker symbol "VWAGY."  Defendant Volkswagen AG is the parent corporation and sole owner of Volkswagen Group of America, Inc.  Volkswagen AG directly controls and directs the actions of Volkswagen Group of America, Inc., which acts as its agent in the United States.  As a result, this Court has specific jurisdiction over Volkswagen AG.

9.     Defendant Volkswagen Group of America, Inc. is a wholly owned subsidiary of Volkswagen AG.  It operates a manufacturing plant in Chattanooga, Tennessee and houses the U.S. operations of Volkswagen's brands including Volkswagen, Audi, Bentley, Bugatti, and Lamborghini.  Headquartered in Herndon, Virginia, the company has approximately 8,000 employees in the United States and sells its vehicles through a 1,000-strong dealer network.

10.     Defendant Scott Keogh ("Keogh") served as the Chief Executive Officer and President of VWoA and Head of Volkswagen brand in North America since November 2018. Defendant Keogh oversees all Volkswagen operations and brand activities in the U.S., including factories in Tennessee.  Prior to his current role with VWoA, Defendant Keogh was president of Audi of America from June 2012 to November 2018, where he oversaw Audi's marketing relationships and oversaw Audi's advancements into new vehicle segments in the American market and crucial product launches that significantly broadened the Audi product line in the U.S. Defendant Keogh helped forge new marketing relationships for the brand.  Prior to assuming the top management position at Audi in June 2012, Defendant Keogh served as Audi's Chief Marketing Officer from January 2006 to June 2012.   As Audi's Chief Marketing Officer, Defendant Keogh led "the revival of the Audi brand with innovative marketing tactics that lead to record awareness and brand strength."

11.     Defendant Mark Gillies ("Gillies") has served as a spokesperson for VWoA since May 2011 and currently serves as VWoA's Acting Head of Communications.  Prior to joining VWoA in 2011, Defendant Gillies for 28 years has written for, and edited, some of the auto industry's most respected publications, serving most recently as executive editor at Car and Driver magazine in the U.S.   During his journalism career, Defendant Gillies has been editor for Automobile Magazine and CAR in the UK, and written for Autocar, Autoweek and Classic & Sportscar Magazine.

12.     Defendants Keogh and Gillies are sometimes referred to herein as the "Individual Defendants."

13.     The Individual Defendants:

a)   directly participated in the management of VWoA;

b) were directly involved in the day-to-day operations of VWoA at the highest levels;

c) were privy to confidential proprietary information concerning the Company and its business and operations;

d) were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e) were directly or indirectly involved in the oversight or implementation of VWoA's internal controls;

f) were aware of or recklessly disregarded the fact that false and misleading statements were being issued concerning VWoA; and/or

g) approved or ratified these statements in violation of the federal securities laws.

14.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**A.  Background**

17.     Volkswagen AG, headquartered in Wolfsburg, Germany, is one of the largest global automotive companies in terms of the number of vehicles sold annually.  In addition to producing Volkswagen-branded passenger cars and light commercial vehicles, Volkswagen AG, along with its 340 subsidiary companies, also sells passenger cars under various automotive brands

including Audi, Bentley, Skoda, Porsche, SEAT, and Lamborghini.  Volkswagen AG has also maintained the largest market share in Europe for over two decades.

18.     On March 15, 2021, Volkswagen staged a so-called Power Day to showcase its latest electric car technology.  The event was Volkswagen's answer to Tesla's Battery Day presentations, which draw intense attention from investors and electric car buffs.  Volkswagen also unveiled plans to build six battery factories in Europe in joint ventures with suppliers, with 18,000 charging stations on the continent by 2025.  During the Power Day, Herbert Diess, the Chairman of the Volkswagen brand Board of Management, revealed that "[e]-mobility has become core business for [Volkswagen]."[2]

## 1. VWoA's Purported Name Change to "Voltswagen" After Volkswagen's Power Day

19.     After Volkswagen emphasized its electric vehicle efforts on March 15, 2021, its U.S. subsidiary, VWoA, announced its name change from *Volks*wagen of America to *Volts*wagen of America in a series of announcements via its press releases, changes on its social media channels, and tweets via Volkswagen's and Defendant Keogh's Twitter accounts.  What was later described as an April Fool's prank or joke came across to the market, journalists, investors, and analysts, as a serious step forward in electric vehicle development for Defendants.

### a. March 29, 2021 Press Release

20.     On March 29, 2021, shortly after Volkswagen's Power Day, VWoA published a "draft" of a press release on its website for a short time with the incorrect date of "April 29," announcing its purported name change from "*Volk*swagen" to "*Volts*wagen."  The volt is the standard international unit of electric potential or electromotive force.  The announcement came

---

[2]  https://www.volkswagen-newsroom.com/en/press-releases/power-day-volkswagen-presents-technology-roadmap-for-batteries-and-charging-up-to-2030-6891.

as VW unveiled in U.S. showrooms earlier that month a new all-electric sport utility vehicle, ID.4, the latest challenge by a conventional automaker to Elon Musk's Tesla franchise.

21.     The "draft" press release was incomplete, citing the need for an additional quote and photography from the Company's plant in Chattanooga, Tennessee.  The "draft" press release announced that the name change was expected to take effect in May.  In this "draft" press release, Defendant Keogh stated: "We might be changing out our K for a T, but what we aren't changing is this brand's commitment to making best-in-class vehicles for drivers and people everywhere." The release called the change a "public declaration of the company's future-forward investment in e-mobility."  The release also stated that "[t]he new name and branding symbolize the highly-charged forward momentum Voltswagen has put in motion, pursuing a goal of moving all people point-to-point with EVs."  Furthermore, the release also stated that "Voltswagen" will be placed as an exterior badge on all EV models with gas vehicles having the Company's iconic VW emblem only.  To "preserve elements of Volkswagen's heritage," the release said the Company planned to retain the dark blue color of the VW logo for gas-powered vehicles and use light blue to differentiate "the new, EV-centric branding."  The release also stated that "Volkswagen of America would remain an operating unit of Volkswagen Group of America and a subsidiary of Volkswagen AG, with headquarters in Herndon, Virginia."  Several prominent news organizations, including *The Associated Press* ("*AP*"), *USA Today*, and *CNBC* had reported the original "draft" press release as real news, some after being assured by Defendant Gillies and William Gock, VWoA's Product Communications Senior Specialist, that it was no joke. For example, the *AP* reported: "Volkswagen is planning to change its brand name in the U.S. to 'Voltswagen' as it shifts its production increasingly toward electric vehicles and tries to distance itself from an emissions

7

cheating scandal. A person briefed on the plan said a formal announcement is planned for Tuesday."

### b. March 30, 2021 Press Release and VWoA's Updated Social Media Channels

22.     VWoA doubled down on its deception a day later, posting on Tuesday morning, March 30, 2021, another full, finished "official" version of the same release, which quoted Defendant Keogh and Kimberly Sweet Gardiner ("Gardiner"), VWoA's Senior Vice President and Head of Marketing, celebrating the new moniker.  As the March 29, 2021 "draft" press release, the "official" press release was also taken down later on Tuesday.

23.     The "official" press release, this time correctly dated March 30, 2021, was entitled "Voltswagen: A new name for a new era of e-Mobility."  The company presented it as a straight announcement, as if it were the truth, stating in pertinent part that "[t]oday, Volkswagen Group of America, is unveiling the official change of its U.S. brand name from Volkswagen of America to Voltswagen of America. U.S. name change from Volkswagen of America to Voltswagen of America begins May 2021. Rebranding to include revised name, brand guidelines and VW.com design. Starting today, new branding will roll out across all of the company's advertising, website and social media channels."  The March 30, 2021 press release also had a section "About Voltswagen," describing "Voltswagen of America" as "formerly Volkswagen of America, Inc.," which sells, among others, ID.4 Electric SUV.  The "official" press release stated that in March 2021, the Company welcomed the arrival of ID.4, its first all-electric, zero direct emission SUV, the first product to be sold across America "that confirms the company's commitment to sustainable mobility."

24.     The "official" press release announced that "[t]he company will preserve elements of Volkswagen's heritage by retaining its iconic VW Dark Blue color for gas-powered vehicles

and Light Blue to differentiate the new, EV-centric branding. Moving forward, 'Voltswagen' will be placed as an exterior badge on all EV models with gas vehicles sporting the VW emblem only. Exterior and interior signage will soon roll out to all Voltswagen properties and dealerships across the US."

25.     Publicly declaring "Voltswagen" more than a name change, the Company stated that "[t]he new name and branding symbolize the highly-charged forward momentum Voltswagen has put in motion, pursuing a goal of moving all people point-to-point with EVs."  Furthermore, the press release quoted Defendant Keogh and Gardiner celebrating the new moniker.  Defendant Keogh stated in pertinent part:

> We might be changing out our K for a T, but what we aren't changing is this brand's commitment to making best-in-class vehicles for drivers and people everywhere. The idea of a "people's car" is the very fabric of our being. We have said, from the beginning of our shift to an electric future, that we will build EVs for the millions, not just millionaires. This name change signifies a nod to our past as the peoples' car and our firm belief that our future is in being the peoples' electric car.

26.     Gardiner also stated in the release:

> As our newly launched ID.4 campaign demonstrates, the humanity at the core of this brand remains its enduring legacy. The tone of Voltswagen will be a consistent thread between the branded communications for our growing electric fleet to our gas vehicles. Over the course of the next few months, you will see the brand transition at all consumer touch points. This is an exciting moment for us, and we have been working through every avenue to make the transition clear, consistent, seamless and fun for all.

27.     The Company also went as far as changing its name on its U.S. website and YouTube channel, and even launched a new Voltswagen Twitter handle.  According to *Dow Jones Institutional News*, following the Tuesday press release with a message about the name change, Defendant Keogh's Twitter account also pushed the new name again.  The new name was written in a fluorescent blue typeface similar to the font General Motors chose for a new logo it unveiled

9

in January 2021.  General Motors' logo was intended to have the same effect – to emphasize its commitment to electric vehicles.

28.     On March 30, 2021, Volkswagen tweeted:



We know, 66 is an unusual age to change your name, but we've always been young at heart. Introducing Voltswagen. Similar to Volkswagen, but with a renewed focus on electric driving. Starting with our all-new, all-electric SUV the ID.4 - available today. #voltswagen

29.     The tweet also included a video showing the "k" in Volkswagen changing to a "t.":[3]

_____

[3] https://twitter.com/VW/status/1376868756782219266;

https://web.archive.org/web/20210330121247/https://twitter.com/VW/status/13768 68756782219266.







30.     On the same day, several global news outlets swiftly reacted to the "official" news. *The Guardian* in an article entitled "No joke: Volkswagen confirms it will change name to Voltswagen in U.S," reported that "[i]n what was initially thought to be an April Fool's prank, apparently thanks to a premature announcement by an overeager publicist, ***the German auto giant has confirmed its metamorphosis into Voltswagen*** – an attempt to reflect its investment in the growing electric vehicle (EV) market."

31.     In reality, however, Volkswagen's intent to adopt the name "Voltswagen" in the U.S. for its coming fleet of electric vehicles was an elaborate plot approved by Company's top executives.

32.     On midday, Tuesday, March 30, 2021, *The Wall Street Journal* ("*WSJ*") published an article entitled "No, Volkswagen Isn't Rebranding Itself Voltswagen. German car maker says announcement by its U.S. operation was supposed to be an April Fools' gag."  The article reported that the name change was originally intended as an early April Fool's Day stunt to get people talking about VW's ambitious electric car strategy.  "The problem for VW is that everyone took it seriously, creating confusion about the company's intentions," the *WSJ* reported.  The *WSJ* also quoted a Volkswagen spokesman in Wolfsburg, Germany, VW AG's headquarters: "We didn't mean to mislead anyone. The whole thing is just a marketing action to get people talking about the ID.4."  The *WSJ* also quoted a VW AG official in Germany: "There will be no name change."  The *WSJ* also noted that "[i]nvestors have been clamoring for shares of companies involved in electric vehicles and have recently been pouring money into the stocks of established car makers with solid EV plans."

33.     On March 31, 2021, *Agence France-Presse* ("*AFP*") published an article entitled "VW says regrets name-change prank after outcry."  The article reported that "German car giant Volkswagen voiced regret Wednesday over a publicity stunt that duped major media outlets and was criticized by *AFP* as a 'breach of trust.'"  The article quoted VW AG's spokesman, Deputy Head of Corporate Communication, Christoph Ludewig: "Volkswagen of America developed . . . a national US marketing campaign, with a wink, to draw attention to Volkswagen's e-offensive. From the start, the goal was to generate attention for an important corporate and industry topic in the USA. The large amount of positive feedback on social media shows we achieved this goal. At the same time, ***we regret if in the eyes of some, we overshot the mark of the campaign.***"

34.     On March 31, 2021 VW AG tweeted:



35.     However, the construct of the Company's joke was all too believable even for sophisticated Wall Street players due to a huge shift happening in the auto industry, which is gearing up for a massive shift toward battery-powered vehicles.  The March 29 and March 30, 2021 press releases went out through official channels with all the trappings of real effort to generate buzz around a new brand.  The way it was laid out, the Company was essentially creating a U.S. subbrand for its coming line of electric vehicles.  Moreover, just two weeks before VWoA rolled out its purported "official" press release, VW AG's CEO, Herbert Diess, described VW's plan to go electric: "[our] transformation will be fast.  It will be unprecedented.  The transformation will be bigger than anything the industry has seen in the past century."

**Materially False and Misleading Statements**

36.     Throughout the Class Period, Defendants made materially false and misleading statements regarding Volkswagen's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the name "Voltswagen" was never going to be used by the Company's U.S. subsidiary; (ii) the Company and its spokespeople purposefully misled reporters, even after the reporters' inquiries about whether the name change was an April Fool's joke; and (iii) as a result, Defendants' public statements and statements to journalists were materially false and/or misleading at all relevant times.

**A.     The March 29, 2021 Statements**

37.     As discussed *supra* at ¶ 20, on March 29, 2021, shortly after Volkswagen's Power Day, VWoA published a "draft" of a press release on its website for a short time with the incorrect date of "April 29," announcing its purported name change from "***Volk*swagen**" to "***Volts*wagen**."

38.     As discussed *supra* at ¶ 21, the "draft" press release stated that VWoA planned to retain the dark blue color of the VW logo for gas-powered vehicles and use light blue to differentiate "the new, EV-centric branding."  The release also stated that "Voltswagen of America would remain an operating unit of Volkswagen Group of America and a subsidiary of Volkswagen AG, with headquarters in Herndon, Virginia."  The release explained that "[t]he new name and branding symbolize the highly-charged forward momentum Voltswagen has put in motion, pursuing a goal of moving all people point-to-point with EVs."

39.     As discussed *supra* at ¶ 21, in the March 29, 2021 "draft" press release, Defendant Keogh stated: "We might be changing out our K for a T, but what we aren't changing is this brand's commitment to making best-in-class vehicles for drivers and people everywhere."

40.     The statements referenced in ¶¶ 37-39 above were materially false and/or misleading for the reasons set forth in ¶ 36(i)-(iii), including because the announcement was a pre-

14

planned April Fool's Day joke that was developed by several of the Company's key executives "in order to get people talking about the ID.4," and VWoA never intended to change its "K for a T," nor to use light blue color for the purported logo "Voltswagen."

### B.  The March 30, 2021 Statements

41.  As discussed *supra* at ¶¶ 22-23, Defendants doubled down on their deception a day later, posting on Tuesday morning, March 30, 2021, another full, finished "official" version of the same release, which quoted Defendant Keogh and Gardiner celebrating the new moniker.  The release, entitled "Voltswagen: A new name for a new era of e-mobility," stated in pertinent part:

> Today, Volkswagen Group of America, is unveiling **the official change of its U.S. brand name from Volkswagen of America to Voltswagen of America**. **U.S. name change from Volkswagen of America to Voltswagen of America begins May 2021.** The company will preserve elements of Volkswagen's heritage by retaining its iconic VW Dark Blue color for gas-powered vehicles and **Light Blue to differentiate the new, EV-centric branding. Moving forward, 'Voltswagen' will be placed as an exterior badge on all EV models** with gas vehicles sporting the VW emblem only. The new name and branding symbolize the highly-charged forward momentum Voltswagen has put in motion, pursuing a goal of moving all people point-to-point with EVs.

42.  As discussed *supra* at ¶ 27, VWoA changed its name to Voltswagen on its U.S. website and YouTube channel, and launched a Voltswagen Twitter handle.

43.  As discussed *supra* at ¶ 28, on March 30, 2021, Volkswagen tweeted: "We know, 66 is an unusual age to change your name, but we've always been young at heart. Introducing Voltswagen. Similar to Volkswagen, but with a renewed focus on electric driving. Starting with our all-new, all-electric SUV the ID.4 - available today. #voltswagen." The tweet also included a video showing the "k" in Volkswagen changing to a "t."

44.  As discussed *supra* at ¶ 30, on March 30, 2021, *The Guardian* reported that "the German auto giant has confirmed its metamorphosis into Voltswagen–an attempt to reflect its investment in the growing electric vehicle (EV) market."

45.     The statements referenced in ¶¶ 41-43 above were materially false and/or misleading for the reasons set forth in ¶ 36(i)-(iii), including because the announcement was a pre-planned April Fool's Day joke that was developed by several VWoA key executives "in order to get people talking about the ID.4," and VWoA never intended to "unveil[] the official change of its U.S. brand name from Volkswagen of America to Voltswagen of America" in May 2021.

46.     As discussed *supra* at ¶ 27, after the "official" March 30, 2021 press release was published on VWoA's website, Defendant Keogh pushed the Voltswagen name change on its Twitter account again.

47.     The statements referenced in ¶ 46 above were materially false and/or misleading for the reasons set forth in ¶ 36(i)-(iii), including because the announcement was a pre-planned April Fool's Day joke that was developed by several VWoA key executives "in order to get people talking about the ID.4" and Defendant Keogh later admitted that he "regret[ted]" the execution of "the whole incident."

### The Truth Emerges

48.     As discussed *supra* at ¶ 32, on midday, Tuesday, March 30, 2021, still two days before April Fool's Day on April 1, The *WSJ* reported that a spokesman for the Company in Wolfsburg, Germany stated that "[t]he whole thing was just a marketing action to get people talking about the ID.4." The *WSJ* also quoted a Company's official back in Germany: "[t]here will be no name change."

49.     Also, on March 30, 2021, the *AP* published an article entitled "Volkswagen hoaxes media with fake statement on name change." The *AP* reported that "Volkswagen's intentionally fake news release" was "highly unusual for a major public company. . . . In falsely announcing a name change, the company went beyond telling reporters that its news release was legitimate."

The *AP* also quoted Tim Calkins, a clinical professor of marketing at Northwestern University, who said that "April Fool's jokes are common in marketing" but that "it's rare for a company to deliberately mislead reporters.  For a company that already has credibility problems, this is really a strange move."

50.     As discussed *supra* at ¶ 33, on March 31, 2021, *AFP* quoted VW AG's spokesman, Deputy Head of Corporate Communication, Christoph Ludewig: "Volkswagen of America developed . . . a national US marketing campaign, with a wink, to draw attention to Volkswagen's e-offensive.  From the start, the goal was to generate attention for an important corporate and industry topic in the USA.  The large amount of positive feedback on social media shows we achieved this goal.  At the same time, we regret if in the eyes of some, we overshot the mark of the campaign."  *AFP* also reported that "[r]eporters reacted angrily to the stunt, with some pointing out that it was tone-deaf coming from a company still recovering from the 2015 'dieselgate' scandal, when Volkswagen was forced to admit it had for years used cheating software in cars to dupe emissions tests."  Phil Chetwynd, Global News Director of *AFP*, wrote to the Company to protest against the deception, stating: "We understand when a spokesperson is not in a position to confirm or comment on a piece of information.  ***But we never expect them to make false statements.***  We strongly think serious journalists and news outlets should not be used by companies like Volkswagen for marketing and advertising purposes.  For us it is a very grave breach of trust which must not be repeated."

51.     On March 31, 2021, further reports regarding how the Company's spokespeople purposefully misled reporters were published.  For example, *ABC News* published an article entitled "An unwelcome prank: Volkswagen purposely hoodwinks reporters.  Journalists are wary

17

of looking out for pranksters around April Fool's Day, but this time it came from a multi-billion

dollar corporation."  The *ABC News* article reported, in pertinent part, that:

> Several news organizations, including The Associated Press, USA Today, CNBC
> and The Washington Post, had reported the original press release as real news, some
> after being assured specifically that it was no joke.
>
> ***"The Associated Press was repeatedly assured by Volkswagen that its U.S.
> subsidiary planned a name change, and reported that information, which we now
> know to be false," company spokeswoman Lauren Easton said.*** "We have
> corrected our story and published a new one based on the company's admission.
> This and any deliberate release of false information hurts accurate journalism and
> the public good."
>
> ***The AP wrote a story about it Monday after its reporter was assured by Mark
> Gillies, a company spokesman in the United States, that it was serious, Easton
> said.***
>
> ***It was a similar story at USA Today, where a reporter specifically asked if it was
> a joke and was told "no," said the newspaper's spokeswoman, Chrissy Terrell.***
>
> "The company used this fake announcement as a way to manipulate respected
> reporters from trusted news outlets to get attention for their marketing campaign,"
> she said. "We are disheartened that the company would choose this type of
> disingenuous marketing."
>
> The *USA Today* reporter who was initially lied to was more blunt.
>
> ***"This was not a joke," reporter Nathan Bomey wrote on Twitter. "It was
> deception.*** In case you haven't noticed, we have a misinformation problem in this
> country. Now you're part of it. Why should anyone trust you again?"

52.     The price of Volkswagen ADRs plummeted on this news, falling 3.84%, or $1.45

per share, to close at $36.3 per share on March 31, 2021 (from a closing price of $37.75 per share

on March 30, 2021), damaging investors.

53.     In an April 1, 2021 article, entitled "Volkswagen's April Fools' Stunt Misses the

Mark—and an Opportunity to Earn Back Trust," *Forbes* reported, in relevant part:

> Earlier this week, Volkswagen had the auto and media industries buzzing when it
> put out an official press release claiming that it was changing the name of its
> American division to Voltswagen.

The stunt certainly did create some buzz: According to data compiled by social media analytics company Sprinklr, "Voltswagen" had been mentioned 6,045 times—on Twitter, Instagram, Facebook, Reddit, news sites and blogs—and reaching 150 million people as of Wednesday evening. However, many have criticized Volkswagen for misleading the public, especially in the wake of its diesel emissions scandal. Some marketers also point out that it missed an opportunity to demonstrate just how serious the company is about its EV efforts and helping to mainstream new technology.

A Volkswagen executive told *Forbes* via email that the **collaboration between corporate headquarters and Volkswagen of American** was an "interesting marketing story to electrify people around the world to stage and position Volkswagen brand as a global market leader."

Kari Shimmel, chief strategy officer at Detroit-based advertising agency Campbell Ewald, says understanding the target audience is the key to landing a joke. ***But the real danger comes when the company doesn't go far enough and what was meant to be a stunt is too closely aligned with reality and then becomes confusing or misleading***.

(Emphasis added).

54.     The price of Volkswagen ADRs continued to fall as the market continued to process the news about the purported name change. The Company's ADR price fell 1.98%, or $0.72 per share, to close at $35.58 per share on April 1, 2021 (from a closing price of $36.3 per share on March 31, 2021), damaging investors.

55.     In total, Volkswagen's ADR price fell by $2.17 per share, or 5.75%, over the course of two trading days from March 31, 2021 through April 1, 2021, damaging investors.

56.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's ADRs, Plaintiff and other Class members have suffered significant losses and damages.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on Plaintiff's own behalf and as a representative of a class, consisting of all those

who purchased or otherwise acquired Volkswagen ADRs during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

58.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable. Throughout the Class Period, Volkswagen ADRs were actively traded on the OTC. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or the Company's transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages from the same wrongful conduct of Defendants. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

60.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff is an adequate representative of the Class and has no interest which is adverse to the interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

61.     Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class.  These common questions of law include, without limitation:

- whether statements made by Defendants to investors during the Class Period included misrepresentations of material fact about Volkswagen;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether Defendants' acts as alleged herein constituted violations of the federal securities laws;

- whether the prices of Volkswagen ADRs during the Class Period were artificially inflated due to Defendants' conduct described herein;

- the nature of the injury suffered by Plaintiff and Class members; and

- the appropriate measure of damages to compensate Plaintiff and Class members.

62.     A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

63.     Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

64.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

65.     The market for Volkswagen ADRs was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Volkswagen's ADRs traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's ADRs relying upon the integrity of the market price of Volkswagen ADRs and market information provided by and relating to Volkswagen, and have been damaged thereby.

66.     During the Class Period, the artificial inflation of Volkswagen's ADRs was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Volkswagen's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Volkswagen's financials and its business, operations, and prospects, thus causing the price of the Company's ADRs to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of Volkswagen ADRs.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Volkswagen ADRs at such artificially inflated prices, and each of them has been damaged as a result.

67.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- these misrepresentations and omissions were material to Plaintiff and the Class;

- Volkswagen ADRs were traded on the OTC and were covered by numerous analysts;

- Volkswagen ADRs were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of Volkswagen ADRs; and

- Plaintiff and Class members purchased and/or sold Volkswagen ADRs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

68.     As a result of the foregoing, the market for Volkswagen ADRs promptly digested current information regarding Volkswagen from all publicly available sources and reflected such information in Volkswagen's ADR price.   Under these circumstances, all purchasers of Volkswagen's ADRs during the Class Period suffered similar injury through their purchase of Volkswagen's ADRs at artificially inflated prices.  Thus, a presumption of reliance applies.

69.     Accordingly, Plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.

70.     In the alternative, Plaintiff and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects, information that Defendants were obligated to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION

71.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. Plaintiff and the Class would not have purchased Volkswagen ADRs if the Company had not made the misrepresentations alleged above or had not failed to provide the investing public the material adverse information alleged herein.

72.     During the Class Period, Plaintiffs and the Class purchased Volkswagen's ADRs at artificially inflated prices and were damaged thereby. The price of Volkswagen ADRs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

73.     As alleged herein, Defendants acted with scienter because Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Volkswagen, their control over, and/or receipt and/or modification of Volkswagen's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Volkswagen, participated in the fraudulent scheme alleged herein.

74.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

75.     The Individual Defendants, because of their positions with Volkswagen, made and/or controlled the contents of the Company's public statements during the Class Period.  Each Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were materially false and misleading.  As a result, each of these Defendants is responsible for the accuracy of Volkswagen's corporate statements and is therefore responsible and liable for the representations contained therein.

## NO SAFE HARBOR

76.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint.  The statements alleged to be false and misleading herein relate to then-existing facts and circumstances.  To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor

is intended to apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Volkswagen who knew that statement was false and misleading when made.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

77.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

78.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew to be false or deliberately disregarded whether they were in fact true or false in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

79.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by: (a) making false statements of material fact or omitting to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with purchases of Volkswagen ADRs during the Class Period.

80.     Defendants acted with scienter because they knew that the statements issued in the name of Volkswagen were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated or acquiesced in the

issuance or dissemination of these statements as primary violations of the federal securities laws. Defendants, through receipt of information reflecting true facts about Volkswagen, their control over, and/or receipt of or modification to Volkswagen's allegedly materially misleading statements, which made them aware of Volkswagen's confidential proprietary information, participated in the fraudulent scheme complained of herein.

81.     The Individual Defendants had actual knowledge of material omissions and/or the material falsity of statements made by Volkswagen, and intended to deceive Plaintiff and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other Volkswagen employees to investors, including Plaintiff and Class members.  These misrepresentations and omissions were material.  A reasonable investor would consider the facts important in deciding whether to buy Volkswagen ADRs and would have viewed the aggregate information available to be significantly altered by the disclosure of this and other material omitted facts.

82.     Pursuant to the foregoing, the price of Volkswagen ADRs were artificially inflated during the Class Period.  Due to their lack of knowledge of the false nature of statements made by Defendants, Plaintiff and Class members relied on the statements made by Defendants and/or the integrity of the market price of Volkswagen ADRs during the Class Period in purchasing Volkswagen ADRs at prices that were artificially inflated due to false and misleading statements made by Defendants.

83.     Were Plaintiff and Class members made aware that the market price of Volkswagen ADRs were artificially and falsely inflated by misleading statements made by Defendants, and by material adverse information that Defendants failed to disclose, they would not have purchased Volkswagen ADRs at artificially inflated prices, or purchased them at any price.

84. Based on the wrongful conducted alleged herein, Plaintiff and Class members have suffered damages in an amount to be determined at trial.

85. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and Class members for significant damages suffered via their purchases of Volkswagen ADRs during the Class Period.

## SECOND CLAIM FOR RELIEF

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

86. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

87. During the Class Period, the Individual Defendants were involved in the management and operation of Volkswagen's business affairs. Due to their senior positions, they had knowledge of adverse non-public information regarding Volkswagen.

88. As directors and/or officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding Volkswagen's financial condition and results of operations, and to correct any public statements issued by Volkswagen which were materially false or misleading.

89. Due to their positions of authority at Volkswagen, the Individual Defendants controlled the contents of various public filings, press releases and reports which Volkswagen disseminated in the market during the Class Period. During the Class Period, the Individual Defendants utilized their authority to cause Volkswagen to execute the wrongful acts alleged herein. The Individual Defendants were therefore "controlling persons" at Volkswagen pursuant to Section 20(a) of the Exchange Act. On this basis, they were participants in the unlawful conduct alleged which caused the prices of Volkswagen ADRs to be artificially inflated.

90.     Based on the conduct described above, the Individual Defendants are liable for the violations committed by Volkswagen pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands relief as follows:

A.     Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class Representative;

B.     Awarding damages in favor of Plaintiff and members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C.     Awarding Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

D.     Awarding Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

E.     Directing such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  January 14, 2022

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Steven J. Toll*
Steven J. Toll (Va. Bar No. 15300)
S. Douglas Bunch
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com

*Liaison Counsel for Plaintiff*

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*
application forthcoming)
J. Alexander Hood II (*pro hac vice*
application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile: 917-463-1044
Email: jalieberman@pomlaw.com
         ahood@pomlaw.com

**PORTNOY LAW FIRM**
Lesley F. Portnoy, Esq.
(*pro hac vice* application forthcoming)
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Attorneys for Plaintiff*