**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| *In re Volkswagen AG Securities Litigation* | **Case No. 1:22-cv-00045-RDA-TCB**<br><br>**CLASS ACTION** |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**
**AMENDED CLASS ACTION COMPLAINT**

MCGUIREWOODS LLP

/s/ *Kenneth W. Abrams*
Kenneth W. Abrams (VSB No. 78216)
Gateway Plaza
800 Canal Street
Richmond, Virginia 23219
Tel: 804-775-4773
Fax: 804-698-2323
kabrams@mcguirewoods.com

SULLIVAN & CROMWELL LLP

Robert J. Giuffra, Jr. (to be admitted *pro hac vice*)
Sharon L. Nelles (to be admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Tel: 212-558-4000
Fax: 212-558-3558
giuffrar@sullcrom.com
nelless@sullcrom.com

Laura Kabler Oswell (to be admitted *pro hac vice*)
1870 Embarcadero Road
Palo Alto, California 94303
Tel.: 650-461-5600
Fax: 650-461-5700
oswelll@sullcrom.com

*Counsel for Defendants Volkswagen AG, Volkswagen*
*Group of America, Inc., Scott Keogh, and Mark Gillies*

August 2, 2022

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ...................................................................................................1

THE ALLEGATIONS OF THE COMPLAINT ..........................................................................3

    A.    VWAG's Foreign Securities and Unsponsored ADRs ...................................................4

    B.    VWGoA's "Voltswagen" April Fool's Day Joke ...........................................................4

    C.    Plaintiffs' Claims Over VWGoA's "Voltswagen" Joke ................................................5

LEGAL STANDARDS ...............................................................................................................7

ARGUMENT ..............................................................................................................................8

I.      THE COMPLAINT MUST BE DISMISSED BECAUSE IT RELIES
      EXCLUSIVELY ON TRANSACTIONS IN UNSPONSORED VWAG AMERICAN
      DEPOSITARY RECEIPTS. ...............................................................................................8

    A.    Plaintiffs' Claim Must Be Dismissed Because Section 10(b) Does Not Apply
          Extraterritorially ...........................................................................................................9

        1.    Purchases of Unsponsored ADRs Over the Counter Are Not "Transactions in
              Securities Listed on Domestic Exchanges." ......................................................9

        2.    Plaintiffs' Purchases of Unsponsored ADRs Were "Predominantly Foreign"
              Transactions. ....................................................................................................10

    B.    Plaintiffs' Claims Must Be Dismissed Because the Alleged Misstatements Were Not
          Made "In Connection With" Unsponsored ADRs. ........................................................12

II.    THE COMPLAINT MUST BE DISMISSED BECAUSE VWGOA'S
      "VOLTSWAGEN" CAMPAIGN WAS NOT SECURITIES FRAUD. ......................17

    A.    Plaintiffs Fail to Allege That VWAG Made Any Statement. ......................................17

    B.    Plaintiffs Fail to Allege with Particularity Any Material Misstatement. ......................17

    C.    Plaintiffs Fail Entirely to Plead That Any Defendant Intended to Defraud. .................20

    D.    Plaintiffs Fail to Plead That VWGoA's "Voltswagen" Joke Affected the Price of the
          Unsponsored ADRs Traded in the United States. ........................................................25

III.   PLAINTIFFS' CLAIM UNDER SECTION 20(a) OF THE EXCHANGE ACT
      FAILS BECAUSE NO DEFENDANT VIOLATED SECTION 10(b). .......................28

CONCLUSION ........................................................................................................................28

## PRELIMINARY STATEMENT

Plaintiffs seek to base a securities fraud suit on an April Fools' joke involving a change to one letter in a corporate subsidiary's name that was revealed the day after it was announced.  A few days before April 1, 2021, Volkswagen Group of America ("VWGoA") posted two press releases on its website and a tweet on Twitter stating that it was changing its name to "***Voltswagen***."  Like many corporate April Fool's Day campaigns, VWGoA sought to draw customer attention to a company initiative, here, VWGoA's commitment to developing and introducing more electric vehicles.  VWGoA revealed the joke the next day.

Plaintiffs allege that, by making the "Voltswagen" joke, VWGoA (a sales distribution subsidiary that issues no stock at all), Volkswagen AG ("VWAG") (Volkswagen's parent company that issues only foreign-traded securities), and two of VWGoA's employees violated the U.S. securities laws.  But a one-day marketing campaign by a subsidiary is not securities fraud, nothing about this joke about a name change bears any resemblance to securities fraud, and Plaintiffs come nowhere close to meeting the exacting standards for pleading securities fraud under the Private Securities Litigation Reform Act ("PSLRA").

*First*, Plaintiffs' claims fail out of the gate because they cannot bring a Section 10(b) claim based solely on their purchase of *unsponsored* American Depositary Receipts ("ADRs") referencing VWAG foreign-issued and traded securities.  In *Morrison* v. *Nat'l Bank of Australia, Ltd.*, 561 U.S. 247, 265 (2010), the Supreme Court made clear that Section 10(b) of the Exchange Act does *not* apply beyond the United States' borders.  As Plaintiffs acknowledge, an unsponsored ADR transaction "is equivalent to the purchase of the underlying foreign securities" (Compl. ¶ 49), and the purchase of VWAG's stock on a European exchange is clearly extraterritorial.  Moreover, Section 10(b) requires Plaintiffs to show that Defendants committed fraud "in connection with" Plaintiffs' ADR transactions.  But neither VWGoA nor VWAG had

any connection to *unsponsored* ADRs sold by third parties. The Complaint does not allege that VWAG or VWGoA were involved in those sales, made any representations to the SEC or U.S. investors in connection with those ADRs, or did anything to facilitate or encourage ADR trading in any way.

*Second*, Plaintiffs' novel claim fails on the merits. To begin, there was no material misstatement. The Complaint does not allege that VWAG made any statement at all, which on its own warrants dismissal of Plaintiffs' claim against that company. *See Janus Cap. Grp., Inc.* v. *First Deriv. Traders*, 564 U.S. 135, 142 (2011). As to VWGoA, companies make April Fool's Day jokes to promote their brands, as journalists, consumers and investors are well aware. The VWGoA "Voltswagen" April Fool's Day joke lasted less than 36 hours. From the beginning, many journalists recognized that this purported rebranding of VWGoA was a joke. And even putting the timing of the joke to the side, "[a]nalysts and arbitraguers rely on facts in determining the value of a security." *Raab* v. *Gen. Physics Corp.,* 4 F.3d 286, 290 (4th Cir. 1993). Here, the joke involved changing a single letter in VWGoA's name and communicated no financial information about the company. The joke was indistinguishable from the vague, "puffing" statements that companies make every day, and the only conclusion a reasonable investor could have drawn from the "Voltswagen" campaign was that VWGoA was committed to developing and offering more electric vehicles: a commitment that was 100 percent true.

Nor do Plaintiffs come close to pleading that VWGoA, which made the April Fool's Joke, the two VWGoA individual defendants, or anyone from VWAG acted with the requisite fraudulent intent. To survive a motion to dismiss, the Complaint must allege facts that "give rise to a strong inference of scienter." The Complaint makes no allegations about *any* VWAG employee. VWGoA and the individual VWGoA Defendants always intended to reveal the joke

shortly after it was made, an intention wholly incompatible with an intent to defraud.  The Complaint includes no allegations of insider trading or pecuniary motive, nor does it allege that anyone at VWGoA or VWAG expected that the joke would mislead investors.  The only inference to be drawn from Plaintiffs' allegations is that VWGoA and the individual VWGoA Defendants intended to carry out an April Fools' marketing campaign, as many companies have before and were doing at the time.

Finally, Plaintiffs cannot establish loss causation.  The price of VWAG unsponsored ADRs barely moved during the marketing campaign, and was higher after the joke was revealed than when the joke began.

## THE ALLEGATIONS OF THE COMPLAINT[1]

The Complaint alleges that VWGoA, VWAG, Scott Keogh, VWGoA's CEO, and Mark Gillies, VWGoA's Acting Head of Communications,  violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, by conducting an April Fools' Day marketing campaign, telling consumers that VWGoA was changing its name to "*Voltswagen*."  Plaintiffs also allege that VWAG and the individual VWGoA Defendants are liable as "controlling persons" under Section 20(a) of the Exchange Act for causing VWGoA to commit that violation.  Plaintiffs' claim relies entirely on transactions in unsponsored ADRs, which Plaintiffs claim to have purchased from third-party banks.

---

[1] For purposes of this Motion, the well-pleaded facts set forth in the Complaint are "accepted as true." *Francis* v. *Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).  At the pleading stage, the Court need not consider "formulaic recitation[s] of the elements of a cause of action" or "unadorned conclusory allegations."  *Id.* (citing *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 540, 555 (2007)).

### A. VWAG's Foreign Securities and Unsponsored ADRs

The common and preferred shares of VWAG are listed on the Frankfurt Stock Exchange. (Compl. ¶ 42) VWGoA is a wholly-owned subsidiary of VWAG engaged in sales and distribution of vehicles. Some U.S. banks established *unsponsored* ADR programs that referenced VWAG's foreign securities. As their name suggests, those unsponsored ADR programs did not require the approval or involvement of VWAG. The value of those ADRs was based solely on the price of VWAG's stock traded in Frankfurt. VWAG previously sponsored ADRs in the United States but terminated its sponsored ADR program in 2018, years before the "Voltswagen" campaign. (Compl. ¶ 53.)[2]

### B. VWGoA's "Voltswagen" April Fool's Day Joke

On March 28, 2021, right before April Fool's Day as part of a marketing campaign for electric vehicles, VWGoA published a "draft" press release on its website, stating that it was changing one letter in its name to become "Voltswagen." (Compl. ¶ 106.) One hour later, after generating some media attention, VWGoA took down this "draft" press release. (*Id*. ¶ 107–110.) The following day, March 30, VWGoA republished its press release, which stated that the rebranding was "a public declaration of the company's future-forward investment in e-mobility." (Compl. ¶ 113.) The tweet following that press release read: "Introducing Voltswagen. Similar to Volkswagen, but with a renewed focus on electric driving." (Compl. ¶ 114.) None of these statements provided any information about VWGoA's financial performance, inventory, sales projections, or any other subject generally relevant to investors in a company's equity securities. VWAG did not make any statements as part of the "Voltswagen" joke.

---

[2] The ADRs referencing preferred shares trade under the symbol "VWAPY," while the ADRs referencing common shares trade under the symbol "VWAGY."

Many reporters correctly suspected the "Voltswagen" rebranding was a joke.  As alleged in the Complaint, journalists immediately began calling VWGoA to ask if it was serious given the proximity to April Fools' Day.  (Compl. ¶ 116.)  Some expressly drew a connection between the "Voltswagen" stunt and other companies' April Fools' jokes—such as IHOP's joke about rebranding itself as "IHOb" to sell more hamburgers.  (Compl. ¶ 104 (citing Boudette, *No, Volkswagen Is Not Renaming Itself Voltswagen*, N.Y. TIMES (Mar. 30, 2021)).)  On March 30, the same day that VWGoA issued the press release, a VWAG official told *The Wall Street Journal* that the name change was a joke intended to draw attention to VWGoA's electric vehicle business in the United States.  (Compl. ¶ 121.)

Prior to the reveal of the joke, ADRs referencing VWAG's common stock traded at a price of $37.75.  The price of those ADRs declined slightly over the next two days, and then rose to $37.16 on the first trading day after April Fools' Day.  ADRs referencing VWAG's preferred stock also fell slightly on March 31, the first day after the "Voltswagen" campaign, but rebounded on April 1 to close at a price higher than at any point during the joke.[3]

### C.    Plaintiffs' Claims Over VWGoA's "Voltswagen" Joke

A few weeks after the revelation of the "Voltswagen" joke, Defendants were sued in the Central District of California by a putative shareholder seeking to represent a class of investors allegedly harmed by the joke.  (*See Montag* v. *Volkswagen AG et al.*, No. 2:21-cv-3678 (C.D. Cal. 2021).)  After selecting a lead plaintiff to represent the class under the PSLRA, the court dismissed the case without prejudice when that plaintiff failed to serve the defendants.  (*Id*. ECF

---

[3] Defendants request that the Court take judicial notice of the publicly-available share price and trade volume data collected in Exhibit 1. *See, e.g.*, *Greenhouse* v. *MCG Cap. Corp.*, 392 F.3d 650, 655 (4th Cir. 2004) ("We note that we, as well as the district court, may take judicial notice of published stock prices without converting a motion to dismiss into a motion for summary judgment") (citing *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000)).

No. 40.)  Rather than re-file a complaint in California, the plaintiff started over in this Court.  This Court then selected yet a third plaintiff, Laszlo Rozsavolgyi, to represent the class.  In his declaration to serve as lead plaintiff, Mr. Rozsavolgyi represented that he had purchased "preferred shares" on March 30, 2021.  (*See* Rozsavolgyi Decl. Ex. 2, ECF No. 9 (March 15, 2022).)  On June 4, 2022, Mr. Rozsavolgyi filed his Amended Complaint.  That Complaint makes no mention of "preferred shares," but includes yet another plaintiff, Thomas Wells, who allegedly purchased 42 shares of "common stock" ADRs on March 30, 2021.  (Compl. ¶ 29.)

The Complaint alleges that Defendants committed securities fraud by making the "Voltswagen" joke.  Specifically, Plaintiffs allege that the "March 29 draft press release, March 30 press release, March 30 Twitter post, and news reports" from those two days "were false and misleading . . . because [VWGoA] had no plans to change its name to 'Voltswagen.'"  (Compl. ¶ 152).  Plaintiffs do not allege that the overarching message of the "Voltswagen" marketing campaign relating to VWGoA's electrification initiative was in any way false or misleading, or that the VWGoA's April Fools' joke differed from similar jokes carried out by companies every year around April 1.  Plaintiffs also do not allege that VWAG made any statements as part of the campaign.

Plaintiffs try to allege scienter—*i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud" investors—based on a generalized "desire to gain free publicity."  (Compl. ¶ 158.)  But they offer no facts relating to the mental state of either of the individual Defendants or any other person that can be attributed to VWGoA, other than the desire to publicize VWGoA's truthful commitment to electric vehicles.  The Complaint does not include any allegations about the mental state (or even the involvement) of *any* VWAG employee.

Finally, Plaintiffs claim that this marketing campaign harmed them because it supposedly caused the price of ADRs representing VWAG's ordinary shares to fall by 5%, even though the price rebounded the first trading day after April Fools' Day. (*Id*. ¶ 155.) Despite Plaintiff Rozsavolgyi's earlier representations about preferred shares, the Complaint includes no allegations about the price of ADRs referencing VWAG's preferred stock.

In addition to the allegations surrounding VWGoA's April Fools' joke, many pages of the Complaint document VWGoA's ongoing efforts to develop and market electric vehicles. (Compl. ¶ 83–105.) The Complaint does not allege that the Company committed any fraud related to those efforts, or that VWGoA is not in fact committed to the sale of electric vehicles.

## LEGAL STANDARDS

Section 10(b) of the Exchange Act does not apply extraterritorially. *Morrison*, 561 U.S. at 265. Extraterritoriality can and should be resolved on the pleadings. *Id*. at 254–255. To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Singer* v. *Reali*, 883 F.3d 425, 438 (4th Cir. 2018) (quotations omitted).

"To survive a motion to dismiss, private securities fraud plaintiffs must clear the hurdle of the Private Securities Litigation Reform Act of 1995 ('PSLRA')," *Matrix Cap. Mgmt. Fund, LP* v. *BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009), which serves as a "check against abusive litigation by private parties." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA requires Plaintiffs to do more than plead a claim that is "plausible on its face." *Francis*, 588 F.3d at 193 (quoting *Ashcroft*, 556 U.S. at 678). As relevant here, the PSLRA requires Plaintiffs to also (1) "specify each statement alleged to have been misleading [and] the

reason or reasons why that statement is misleading," and (2) "state with particularity facts giving rise to a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(1)-(2).

## ARGUMENT

Plaintiffs' allegations suffer from two critical defects.  *First*, the only transactions alleged in the Complaint involved *unsponsored* ADRs.  Plaintiffs purchased those ADRs from third-party banks, not from VWGoA or VWAG.  The value of those ADRs turned entirely on VWAG's common and preferred stock, which was listed on the Frankfurt Stock Exchange.  VWAG has no connection to those ADRs and cannot stop third parties from offering them in the United States.  *Second*, Plaintiffs' Complaint rests entirely on an April Fools' Day joke, not a willful attempt to defraud investors about some financial or operational metric they may find relevant.  The "Voltswagen" campaign included vague marketing statements, not concrete guarantees of fact.  Defendants always intended to reveal the joke shortly after it began.  And Plaintiffs cannot demonstrate that the market responded to the "Voltswagen" joke in any way.  The Complaint should be dismissed with prejudice.

## I.    THE COMPLAINT MUST BE DISMISSED BECAUSE IT RELIES EXCLUSIVELY ON TRANSACTIONS IN UNSPONSORED VWAG AMERICAN DEPOSITARY RECEIPTS.

Plaintiffs cannot pursue a claim against Defendants based on unsponsored ADRs for two reasons.  *First*, Section 10(b) does not apply extraterritorially, and the value of the unsponsored ADRs referenced in the Complaint turns entirely on the value of a foreign stock listed and traded on a foreign exchange.  *Second*, the alleged misstatements in the Complaint had no "connection with" Plaintiffs' ADR transactions.  Plaintiffs purchased those ADRs from third party banks, and neither VWAG nor VWGoA participated in, encouraged, or benefitted from those transactions in any way.

A.    **Plaintiffs' Claim Must Be Dismissed Because Section 10(b) Does Not Apply Extraterritorially.**

In *Morrison*, 561 U.S. at 265, the Supreme Court held that Section 10(b) of the Exchange Act does *not* apply to foreign securities transactions. As a result, only two categories of securities transactions, neither relevant here, may fall within the territorial reach of Section 10(b): (1) "transactions in securities listed on domestic exchanges," and (2) "domestic transactions in other securities." *Id*. at 267. The only transactions alleged in the Complaint involve *unsponsored* VWAG ADRs.

As shown above, those securities do not trade on "domestic exchanges," and Defendants had no involvement in their sale. The value of those securities was entirely dependent on the value of a foreign asset: VWAG's common shares, which are listed only on European exchanges. As the Second Circuit has already held—in a case involving "VW shares [that] trade on the Frankfurt Stock Exchange"—transactions in the United States, there, swap transactions, that simply referenced a foreign security are beyond the reach of Section 10(b). *See Parkcentral Global Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 207 (2d Cir. 2014).

1.    **Purchases of Unsponsored ADRs Over the Counter Are Not "Transactions in Securities Listed on Domestic Exchanges."**

Under *Morrison*'s first prong—"transactions in securities listed on domestic exchanges"—a "domestic exchange" is simply one of the "national security exchanges" registered by the Securities and Exchange Commission. *See United States* v. *Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015); *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, 2021 WL 3863372, at *2 (S.D.N.Y. Aug. 30, 2021). That conclusion follows directly from the text of *Morrison*, which explained that "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an *American stock exchange* . . . ." 561 U.S. at 273 (emphasis added). The SEC maintains a list of the national security exchanges

-9-

registered under Section 6 of the Exchange Act.  *See* SEC, National Security Exchanges (Apr. 25, 2022), *available at* https://www.sec.gov/fast-answers/divisionsmarketregmrexchangesshtml.html. Because Plaintiffs allege that VWAG unsponsored ADRs trade only on OTC markets, and "OTC markets are not national security exchanges within the scope of *Morrison*," *Georgiou*, 777 F.3d at 135, the Complaint cannot satisfy *Morrison*'s first prong.

### 2. Plaintiffs' Purchases of Unsponsored ADRs Were "Predominantly Foreign" Transactions.

To satisfy *Morrison*'s second prong, a plaintiff must demonstrate both (1) that "irrevocable liability" for the transaction was incurred within the United States, and (2) that the transaction was not "predominantly foreign."  *Porsche Auto. Holdings SE*, 763 F.3d at 216. Plaintiffs' transactions in *unsponsored* ADRs, which "are pegged to the value" of an underlying foreign asset, *Prime Int'l Trading, Ltd.* v. *BP P.L.C.*, 937 F.3d 94, 106 (2d Cir. 2019), cannot satisfy that test.

Although the Fourth Circuit has yet to weigh in on *Morrison*'s "domestic transaction" requirement, every court of appeals to address the issue has held that a "domestic transaction" requires that "irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). *See also Stoyas* v. *Toshiba Corp.*, 896 F.3d 933, 949 (9th Cir. 2018) ("We are persuaded by the Second and Third Circuits' analysis and therefore adopt the irrevocable liability test to determine whether the securities were the subject of a domestic transaction."); *Georgiou*, 777 F.3d at 136. The Second Circuit has further explained that, even when the "irrevocable liability" test is satisfied, transactions that are "predominantly foreign" are beyond the reach of Section 10(b). *Porsche Auto. Holdings SE*, 763 F.3d at 216.

In *Porsche*, the Second Circuit confronted a Section 10(b) claim based on "securities-based swap agreements" entered into within the United States. *Id*. at 206. Those swap agreements referenced VWAG's shares, which (as explained above) trade only on foreign exchanges. *Id*. at 207. Applying *Morrison*, the court held that the claim was impermissibly extraterritorial. As the court explained, applying Section 10(b) to a transaction based entirely on the value of a foreign asset "would seriously undermine *Morrison's* insistence that § 10(b) has no extraterritorial application," and would "subject to U.S. securities laws conduct . . . concerning securities in a foreign company, traded entirely on foreign exchanges." *Id*. at 215–16. Although that reasoning has not yet been applied to ADRs, the Second Circuit has applied *Porsche* to transactions in other securities that (like ADRs) are pegged to the value of a foreign asset. *See Prime Int'l Trading*, 937 F.3d at 106 (discussing futures contracts pegged to the price of crude oil trading in Europe).

The Second Circuit's reasoning is correct and compels dismissal here. VWAG took no steps to facilitate the offer or sale of *unsponsored* ADRs in the United States. Those ADRs were offered independently by U.S. banks to facilitate investment in a foreign market. Those securities reference VWAG's ordinary and preferred stock, which is listed only on European exchanges. Plaintiffs acknowledge that transactions in unsponsored ADRs are "equivalent to" a transaction in a foreign asset—just like the swap agreements in *Porsche* or the futures agreements in *Prime International Trading*. (Compl. ¶ 49.)[4] Accordingly, the Complaint must be dismissed because it is based on an extraterritorial application of Section 10(b).

---

[4] Although *Porsche* and *Prime International Trading* noted that the relevant conduct in those cases occurred abroad, that fact did not drive the outcome in either case. In *Morrison*, the Supreme Court rejected the "conduct or effects" test for determining the territorial reach of Section 10(b), which considered where the relevant conduct occurred. *Porsche* did not revive that analysis. As the Second Circuit explained in *Cavello Bay Reinsurance Ltd.* v. *Shubin Stein*, the "predominantly

-11-

The consequences of allowing this claim to go forward reinforce that conclusion. If Plaintiffs are able to pursue a securities fraud suit based solely on unsponsored ADRs, then American securities law could be applied to any foreign company that offers no securities in the United States and is already subject to European securities regulations. That is the very problem *Morrison* aimed to prevent. 561 U.S. at 269 (noting "the interference with foreign securities regulations that application of § 10(b) abroad would produce"); *Prime Int'l Trading*, 937 F.3d at 106 (explaining that a contrary rule would lead to "unintended clashes between our laws and those of other nations" and would "carr[y] foreign policy consequences not clearly intended by the political branches").[5]

Put simply, *Porsche* recognizes—as *Morrison* did—that Section 10(b) does not regulate the conduct of a foreign company that does not trade securities in the United States and that does not list its securities on an American stock exchange. Because Plaintiffs' complaint seeks to do exactly that, it must be dismissed.

**B.      Plaintiffs' Claims Must Be Dismissed Because the Alleged Misstatements Were Not Made "In Connection With" Unsponsored ADRs.**

Even if Plaintiffs could demonstrate that unsponsored ADRs are somehow domestic, the nature of those securities poses a different problem for their claim: VWGoA's statements were not made "in connection with" ADRs that VWAG and VWGoA did not sponsor, did not trade, did not benefit from, and did not influence in any way. Unlike sponsored ADRs,

---

foreign" test looks to the facts concerning the *transaction*. 986 F.3d 161, 166–167 (2d Cir. 2021) ("[E]ven if a transaction occurs in the United States, the features and incidents of the transaction may nevertheless be so foreign that it is not regulated by § 10(b).").

[5] Although two courts of appeals have disagreed with *Porsche,* they have failed to explain how their alternative approach accommodates *Morrison*'s concern that allowing securities fraud suits against foreign companies that do not trade securities in the United States would lead to clashes between our laws and those of other nations. *See Stoyas*, 896 F.3d at 950; *SEC* v. *Morrone*, 997 F.3d 52, 60 (1st Cir. 2021).

which are "established jointly by a deposit agreement between [a] foreign company" and a U.S. bank, unsponsored ADR programs "do not involve the formal participation, *or even require the acquiescence* of" VWAG.  *See* SEC, *Additional Form F-6 Eligibility Requirements Related to the Listed Status of Deposited Securities Underlying American Depositary Receipts*, 68 Fed. Reg. 54,643, 54,645 (Sept. 17, 2003) ("SEC F-6 Proposed Rule").  As the SEC has recently explained, Section 10(b)'s "in connection with" requirement prevents securities fraud plaintiffs from using unsponsored ADR transactions—which involve only the plaintiff and an independent third party, *supra*, at 4—to drag foreign companies into U.S. courts.

Rule 10b-5 only prohibits conduct that is "in connection with the purchase or sale of any security."  The "in connection with" language requires a "transactional nexus," which "prohibits claims based on the extremely attenuated links between the plaintiff's injury and defendant's conduct as alleged."  *In re Fin. Corp. of Am. S'holder Litig.*, 796 F.2d 1126, 1130 (9th Cir. 1986) (citation omitted).  To decide whether that connection has been established, important considerations include "whether a securities sale was necessary to the completion of the fraudulent scheme," "whether the parties' relationship was such that it would necessarily involve trading in securities," and "whether the defendant intended to induce a securities transaction."  *SEC* v. *Pirate Investor LLC*, 580 F.3d 233, 244 (4th Cir. 2009).

Relatedly, Courts have long rejected securities fraud suits brought by plaintiffs against a company "whose stock they [did] not purchase."  *Ontario Pub. Servs. Emps. Union Pension Tr. Fund* v. *Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004).   In *Nortel Networks*, for instance, the Second Circuit rejected a claim brought by a class of investors who "instead of purchasing securities of the entity that made the alleged misrepresentations, . . . purchased securities of a company that had a business relationship with the misrepresenter."  *Id*. at 32.  As

the Court explained, Section 10(b) does not provide a cause of action for any plaintiff "affected in some way by the misrepresentation." *Id.*; *see also Harbinger Capital Partners LLC* v. *Deere & Co.*, 632 Fed. Appx. 653, 656 (2d Cir. 2015) (applying *Nortel Networks* to dismiss similar claims and reasoning that the connection between the defendants' omissions and the plaintiffs' stock purchase was "too remote to sustain an action under 10(b)") (internal citation omitted); *Klein* v. *Altria Grp., Inc.*, 525 F. Supp. 3d 638, 658 (E.D. Va. 2021) (allowing the shareholders of one company to pursue a claim against a different company because, *inter alia*, the two firms "conducted a scheme together").[6]

The misstatements alleged in the Complaint were not connected to Plaintiffs' transactions in unsponsored ADRs. Defendants were not parties to those transactions. Defendants did not take any steps to encourage trading in unsponsored ADRs in the United States, nor did Defendants file any reports with the SEC associated with those securities. Applying the factors identified in *Pirate Investors*, a "securities sale" could not have been important to any scheme because VWAG did not sell the securities at issue in this case. "The parties' relationship" did not involve "trading in securities" because VWAG had no relationship with Plaintiffs, even though it sells securities to many investors through foreign exchanges. And Defendants clearly did not "intend[] to induce a securities transaction" in ADRs that they did not offer for sale or sponsor.

---

[6] *Nortel Networks* addressed the disconnect between the misrepresentation and the securities at issue as a question of statutory standing. Although this Court may wish to dismiss Plaintiffs' claim on that basis given the similar disconnect between the "Voltswagen" campaign and ADRs, the Second Circuit in *Nortel Networks* noted the similarities between the statutory standing analysis and the "in connection with" requirement, and distinguished cases addressing the "in connection with" requirement. 369 F.3d at 33–34 (distinguishing *Semerenko* v. *Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000)). *See Fogel* v. *Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at 12, n.14 (S.D.N.Y. 2017) (discussing *Nortel Networks* in the context of the "in connection with" requirement); *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 902 n.23 (E.D. Tenn. 2005) (same).

To the contrary, VWAG terminated its sponsored ADR program years before Plaintiffs' asserted class period commenced. (Compl. ¶ 53.) By purchasing *unsponsored* ADRs, Plaintiffs are in the same shoes as the shareholders in *Nortel Networks* and the host of cases that rely on it. Instead of purchasing VWAG's securities, Plaintiffs purchased securities that have no connection to VWAG, but may be affected by the Company's actions. Under Section 10(b), that is not enough.

The SEC has recently explained why the "in connection with" requirement may not be satisfied when a claim, like Plaintiffs', is based solely on *unsponsored* ADRs. *Brief for the United States as Amicus Curiae* at 16, *Toshiba Corp.* v. *Automotive Indus. Pension Tr. Fund*, No. 18-486 (U.S. May 20, 2019).[7] According to the SEC, "the distinction between sponsored and unsponsored ADRs . . . may be relevant" to the "in connection with" requirement. *Id*. "[I]f [a defendant] can show that it chose to list and transact its securities only in foreign markets precisely to avoid U.S. securities regulation and litigation, it [will] be more difficult for respondents to prove that petitioner's . . . fraud was 'in connection with' domestic ADR purchases." *Id.* That describes this case to the letter. Since VWAG did not sponsored ADRs, it could not have committed wrongdoing *in connection with* their sale.[8]

---

[7]In *Toshiba*, the SEC took the position that a foreign company's "involvement or non-involvement in the unsponsored ADRs has no bearing on the extraterritoriality analysis, but instead should be considered in determining whether petitioner's fraud was 'in connection with' . . . ADR purchases." *Id*. at 8–9. On remand, the district court held that the "in connection with" requirement was satisfied because the plaintiffs had "sufficiently alleged Toshiba's plausible participation in the establishment of the ADR program" by alleging facts about the volume of Toshiba shares held by U.S. banks offering unsponsored ADRs. *Stoyas* v. *Toshiba Corp.*, 424 F. Supp. 3d 821, 828 (C.D. Cal. 2020). That decision is not persuasive. The relevant question is whether the foreign company is connected to the ADR transactions between a U.S. bank and investors, not whether the foreign company sells stock to a U.S. bank.

[8] This application of the "in connection with" requirement differs from the question of whether a party who does not offer securities, such as a broker, can be held liable for committing fraudulent acts with securities under the party's control. *See, e.g.*, *SEC* v. *Zandford*, 535 U.S. 813 (2002). In that situation, the defendant has taken deliberate acts respecting the securities at issue. Here, by contrast, Defendants took no action whatsoever respecting VWAG's unsponsored ADRs.

-15-

Plaintiffs resist that conclusion by alleging "[i]t is a regular practice and custom in the industry for a depository institution to notify" a foreign company about an unsponsored ADR program, and that "a depository institution ordinarily will not proceed" if the foreign company objects. (Compl. ¶ 64.) Whatever the "regular" or "ordinary" practice might be, the Complaint does not allege that *VWAG* was aware of the unsponsored ADRs at issue here, and Plaintiffs have therefore failed to establish the connection required by Section 10(b). But even if those allegations had been made, a company is not connected to a transaction simply because it does not stop the transaction from happening. If VWAG wanted to establish a connection to an ADR program, it would have sponsored one. *See* SEC Proposed F-6 Eligibility Rule, at 54,645 (explaining that unsponsored ADRs do not require the "acquiescence of the foreign company").[9] On Plaintiffs' view, the choice to sponsor or to not sponsor an ADR program has no consequences, as the foreign company could be forced to defend a U.S. securities suit either way.

* * *

Plaintiffs seek to litigate a case under United States securities laws against a foreign company that does not offer securities in the United States and has not taken any actions with respect to domestic securities transactions. The securities laws do not permit that result. Either Plaintiffs' ADR transactions were "equivalent" to transactions in VWAG's European stock, as Plaintiffs' allege, in which case Plaintiffs' claim is extraterritorial, or those ADR transactions were

---

[9] In 2008, the SEC finalized a rule that made it much easier for U.S. banks to establish unsponsored ADR programs. *See* SEC, *Exemption From Registration Under Section 12(G) of the Securities Exchange Act of 1934 for Foreign Private Issuers*, 73 Fed. Reg. 52,752 (Sept. 10, 2008). At the time, commenters asked the agency to amend its regulation to require that foreign issuers consent to unsponsored ADR programs. *Id*. at 52,762. The agency refused to impose that requirement, instead allowing banks to establish those programs entirely on their own. *Id*.

domestic transactions with third-party depositary institutions, in which case VWAG or VWGoA had no connection to them. Plaintiffs cannot have it both ways.

**II. THE COMPLAINT MUST BE DISMISSED BECAUSE VWGoA's "VOLTSWAGEN" CAMPAIGN WAS NOT SECURITIES FRAUD.**

Although Plaintiffs attempt to convert VWGoA's April Fools' joke into a scheme to defraud investors, the simple fact is that such marketing efforts do *not* constitute securities fraud. That conclusion is not only obvious on its face; it follows from blackletter securities law.

**A.    Plaintiffs Fail to Allege That VWAG Made Any Statement.**

Rule 10b-5 prohibits "making any untrue statement of a material fact." Under that provision, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp.*, 564 U.S. at 142. The Complaint does not allege that VWAG made any statement at all, and for that reason alone Plaintiffs' claims against VWAG must be dismissed. *See In re Optimal U.S. Litig.*, 2011 WL 4908745, at *5 (S.D.N.Y. 2011) (holding that, under *Janus*, the parent of a wholly-owned subsidiary did not "make" the statements issued by its subsidiary).

**B.    Plaintiffs Fail to Allege with Particularity Any Material Misstatement.**

"The materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc.* v. *Levinson*, 485 U.S. 224, 232 (1988)). A misstatement is material only if it is "sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome." *City of Pontiac Policemen's & Fireman's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). Materiality is a "contextual inquiry," which requires examining the surrounding facts known to the market. *Matrixx*

*Initiatives*, 563 U.S. at 44. "It is important to note that a 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." *Greenhouse*, 392 F.3d at 656.

No reasonable investor would base an investment decision on the "Voltswagen" joke. *First*, the campaign began right before April Fools' Day, a time when many major companies have tried advertising gimmicks to generate media coverage—including by joking about rebranding the company. For instance, Tesla, another automaker, issued a press release on April 1, 2015 about a new "Model W" watch. Tesla, *Announcing the Tesla Model W* (April 1, 2015), *available at* https://www.tesla.com/blog/announcing-tesla-model-w. Another car company, BMW, posted a video on social media "introducing the latest charging technology" in the form of "BMW lunar paint" on March 31, 2019. BMW UK (@BMW_UK), TWITTER (Mar. 31, 2019, 11:25 p.m.), *available at* https://twitter.com/BMW_UK/status/1112601787117248512. And the International House of Pancakes ("IHOP") temporarily joked it would change its name to "IHOb" to "convey" that IHOP "tak[es] [its] burgers as seriously as [its] pancakes." *See* Paul R. La Monica, *IHOP Reveals the Mystery of IHOb*, CNN BUS. (June 11, 2018, 8:17 a.m.), *available at* https://money.cnn.com/2018/06/11/investing/ihob-ihop-burgers-name-change/.[10]

A reasonable investor was surely aware that playful advertising campaigns in the run-up to April Fools' Day did not reflect permanent changes in a company's business or strategy. The Complaint acknowledges that many journalists expressed confusion as to whether the "Voltswagen" name change was real. (Compl. ¶ 116.)    This Court cannot ignore the obvious "context of all of the information publicly available" when deciding whether the "Voltswagen"

---

[10] *See Philips* v. *Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("In reviewing a Rule 12(b)(6) dismissal, [this Court] may properly take judicial notice of matters of public record.").

campaign would mislead reasonable investors. *Philips* v. *LCI Int'l, Inc.*, 190 F.3d 609, 615 (4th Cir. 1999).

*Second*, even if the context surrounding April Fools' Day were not dispositive, VWGoA's actual statements during the campaign were not materially misleading. A statement is material only if it leads reasonable investors to form an impression about "something consequential." *In re Marriott Int'l, Inc.*, 31 F.4th 898, 901 (4th Cir. 2022). Here, the joke itself—which said that VWGoA was changing a single letter in its name—was clearly immaterial.

Investors care about "specific business projects" when deciding where to put their money, not "commonplace commercial puffery." *Raab*, 4 F.3d at 289 n.1. Standing alone, a corporate rebranding (especially one as minor as the "Voltswagen" joke) is no different from the many "puffing" statements that companies make about their business, *see Carlucci* v. *Han*, 886 F. Supp. 2d 497, 522 (E.D. Va. 2012), and "[is] not specific enough to perpetrate a fraud on the market." *Malone* v. *Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994). Moreover, the fact that the "Voltswagen" joke was technically not true (as jokes inherently are) did not make it material to investors. *See Greenhouse*, 392 F.3d at 661 (holding at the motion to dismiss stage that a company's false statement that its CEO finished his Bachelor's Degree was not material).

The only "consequential" fact reasonable investors could possibly take away from the "Voltswagen" joke (putting to the side their likely skepticism in the first place) was that VWGoA is committed to producing electric vehicles. Plaintiffs seem to agree, noting that the "Voltswagen" campaign was rolled out shortly after VWGoA made other efforts to promote its new electric car, the ID.4. (Compl. ¶ 105.) But if investors who saw the "Voltswagen" materials formed the impression VWGoA was serious about pursuing the electric vehicle market, they were in no way misled. VWGoA was investing heavily in electric cars like the ID.4 and—name change

or not—was pursuing ambitious plans for those vehicles. The Complaint does not suggest otherwise.

Materiality requires examining both the context in which statements are made and the specific representations those statements communicate to the market. Here, Plaintiffs have challenged an April Fools' Day joke that drew attention to the company's electric car business. A reasonable investor would not rely on a joke when deciding where to put her money. And if she did, all she would take away is an accurate assessment: VWGoA is committed to electric vehicles.

## C. Plaintiffs Fail Entirely to Plead That Any Defendant Intended to Defraud.

Under the PSLRA, Plaintiffs have the burden to plead "with particularity facts giving rise to the strong inference" that Defendants acted with the "intent to deceive, manipulate, or defraud" investors or "severe recklessness" as to that result. *Maguire Fin., LP* v. *PowerSecure Int'l, Inc.*, 876 F.3d 541, 546–47 (4th Cir. 2017) (citations omitted). The Complaint must demonstrate scienter as to each individual Defendant and, for VWAG and VWGoA, "must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation." *Yates* v. *Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014). And the allegations must create "a strong inference, at least as compelling as any opposing inference, that the . . . defendant either knowingly or recklessly defrauded investors." *Id*. In determining if a Complaint meets that high bar, courts in the Fourth Circuit "evaluate plaintiffs' allegations of scienter holistically" and "only afford their allegation[s] the inferential weight warranted by context and common sense." *Matrix Cap.*, 576 F.3d at 183 (quoting *Cozzarelli* v. *Inspire Pharm. Inc.*, 549 F.3d 618, 625-626 (4th Cir. 2008)).

The Complaint contains no allegations about any single employee of VWAG. That alone warrants dismissal of Plaintiffs' claim against that entity. As to VWGoA, any consideration of "context" or "common sense" dooms Plaintiffs' claim here. Plaintiffs acknowledge that

-20-

VWGoA carried out the joke for "marketing and public relations" reasons. (Compl. ¶ 158.) They could hardly argue otherwise, considering that VWGoA always intended to reveal the joke very shortly after making it, and in fact revealed the joke the very next day. Moreover, nothing about the joke was in any way tied to VWGoA's financial performance or prospects.

Nonetheless, Plaintiffs argue that this particular April Fools' joke, unlike so many others, "presented a danger of misleading investors that was so obvious that Defendants must have been aware of it." (Compl. ¶ 161.) To support that broad assertion, Plaintiffs offer none of the allegations that are familiar to securities fraud suits. The Complaint fails to allege any "sale[s] of personally-held stock or insider trading" by the individual Defendants—allegations the Fourth Circuit has previously deemed necessary to demonstrate a motive to defraud. *Philips*, 190 F.3d at 622. "[P]laintiffs have not alleged the existence of any internal documents . . . or other direct statements contradicting the inference that defendants acted with lawful intent," meaning that Plaintiffs "have the difficult task of establishing a countervailing, cogent inference of scienter through indirect and circumstantial allegations." *Cozzarelli*, 549 F.3d at 626. And most importantly, the Complaint fails to allege that any employee involved with the campaign worked in investor relations, or even contemplated that the joke would influence investors in any way.

Turning to the circumstantial allegations here, the Complaint comes nowhere close to establishing either an "intent to deceive" or "severe recklessness" as to that result by any of the defendants in this case.

*First*, Plaintiffs argue that the Defendants knew the joke could mislead investors because of an alleged SEC investigation into VWGoA's conduct launched *after* the campaign was complete. (Compl. ¶ 163.) Defendants' state of mind cannot be proven by facts that only arose *after* the alleged misstatements, however, and Plaintiffs have offered no explanation for that

-21-

counterintuitive proposition. *See Brophy* v. *Jiangbo Pharma., Inc.*, 781 F.3d 1296, 1307 (11th Cir. 2015) ("[T]here is no connection between the fact of an SEC investigation and [defendant's] state of mind that a reviewing court may reasonably draw on the face of the complaint."); *Cozzarelli*, 549 F.3d at 628 n.2.

*Second*, Plaintiffs claim that the individual Defendants must have been aware of a separate SEC enforcement action based on Elon Musk's misstatements about taking Tesla private, and were "doubtlessly aware of [the] similarity" between Musk's statements and the "Voltswagen" joke. (Compl. ¶ 162.) In fact, the Complaint contains no "particular facts" demonstrating that any individual Defendant (or anyone else at VWGoA) was actually aware of the SEC investigation and there is no resemblance between Musk's misstatements and the "Voltswagen" joke. Musk tweeted that he had "secured funding" to take Tesla private at "the highly specific price of $420 [a] share," even though no funding had been lined up. *See In re Tesla Sec. Litig.*, 477 F. Supp. 3d 903, 924 (N.D. Cal. 2020). His tweets followed extensive negotiations with a Saudi wealth fund about a going-private transaction, and stated that a shareholder vote was needed to finalize the deal. The Tesla case involved specific communications about the price of the investors' shares and false statements about the company's future governance structure; the "Voltswagen" joke followed a long line of similar marketing efforts in the run-up to April Fools' Day. It had nothing to do with the share price or any financial metric, but instead had every indicia of a joke.

*Third*, Plaintiffs allege that scienter is established because Mr. Keogh and Mr. Gillies "knew at all times that the Company had no plans to change its name to Voltswagen," despite telling reporters that the rebranding was moving forward. (Compl. ¶ 157.) That argument improperly "fuses an inference that [a defendant] knew enough to realize that his characterization was technically incorrect with an inference that he intended it to deceive" investors. *Maguire Fin.*,

-22-

876 F.3d at 548. "[S]cienter and knowledge with respect to misrepresentation are distinct components" of a securities law claim, and knowingly making a false statement is not enough to show an "intent to mislead." *Id*. That position is also at odds with common sense. Companies routinely make "false" statements in advertising and marketing campaigns without any intent to defraud investors. (Consider Geico's famous line: "so easy a caveman can do it.") Neither law nor logic supports converting routine advertising campaigns involving public companies into securities class actions.

The PSLRA calls for a "comparative inquiry" of Plaintiffs' allegations against "plausible opposing inferences." *Tellabs*, 551 U.S. at 323. Here, the Complaint supports one obvious inference: VWGoA made a joke that was revealed the next day. The alleged misstatements occurred right before April 1, exactly when a reasonable investor would expect such a joke. The company communicated this joke through journalists and social media accounts rather than in its securities filings or investor calls. And the company's chosen name for the joke, "Voltswagen," was obviously designed to draw attention to a very real focus on electric vehicles.

Rather than attempt to conceal some fact from the market for their own benefit, Defendants revealed the joke shortly after it began, as they always intended to. *See Matrix Cap.*, 576 F.3d at 192 (explaining that plaintiffs' scienter allegations were "weakened by the fact that [Defendant] clarified the allegedly misleading statement one month later"); *Yates*, 744 F.3d at 888 ("find[ing] it significant that it was [the company]—and not some outside entity—that ultimately disclosed" information correcting the earlier misstatements). Put simply, like many other companies, VWGoA engaged in some lighthearted jesting for marketing purposes. The campaign was successful in drawing coverage for its electrification initiative, just as Defendants hoped. Nothing about that effort suggests that VVWGoA or VWAG intended to deceive investors or

"must have been aware" that investors would be harmed by the prank. Plaintiffs' meager allegations do nothing to refute that obvious conclusion.

Finding that Plaintiffs have established a "strong inference" of scienter on these facts would be unprecedented. Since the enactment of the PSLRA, the Fourth Circuit has published 12 decisions reviewing the dismissal of a securities fraud case for failure to plead scienter. The Circuit affirmed the district court's judgment in 10 of them, including in many cases where plaintiffs alleged that a public company engaged in knowing misconduct over a long period of time concerning issues central to the business's prospects. *See KBC Asset Mgmt., NV* v. *DXC Tech. Co.*, 19 F.4th 601, 606 (4th Cir. 2021) (dismissing allegation that defendant knowingly failed to disclose that its cost-cutting measures were causing substantial declines in revenue); *Maguire Fin.*, 876 F.3d at 544–545 (dismissing allegation that defendant knew about the termination of a contract but stated that it was renewed, causing the share price to decline by 62% when the truth was revealed); *Matrix Cap.*, 576 F.3d at 179 (dismissing allegation that defendant misstated its accounting and internal control procedures for years, ultimately leading to updated financial reports showing much lower revenues). Despite the seriousness and specificity of the allegations in these cases, the Fourth Circuit concluded that "legitimate business motivations explain each of the facts alleged in the complaint more convincingly than plaintiff's tenuous theory of wrongful intent." *Cozzarelli*, 549 F.3d at 627.

The Fourth Circuit's two decisions holding that scienter had been adequately pleaded demonstrate both the demands imposed by the PSLRA and the serious deficiencies in the Complaint. In *Singer*, the plaintiff alleged defendants knew of a fraudulent and illegal reimbursement scheme and failed to disclose that scheme to trick the market for more than two years. 883 F.3d at 429–430. When the scheme was revealed following a federal subpoena, the

-24-

company's share price fell 40%. *Id*. at 434. Similarly, in *Zak*, a drug company submitted an application for a new drug to the FDA while aware of the high risk its application would be denied. *Zak* v. *Chelsea Thera. Int'l, Ltd.*, 780 F.3d 597, 602–03 (4th Cir. 2015). Rather than disclosing that risk, the defendants continued to release misleading information, suggesting the FDA would approve the drug. When the truth was revealed, after four years of misleading statements, the defendants' share price declined by 37.5%. Despite the strength of the plaintiffs' evidence in *Singer* and *Zak*, both cases were decided by divided panels, with dissents arguing that the complaints failed to allege scienter under the PSLRA. *Singer*, 883 F.3d at 453 (Agee, J. dissenting); *Zak*, 780 F.3d at 612 (Thacker, J. dissenting).

Plaintiffs' allegations come nowhere close to *Singer* and *Zak*. Those cases involve a prolonged fraud meant to conceal major issues that were core to a business's performance. In both cases the fraud was only revealed when external events forced the company's hand several *years* later. And most importantly, the defendants in those cases stood to gain from deceiving investors by hiding major weaknesses from public view. Here, by contrast, Plaintiffs challenge a joke that played out over two days, which involved no misrepresentations about VWGoA's business, inured no personal benefit to any individual Defendant, and was revealed by the Defendants themselves.

> **D.     Plaintiffs Fail to Plead That VWGoA's "Voltswagen" Joke Affected the Price of the Unsponsored ADRs Traded in the United States.**

The PSLRA also places on Plaintiffs "'the burden of proving' that [D]efendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover.'" *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 345–346 (2005) (citing 15 U.S.C. § 78u-4(b)(4)). To adequately plead loss causation, the Complaint "must allege a sufficiently direct relationship" between the "Voltswagen" campaign and Plaintiffs alleged losses. *Katyle* v. *Penn Nat. Gaming, Inc.*, 637 F.3d

-25-

462, 472 (4th Cir. 2011); *see also Teacher's Ret. Sys. of Louisiana* v. *Hunter*, 477 F.3d 162, 186 (2007). At the motion to dismiss stage, a plaintiff must "at least plead a theory of economic loss, supported by allegations showing that Defendants' conduct is a substantial cause of that loss." *Carlucci* v. *Han*, 886 F. Supp. 2d 497, 527 (E.D. Va. 2012). Plaintiffs have not met that burden here.

*First*, the theory of loss causation set forth in the Amended Complaint—that the "Voltswagen" joke caused the price of unsponsored common stock ADRs to decline by $2.17 between March 30 and April 1 (Compl. ¶ 155)—is nonsensical. There are two types of unsponsored ADRs that reference VWAG's stock traded on the Frankfurt Stock Exchange: common stock ADRs and preferred stock ADRs. Although these securities trade separately, they are "virtually identical."[11] Yet the price of preferred stock ADRs actually rose on April 1.[12] Not only does the Amended Complaint fail to offer a plausible explanation for this discrepancy, it does not mention preferred stock ADRs at all—even though that was the security identified by the lead plaintiff in his application to represent the class, *supra*, at 5.[13] *See Miller* v. *Asensio & Co., Inc.*, 364 F.3d 223, 230 (4th Cir. 2004) (explaining that loss causation "function[s] as a gate-keeping requirement designed to forestall attenuated, and difficult to prove, claims").

*Second*, even focusing only on the price of common stock ADRs, the Amended Complaint does not show that the "Voltswagen" joke harmed investors. According to Plaintiffs,

---

[11] *See* Stephen Wilmot, *Don't Buy the Wrong Volkswagen*, WALL ST. J. (March 24, 2021).

[12] On April 1, the preferred stock ADRs rose by 1.4%, while the common stock ADRs declined by 2.0%.

[13] Plaintiffs' action is brought "on behalf of a class consistent of all persons other than Defendants who acquired Volkswagen's ADSs (common shares)" during the class period (Compl. ¶ 165), and does not include any allegations regarding preferred stock ADRs. To the extent Mr. Rozsavolgyi only purchased preferred stock ADRs, his claim must be dismissed.

the first public reporting of the joke occurred in the middle of the trading day on March 29. (Compl. ¶ 5.) Following that report, the common stock ADRs closed at a price of $34.65. But the price was actually higher after the joke was revealed:  The ADRs were trading at $36.30 by the end of March 31, and $35.58 by the end of April 1. Plaintiffs make much of the small price decline following the close of trading on March 30. But they fail to mention that the stock rose by more than 4% on the first full trading day after April 1, closing at a price of $37.16.[14]

Courts have routinely held, at the motion to dismiss stage, that a sharp rebound in share price after an alleged corrective disclosure can defeat allegations of loss causation. *See Wochos* v. *Tesla*, 985 F.3d 1180, 1197 (9th Cir. 2021) (explaining that "where . . . a 'modest' drop in the stock price coincides with the disclosure of certain news but then recovers very shortly after, the allegation of loss causation may be insufficient") (citation omitted); *In re Immucor, Inc. Sec. Litig.*, 2011 WL 2619092, at *4 (N.D. Ga. June 30, 2011) (dismissing a complaint where, within a few months, "the share price rebounded to pre-disclosure levels"); *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011) ("While such a 'rebound' in a stock price after an alleged corrective disclosure does not make the allegation implausible per se, the Lead Plaintiffs' failure to address or explain this rebound renders their loss causation allegation implausible in this case.").

*Third*, the Complaint does not allege there was unusually high trading volume associated with the "Voltswagen" joke. That is a telling omission. If the revelation of the joke really caused investors to sell off unsponsored ADRs referencing VWAG shares, then there would

---

[14] On June 7, 2022, roughly two months after April Fools' Day, the common stock ADRs were trading at $38.35, a price higher than at any point during the "Voltswagen" campaign. *See Hunter*, 477 F.3d at 189 (dismissing a complaint alleging that a share price declined following an event in June 2003 when it had recovered by the end of the year).

likely be unusually high trading following March 30.  *See, e.g.*, *Yates*, 744 F.3d at 883 (noting plaintiff's allegation of "unusually heavy trading volume").   But the Complaint includes no allegations on that score, likely because the trading volume for common stock ADRs was actually lower on March 31 and April 1 than it was for the average day the prior week.  *See* Exhibit 1.

All told The Complaint alleges nothing more than ordinary price fluctuation. Plaintiffs have therefore failed to plead loss causation with the "sufficient specificity" that would "enable the court to evaluate whether the necessary causal link exists." *Hunter*, 477 F.3d at 186.

## III.    PLAINTIFFS' CLAIM UNDER SECTION 20(a) OF THE EXCHANGE ACT FAILS BECAUSE NO DEFENDANT VIOLATED SECTION 10(b).

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable" under Section 10(b) "shall also be liable jointly and severally" for that violation.   15 U.S.C. § 78t(a).   "A claim of control person liability must allege: (1) a predicate violation of § 10(b) and (2) control by the defendant over the primary violator." *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 129 (4th Cir. 2009), *rev'd on other grounds*, *Janus Cap. Grp., Inc.* v. *First Deriv. Traders*, 564 U.S. 135 (2011).   Because Plaintiffs' Section 10(b) claim suffers from numerous fatal defects, the Complaint does not allege a predicate violation required to establish liability under Section 20(a).

### CONCLUSION

For the reasons set forth above, Defendants respectfully request the Court dismiss the Complaint with prejudice for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and the PSLRA.   Because the defects in Plaintiffs' claims cannot be cured through repleading, the Complaint should be dismissed with prejudice.

MCGUIREWOODS LLP                          SULLIVAN & CROMWELL LLP

*/s/ Kenneth W. Abrams*                    Robert J. Giuffra, Jr. (to be admitted *pro hac vice*)
Kenneth W. Abrams (VSB No. 78216)         Sharon L. Nelles (to be admitted *pro hac vice*)
Gateway Plaza                             125 Broad Street
800 Canal Street                          New York, NY 10004
Richmond, Virginia 23219                  Tel: 212-558-4000
Tel: 804-775-4773                         Fax: 212-558-3558
Fax: 804-698-2323                         giuffrar@sullcrom.com
kabrams@mcguirewoods.com                  nelless@sullcrom.com

                                          Laura Kabler Oswell (to be admitted *pro hac vice*)
                                          1870 Embarcadero Road
                                          Palo Alto, California 94303
                                          Tel.: 650-461-5600
                                          Fax: 650-461-5700
                                          oswelll@sullcrom.com

                                          *Counsel for Defendants Volkswagen AG, Volkswagen*
                                          *Group of America, Inc., Scott Keogh, and Mark Gillies*

August 2, 2022

-29-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 2, 2022, I electronically filed the foregoing with the Clerk of Court using the Court's CM/ECF filing system which will send notification of electronic filing (NEF) to all counsel of record.

/s/ *Kenneth W. Abrams*
Kenneth W. Abrams (VSB No. 78216)
Gateway Plaza
800 Canal Street
Richmond, Virginia 23219
Tel: 804-775-4773
Fax: 804-698-2323
kabrams@mcguirewoods.com

*Counsel for Defendants Volkswagen AG, Volkswagen Group of America, Inc., Scott Keogh, and Mark Gillies*

-30-