**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| *In re Volkswagen AG Securities Litigation* | **Case No. 1:22-cv-00045-RDA-TCB** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................... 1

II.   FACTS ........................................................................................................................... 3

  A.  Defendants ................................................................................................................. 3

  B.  Background ................................................................................................................ 4

  C.  False Statements ........................................................................................................ 5

III.  ARGUMENT ................................................................................................................. 7

  A.  Standard on an MTD .................................................................................................. 7

  B.  Defendants Made their Statements "In Connection With" "Domestic Transactions" .
    ...................................................................................................................................... 8

    1.   Plaintiffs' transactions in Volkswagen ADSs were "domestic" .................................. 8

  C.  Defendants' False Statements Were "In Connection With" Plaintiffs' Transactions 11

  D.  Defendants Made Materially False Statements ............................................................. 16

  E.  Defendants Made False Statements With Scienter ......................................................... 20

  F.  The Complaint Sufficiently Alleges Loss Causation ...................................................... 27

IV.  SECTION 20(a) ............................................................................................................. 30

V.   CONCLUSION ............................................................................................................... 30

i

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
  677 F.3d 60 (2d Cir. 2012)...................................................................................................... 8

*Acticon AG v. China N. E. Petroleum Holdings Ltd.,*
  692 F.3d 34 (2d Cir. 2012)............................................................................................... 28, 29

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .............................................................................................................. 7

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .............................................................................................................. 7

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.,*
  814 F. Supp. 2d 395 (S.D.N.Y. 2011)................................................................................. 16

*Collier v. ModusLink Glob. Sols., Inc.,*
  9 F. Supp. 3d 61 (D. Mass. 2014) ....................................................................................... 21

*Cozzarelli v. Inspire Pharms. Inc.,*
  549 F.3d 618 (4th Cir. 2008)............................................................................................... 25

*Harbinger Cap. Partners LLC v. Deere & Co.,*
  632 F. App'x 653 (2d Cir. 2015) ......................................................................................... 15

*Hornblower & Weeks, Inc. v. Blue Marlin Breweries, Inc.,*
  No. 98 CIV. 6242 KNF, 2000 WL 1371329 (S.D.N.Y. Sept. 22, 2000) ............................. 26

*In re 2U, Inc. Sec. Class Action,*
  No. CV TDC-19-3455, 2021 WL 3418841 (D. Md. Aug. 5, 2021) ...................................... 25

*In re Alphabet, Inc. Sec. Litig.,*
  1 F.4th 687 (9th Cir. 2021)................................................................................................... 24

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.,*
  757 F. Supp. 2d 260 (S.D.N.Y. 2010).................................................................................. 24

*In re Carter-Wallace, Inc. Sec. Litig.,*
  150 F.3d 153 (2d Cir. 1998)................................................................................................. 22

*In re Equifax Inc. Sec. Litig.,*
  357 F. Supp. 3d 1189 (N.D. Ga. 2019) ........................................................................... 22, 23

ii

*In re Facebook, Inc. Sec. Litig.*,
  405 F. Supp. 3d 809 (N.D. Cal. 2019) ..................................................................... 23

*In re Galena Biopharma, Inc. Sec. Litig.*,
  117 F. Supp. 3d 1145 (D. Or. 2015)......................................................................... 26

*In re Genworth Fin. Inc. Sec. Litig.*,
  103 F. Supp. 3d 759 (E.D. Va. 2015)....................................................................... 20

*In re Glob. Brokerage, Inc.*,
  No. 1:17-CV-00916-RA, 2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019) ................................ 21

In re iAnthus Capital Holdings, Inc. Sec. Litig.,
  1:20-cv-03898 (S.D.N.Y. Sept. 28, 2022).................................................................. 11

*In re Iso Ray, Inc. Sec. Litig.*,
  189 F. Supp. 3d 1057 (E.D. Wash. 2016) ................................................................. 26

*In re Massey Energy Co. Sec. Litig.*,
  883 F. Supp. 2d 597 (S.D.W. Va. 2012) ................................................................... 17

*In re NYSE Specialists Sec. Litig.*,
  503 F.3d 89 (2d Cir. 2007)............................................................................... 14, 15

*In re Optimal U.S. Litig.*,
  No. 10 CIV 4095 SAS, 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ..................................... 16

In re Sinclair Broad. Grp., Inc. Sec. Litig.,
  No. CV CCB-18-2445, 2020 WL 571724 (D. Md. Feb. 4, 2020) ..................................... 12, 23

*In re Tesla, Inc. Sec. Litig.*,
  477 F. Supp. 3d 903 (N.D. Cal. 2020) ......................................................... 23, 24, 26

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  No. 20-CV-08585 (LJL), 2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022)............................... 14, 15

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
  No. 2672 CRB (JSC), 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ................................... 16, 26

*In re Willis Towers Watson plc Proxy Litig.*,
  937 F.3d 297 (4th Cir. 2019)............................................................................... 17

*IOP Cast Iron Holdings, LLC v. J.H. Whitney Cap. Partners, LLC*,
  91 F. Supp. 3d 456 (S.D.N.Y. 2015)....................................................................... 16

iii

*Janus Capital Group Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ............................................................................... 15, 16

*Karp v. First Connecticut Bancorp, Inc.*,
    No. CV RDB-18-2496, 2019 WL 4643799 (D. Md. Sept. 24, 2019) ...................................... 16

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-CV-02393-MGL,
    2016 WL 3981236 (D.S.C. July 25, 2016) ................................................................. 19

*Kiken v. Lumber Liquidators Holdings, Inc.*,
    155 F. Supp. 3d 593 (E.D. Va. 2015)....................................................................... 28

*Klein v. Altria Grp., Inc.*,
    525 F. Supp. 3d 638 (E.D. Va. 2021)....................................................................... 26

*Lorenzo v. Sec. & Exch. Comm'n*,
    139 S. Ct. 1094 (2019) ...................................................................................... 2, 23

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
    876 F.3d 541 (4th Cir. 2017)................................................................................. 25

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009)................................................................................. 24

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006) ............................................................................................ 14

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010) .......................................................................................... 8, 10

*Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*,
    369 F.3d 27 (2d Cir. 2004)................................................................................... 14

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)................................................................................. 19

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014)............................................................................ 9, 10, 11

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
    937 F.3d 94 (2d Cir. 2019)................................................................................... 11

*Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens*,
    645 F.3d 1307 (11th Cir. 2011).............................................................................. 8

iv

*S.E.C. v. Pirate Inv. LLC*,
  580 F.3d 233 (4th Cir. 2009).................................................................... 11, 12, 17, 21

*SEC v. Morrone*,
  997 F.3d 52 (1st Cir. 2021) ................................................................................ 8, 9

*Sec. & Exch. Comm'n v. Texas Gulf Sulphur Co.*,
  401 F.2d 833 (2d Cir. 1968)................................................................................ 11, 12

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018)................................................................................ passim

*Stoyas v. Toshiba Corp.*,
  424 F. Supp. 3d 821 (C.D. Cal. 2020).................................................................. 9, 14

*Stoyas v. Toshiba Corp.*,
  896 F.3d 933 (9th Cir. 2018)................................................................. 8, 9, 10, 11

*Stoyas v. Toshiba Corp.*,
  No. 2:15-CV-04194 DDP-JC, 2022 WL 220920 (C.D. Cal. Jan. 25, 2022).............................. 9

*Teachers' Ret. Sys. Of LA v. Hunter*,
  477 F.3d 162 (4th Cir. 2007).................................................................................. 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ......................................................................................... 20, 21

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ............................................................................................. 17

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991) ........................................................................................... 17

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021).................................................................................. 29

*Yates v. Mun. Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014).................................................................................. 24

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
  780 F.3d 597 (4th Cir. 2015)................................................................................ 25, 27

## **Regulations**

17 C.F.R. § 240.10b-5(b) .................................................................................... 15

## I.  INTRODUCTION

In their Motion[1] Defendants ask the Court to hold that investors are not entitled to rely on a public company's statements. Because this violates the fundamental principles of U.S. securities laws and shareholder capitalism the Court should deny Defendants' Motion.

On March 29 and 30, 2021, Defendants told the public, including investors, that Volkswagen AG's U.S. subsidiary[2] had changed its name to "Voltswagen." The name change would signify that VWoA gas-powered cars were legacy products and that Volkswagen was of the same caliber as EV pioneer Tesla. Volkswagen's valuation, a reasonable investor would believe, would rise like Tesla's.

Defendants took calculated steps to convince the public the name change was accurate, and that news of it would reach as many investors and consumers as possible. On March 29, they placed a draft press release dated April 29 on Volkswagen's website, used an anonymous email address to send links of the draft press release to journalists, and craftily took the link down upon publication of the first news story concerning the name change. Journalists reasonably believed that through an error of Volkswagen's they had uncovered information Volkswagen wasn't ready to disclose—a scoop, in other words. They wrote about it, and wrote about Volkswagen's EVs.

Defendants did not stop there. Journalists called to confirm the story was true. Lying, Defendants confirmed it was.  On March 30, Defendants published a press release announcing the name change. The press release included a quote from Defendant Keough along with details

---

[1] References to "MTD" or "Motion" are to Defendants' Memorandum of Law in support of their Motion to Dismiss, ECF No. 23. References to "Fuks Decl. Ex." are to Exhibits to the Declaration of Sara Fuks filed contemporaneously herewith.

[2] Throughout, Volkswagen AG is "VWAG", Volkswagen of America Inc. is "VWoA", and VWAG collectively with all its subsidiaries is "Volkswagen." References to "¶_" are to Paragraphs of the Amended Complaint, ECF No. 21 ("Complaint"). All capitalized terms herein have the meanings ascribed to them the Complaint, unless otherwise stated.

concerning the actions Volkswagen would take in connection with the name change, including new brand guidelines, new signage for all dealerships across the U.S., and a new VW.com design.

In total, news of the name changed reached 150 million people and "Voltswagen" was mentioned 6,045 times on news and social media sites. Of course, news of the name changed reached U.S. investors and securities analysts, who bid up the price of Volkswagen's U.S. traded American Depositary Receipts representing Volkswagen common stock ("ADSs") by 10%.

After the close of trading on March 30, a Volkswagen employee at the Company's headquarters in Germany admitted that Volkswagen had not and had never intended to change its U.S. subsidiary's name to Voltswagen. Volkswagen had not in fact spent the exorbitant amounts of money that would have been necessary to cement its rebranding. Volkswagen was not taking the risk that gas-powered vehicle consumers would leave it in favor of putting all its eggs in the EV basket. Correspondingly, Volkswagen would *not* receive a valuation similar to electric-only companies like Tesla. The purported name change was a publicity stunt.

U.S. capital markets are built on the premise that investors can rely on statements issued by senior corporate officials. "[T]he basic purpose behind [the Exchange Act] [is] to substitute a philosophy of full disclosure for the philosophy of *caveat emptor"[.] Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1103 (2019). Shareholder capitalism cannot function when companies are free to spew falsehoods to meet business objectives.[3] When Defendants made false statements, and schemed to maximize their reach, Defendants were at best reckless in not knowing that investors would take the statements as true.

---

[3] i.e. the principle popularized by economist Milton Friedman that a corporation is responsible for increasing shareholder value by engaging in open and free competition without deception or fraud. https://www.investopedia.com/stakeholder-capitalism-4774323.

In their Motion, Defendants characterize the name change as an April Fools' Day joke gone awry. But just as the Holy Roman Empire was neither holy, nor roman nor an empire, Defendants held the publicity stunt in March, it lasted two days, and no one was a fool to believe the name change was real after Defendants' specific reassurances that it was. Without Defendants' fraud, the stunt would at best have been reported in a list of April Fools' Day jokes. Defendants' stunt required deception. That investors were deceived is confirmed by, for example, securities analyst Dan Ives of Wedbush, who after publishing a bullish research note on Volkswagen following the purported name change stated "many got fooled" and predicted "ramifications"; a former SEC chief; securities law professors; journalists from the top U.S. news outlets; and perhaps most importantly, the SEC who commenced an investigation into Volkswagen following the "stunt."

Defendants also raise several technical challenges to the Complaint. Their arguments mischaracterize and omit key information concerning Volkswagen's entanglement with U.S. capital markets. Volkswagen previously sponsored U.S.-traded ADRs and currently consents to their continued existence. VWAG executives regularly deliver presentations to U.S. capital markets encouraging U.S. investors to purchase its securities. Most trading in VWAG Stock occurs in the United States. Volkswagen's technical decision to not sponsor ADRs but in every other way exploit U.S. capital markets has no legal import. Benefiting from U.S. capital markets, as Volkswagen does, necessarily means that it is subject to U.S. securities laws.  The Court should deny Defendants' Motion.

## II.    FACTS

### A.    Defendants

This is a securities class action brought on behalf of persons who purchased Volkswagen ADSs of Volkswagen common shares (VWAGY) on March 29-30, 2021. ¶1. The Defendants are

VWAG, VWoA, Scott Keough, VWoA's CEO since 2018, and Mark Gillies, VWoA's acting head of communications during the Class Period. ¶¶32, 34-36.

### B.    Background

In 2017, Volkswagen pleaded guilty to charges that it had used deceptive software to conceal illegal levels of nitrogen oxide its diesel vehicles emitted. ¶80. Volkswagen paid $35 billion in fines and legal fees. *Id.* Millions of its vehicles were recalled. *Id.* The scandal, dubbed Dieselgate, shattered Volkswagen's reputation. As Defendant Keough admitted, three years later Volkswagen was still trying to "win [customers] back." ¶81.

By 2021, some automakers had made various commitments to phase out or limit gasoline-powered cars in favor of electric vehicles. ¶83. Volkswagen was one of them. It pledged to reach carbon neutrality by 2050. ¶87. With a plan to invest a total of €35 billion by the end of 2025, EVs were one of Volkswagen's "core business[es]". ¶88. EVs were also Volkswagen's attempt to put Dieselgate behind it. As Defendant Keough noted, "the way you catch on in culture is you launch a great product and it catches fire." ¶92.  Yet until 2021, the market "didn't care". ¶¶97, 100.

Frustrated that its efforts weren't working, Volkswagen shamelessly copied Tesla and its CEO Elon Musk. ¶95. Tesla is beloved by investors; it was valued at $800 billion, 8 times Volkswagen's valuation, on the "mere promise of EV domination." *Id.* Tesla builds its batteries in enormous factories that are among the world's largest; Volkswagen promised it would do the same. ¶100. Tesla had held a presentation it called Battery Day; on March 15, 2021, Volkswagen held one it called Power Day which focused on batteries. ¶¶93-94.  Volkswagen's CEO Herbert Diess even adopted the mannerisms of Tesla's CEO Elon Musk, right down to a Twitter account that "gratuitous[ly]" used "technobabble and concept car imagery." ¶100. Diess's emulation of Musk went so far that an analyst dubbed Diess the "TechnoKaiser," a play on Musk's official title at Tesla, Techno King. ¶99 n.19. And Volkswagen's Stock price rose.  ¶95 n.16.

4

## C. False Statements

Two weeks to the day after Power Day—March 29—and the very day Volkswagen had planned to start selling its new electric SUV in the U.S., Defendants published a press release on Volkswagen's website. ¶¶93, 106. The press release's text stated it was a "draft" and contained a date of April 29. ¶¶106. Defendants emailed a link to the press release to dozens of reporters from an anonymous email account. ¶107. After reporters investigated the story and found the press release, they began publishing news stories. When the first news reports appeared, Defendants removed the press release. ¶106.

Thinking they had learned something Volkswagen inadvertently disclosed, reporters promptly wrote up news stories and contacted Volkswagen for comment. Defendants told the reporters (including reporters at CNBC, USA Today and the Associated Press) that the information contained in the press release was true and that VWoA was changing its name to "Voltswagen." ¶¶108-109, 112. Defendant Gillies personally assured the Associated Press that the name change was real. ¶149. A USA Today reporter specifically asked if the name change was a joke; Defendants told the reporter it was no joke. ¶154. With Defendants' word in hand to ensure accurate reporting, journalists published a slew of articles describing both the name change and "Voltswagen's" EVs. ¶¶146-49. Wedbush securities analyst Dan Ives "published a bullish note about the decision." ¶124.

Continuing to pretend it had been forced into an early reveal by the preceding day's technical error, on March 30, Defendants issued a press release concerning the name change, proclaiming it "a public declaration of the company's future-forward investment in e-mobility." ¶113. The press release quoted VWoA CEO Defendant Keogh. The press release also reported on concrete changes, including "Voltswagen" badges on all EV models (gas-powered cars would "continue to sport[] the VW emblem only") and signage at all "Voltswagen" properties and dealerships. *Id.*

5

Journalists then published a second wave of articles, based on the seemingly official press release. Wedbush analyst Dan Ives concluded that the name change "underscores VW's clear commitment to its EV brand and massive EV endeavors over the coming years." ¶11. A member of Tesla's board of directors opined that Volkswagen's name change is "more than changing [a] corporate logo": it is "absolutely serious". ¶ 119. The price of Volkswagen's ADSs rose more than 10% to close at $37.75/ADS on March 30. ¶136.

After the close of trading on March 30, 2021, the Wall Street Journal reported that Volkswagen had admitted that "there will be no name change." ¶13. Reporters and legal experts were shocked. With no "winking or nudging," the public had taken the announcement "at face value." ¶124. The Associated Press commented that "[t]his and any deliberate release of false information hurts accurate journalism and the public good." ¶123. A University of Michigan business professor remarked that "[t]he use of deceit is really dangerous", particularly with a company that "ha[s] admitted guilt to having tricked us before" in Dieselgate. ¶127. The deception seemed especially shocking given that, since Dieselgate, the "stunt ran counter to years of claims that the automaker's history of intentional falsehoods was in the past." ¶128. Former SEC chief economist Chester Spatt opined that the SEC would likely investigate Volkswagen. ¶135. It took little time to prove him right: *Der Spiegel* revealed the SEC investigation on April 29, 2021. ¶143. On March 31 and April 1, the price of Volkswagen ADSs fell from $37.75 to $35.58, down $2.17, or more than 5%. ¶136.

Yet the deceptive stunt still earned Volkswagen the publicity it had sought. *The New York Times* observed that Volkswagen would have to "make a splash" to boost sales. ¶159. Unrepentant, Defendant Keogh described the stunt's "upside" stating "the social response has been the biggest numbers we've ever seen." ¶160. "Voltswagen" was mentioned 6,045 on social media sites, news

sites, and blogs. ¶160. Together, these mentions had reached 150 million people as of the evening of April 1. *Id.*

ADSs representing Volkswagen preferred shares ("Preferred ADSs") also trade in the U.S. In his PSLRA certification, Lead Plaintiff erroneously stated that he had acquired Preferred ADSs rather than common stock ADSs. Prior to Defendants filing their Motion, Lead Plaintiff's counsel informed Defendants' counsel that Lead Plaintiff had in fact purchased common stock ADSs.[4]  In any event, Lead Plaintiff's corrected PSLRA certification is attached as Exhibit 1 to the Fuks Dec. filed herewith. There are no other changes between Lead Plaintiff's and [corrected] PSLRA certifications except changing the security acquired from Preferred ADSs to common stock ADSs.

## III.    ARGUMENT

### A.    Standard on an MTD

To survive a Rule 12(b)(6) motion to dismiss, a complaint need only allege sufficient facts to "state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "assum[e] that all the [factual] allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Rule 12(b)(6) does not countenance [] dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556.

To state a claim for securities fraud under Section 10(b), a plaintiff must plead, among other things, that the defendant: (1) made a misstatement or omission of material fact ("falsity"), (2) with scienter, (3) in connection with a domestic transaction in securities. *Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018). There are no special pleading rules for the third element; the other two are addressed below.

---

[4] Indeed, the prices listed on Lead Plaintiff's PSLRA certification are consistent only with the prices for common shares (VWAGY).

**B.    Defendants Made their Statements "In Connection With" "Domestic Transactions"**

*1.    Plaintiffs' transactions in Volkswagen ADSs were "domestic"*

In *Morrison*, the Supreme Court held that Section 10(b) does not apply to transactions taking place outside the U.S. but that it applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities[.]" *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265, 267 (2010). While based on the text of Section 10(b) and a presumption against extraterritoriality, the *Morrison* Court also observed that its test was "clear" and faulted the test it rejected "not [being] easy to administer." *Id.* at 258, 269.

Every circuit court that has considered the issue has held that a transaction is "domestic" if a party becomes irrecoverably committed to the transaction, or title changes, in the U.S. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012).[5]

An ADR is a U.S.-traded security equivalent to a share of foreign common stock (hence the "American" in the acronym for American Depositary Receipt). ADRs are the preferred way for American investors to transact in foreign stocks. Owners are not exposed to foreign currency risks, because ADRs trade in U.S. dollars. Further, ADRs clear through the U.S. settlement system so investors need not purchase their shares on foreign markets. ADRs are a boon to issuers, too, allowing them to access U.S. capital markets. ¶47. Sponsored ADRs are created by the issuer itself.

---

[5] accord 1st, 3rd, 9th, 11th. *See, e.g.  See SEC v. Morrone*, 997 F.3d 52, 60 (1st Cir. 2021) ("We agree with the reasoning of the [pre-*Parkcentral*] Second, Third, and Ninth Circuits and hold that a transaction is domestic under *Morrison* if irrevocable liability occurs in the United States."); *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 949 (9th Cir. 2018) ("We are persuaded by the [pre-*Parkcentral*] Second and Third Circuits' analysis and therefore adopt the irrevocable liability test to determine whether the securities were the subject of a domestic transaction."); *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens*, 645 F.3d 1307, 1310-11 (11th Cir. 2011) (allegation that closing in Florida precipitated transfer of title sufficient to satisfy *Morrison* at motion to dismiss).

Unsponsored ADRs like Volkswagen's are issued without the issuer's participation though with its consent. ¶¶64-66.

U.S. purchases of ADRs are usually domestic transactions. *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 949 (9th Cir. 2018) ("*Toshiba I*") (plaintiff can "almost certainly" plead a domestic transaction because it is located in the U.S. and the "four [] ADR depository institutions' principal executive offices, agents for service, and offices where ADR holders can exchange their ADRs for [] common shares are all in New York."). Plaintiffs in this case placed orders to their U.S.-based brokers. ¶¶26-31. All four depositaries are located in the U.S. ¶59. Every step of the transaction takes place in the U.S. Thus, both irrevocable liability and title pass in the U.S. *Stoyas v. Toshiba Corp.*, 424 F. Supp. 3d 821, 826 (C.D. Cal. 2020) ("*Toshiba II*").[6]

Defendants cite *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 206 (2d Cir. 2014) (MTD at 9). There, the Second Circuit conceded that the transactions at issue were "domestic" but insufficient to satisfy *Morrison* because they were "predominantly foreign." *Id.* The First and Ninth Circuits were correct to reject *Parkcentral* because it substantially misreads *Morrison*. *Toshiba*, 896 F.3d at 950 (*Parkcentral* rejects *Morrison*'s emphasis on a "clear administrable rule" to determine whether Section 10(b) applies to a transaction in favor of an "open-ended, under-defined multi-factor test"); *Sec. & Exch. Comm'n v. Morrone*, 997 F.3d 52, 60 (1st Cir. 2021) ("[W]e reject *Parkcentral* as inconsistent with *Morrison* [] [t]he existence of a

---

[6] At class certification, based on a full evidentiary record, the *Toshiba* court determined that the transactions were not domestic because there, upon receiving an order from the plaintiffs, the brokers purchased Toshiba shares on a foreign market and then issued the ADRs represented by these shares to the plaintiffs. *Stoyas v. Toshiba Corp.*, No. 2:15-CV-04194 DDP-JC, 2022 WL 220920, at *5 (C.D. Cal. Jan. 25, 2022) ("*Toshiba III*"). Here, plaintiffs allege that their brokers purchased ADSs directly on the OTC market. In any case, the mechanism through which brokers obtained Plaintiffs' shares is a fact question that cannot be resolved on a motion to dismiss.

domestic transaction suffices to apply the federal securities laws under *Morrison*. No further inquiry is required.").

*Morrison* acknowledged that "domestic" transactions "are the objects of the statute's solicitude," 561 U.S. at 266-67, and never suggested that anything more than a domestic transaction is required. *Id* at 267. *Morrison*, 561 U.S. at 267 ("***[I]t is in our view*** only transactions in securities listed on domestic exchanges, ***and domestic transactions in other securities, to which § 10(b) applies***."). *Parkcentral* reads *Morrison* as being animated by the need to avoid conflicts with foreign law, but *Morrison* was based on the text of Section 10(b) and found that concerns about conflicts were adequately addressed by the "transactional test we have adopted—whether the purchase or sale is made in the United States[]". *Id.* at 269-70. Indeed, the U.S. itself argued in a brief Defendants cite that "[t]he *Parkcentral* court relied on amorphous and atextual presumptions about Congress's intent, and it acknowledged that its approach would not 'reliably determine when a particular invocation of Section 10(b) will be deemed appropriately domestic or impermissibly extraterritorial, [] thus replicating several principal defects that this Court identified in earlier Second Circuit law[.]") *Brief for the U.S. as Amicus Curiae*, *Toshiba Corp. v. Automotive Indus. Pension Tr. Fund,* p. 14-15, No. 18-486 (U.S. May 20, 2019) (MTD at 15) ("Amicus Brief").

In any case, *Parkcentral* is distinguishable. In *Parkcentral*, two U.S.-based parties created synthetic derivatives intended to roughly approximate economic returns from ownership of a foreign security. *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 201 (2d Cir. 2014). The derivative securities "d[id] not constitute investments in the company on whose securities they [were] based." *Toshiba I*, 896 F.3d at 950. Whereas ADRs represent a limited, discernable liability, the derivative securities' value was "wholly unconstrained" by the reference security. *Id.* There was no allegation that the company facilitated or even knew about the derivative

10

securities. *Id.* And because the securities were not publicly traded, it was quite likely that neither Volkswagen nor the *Parkcentral* defendants even knew about them. *Id.*[7] As a very recent Southern District of New York case noted in rejecting the assertion that claims against a Canadian company whose securities were listed on a Canadian exchange were "predominantly foreign" under *Parkcentral*, "[t]he VW shares referenced in the *Parkcentral* swap agreements traded only on foreign exchanges while iAnthus shares *traded both on the [Canadian Stock Exchange] **and over-the-counter in the United States.***" *In re iAnthus Capital Holdings, Inc. Sec. Litig.* 1:20-cv-03898, p. 27-28 (S.D.N.Y. Sept. 28, 2022) (Dkt. No. 100). Indeed, the *Parkcentral* Court itself cautioned against "perfunctorily appl[ying]" its holding "to other cases based on the perceived similarity of a few facts" and described its holding as based "in some part on the particular character of the unusual security at issue." *In re iAnthus Capital* at 27, quoting *Parkcentral*, 763 F.3d 198, 202, 216-17.

### C.    Defendants' False Statements Were "In Connection With" Plaintiffs' Transactions

"The Supreme Court has consistently embraced an expansive reading of § 10(b)'s 'in connection with' requirement." *S.E.C. v. Pirate Inv. LLC*, 580 F.3d 233, 244 (4th Cir. 2009). Courts "construe the statute not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Id.* The "in connection with" requirement protects speakers "who had no idea that their conduct might implicate Section 10(b)." *Id.* at 250. In *Pirate*, the Fourth Circuit broadened the Second Circuit's test in *Sec. & Exch. Comm'n v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir. 1968) ("*Texas Gulf*") to determine whether false statements were "in connection

---

[7] *Parkcentral* is also based on the incorrect premise that unless it was decided otherwise, "a rule making [Section 10(b)] applicable whenever the plaintiff's suit is predicated on a domestic transaction," [] would trample on *Morrison* by requiring us to apply the statute to "wholly foreign activity[.]" *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 106 (2d Cir. 2019). *Parkcentral* ignores jurisdiction and the "in connection with" requirements.

with" transactions. *Texas Gulf* had required that the transactions be "disseminated to the public *in a medium* upon which a reasonable investor would rely." *Pirate* at 249. Press releases, like those at issue here, clearly fit the bill; indeed, the statements at issue in *Texas Gulf* were in press releases. *Texas Gulf* 401 F.2d 833, 860. In *Pirate*, by contrast, the statements were made in spam emails, on which no reasonable investors would rely. While *Pirate* **expanded** the *Texas Gulf* test to add three other factors that courts could consider *Pirate* did not **narrow** *Texas Gulf*: it held that "a close fit with one factor may well be enough", exactly what was at issue in *Texas Gulf*. 580 F.3d at 245. Courts in the Fourth Circuit have continued to hold that statements made by a company's officers, especially in press releases, are "in connection with" transactions in its securities. *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, No. CV CCB-18-2445, 2020 WL 571724, at *5 (D. Md. Feb. 4, 2020), *reconsideration denied,* 473 F. Supp. 3d 529 (D. Md. 2020). Thus, Defendants' false statements were "in connection with" the domestic transactions in Volkswagen's ADSs.

Though Volkswagen does not currently sponsor its ADRs, it has aggressively courted the U.S. market. Volkswagen had recently sponsored a U.S. ADR program. When it declined to renew the program in 2018, it took no action to prevent future sales. It could have: one of the four banks which offers Volkswagen ADRs in the U.S., explained that "in practice depositary banks obtain the issuer's consent before establishing an unsponsored ADR program." ¶65. Thus, Volkswagen ADRs would not have been offered in the U.S. without Volkswagen's consent. Volkswagen also promoted its ADRs by delivering presentations in the United States to U.S. investors. For example, in 2019, Volkswagen executives delivered 3 presentations in New York, 2 in Boston, and 1 in Detroit.[8] Volkswagen only held 3 presentations in 2020 before COVID shutdowns; one was in

---

[8]https://www.volkswagenag.com/presence/investorrelation/publications/presentations/2019/01_january/2019-01-16_Volkswagen_Group_presentation_Dr_Dahlheim.pdf;
https://www.volkswagenag.com/presence/investorrelation/publications/presentations/2019/03_m

New York.[9] After the shutdowns, Volkswagen continued to make virtual presentations at the same America-focused conferences it had previously attended in person, including the virtual Deutsche Bank Automotive Industry Conference, an annual conference traditionally held in Detroit which targets U.S. capital markets.[10] Volkswagen also maintains an English language version of its investor relations website.

Defendants assert that the mere fact that they consented to- without sponsoring- Volkswagen's ADR programs exempt them from the requirements of U.S. securities laws. U.S. laws cannot be circumvented so easily. The Amicus Brief—the only authority Defendants cite—makes clear that whether conduct satisfies the "in connection with" requirement is a fact-based evidentiary question. First, the *defendant* must "*show* that it chose to list and transact its securities only in foreign markets precisely to avoid U.S. securities regulation and litigation." Amicus Brief at 17. Then, "it [will] be *more difficult*" for the plaintiff to "*prove*" the "in connection with" element. *Id.* Thus, the Amicus Brief envisions a fact-based determination rather than the *per se* rule Defendants suggest. And because Volkswagen wooed U.S. capital markets and U.S. investors, rather than shunning them, Defendants will lose that dispute. Regardless, this factual question is inappropriate for resolution at the motion to dismiss stage.

The only cases addressing the "in connection with" element in the context of unsponsored ADRs are *Toshiba I* and *Toshiba II*. These courts found that allegations suffice to establish the "in

---

arch/2019_03_28_29_Volkswagen_Konzern_Presentation_Boston_NY.pdf;
https://www.volkswagenag.com/presence/investorrelation/publications/presentations/2019/07_july/Ford_VolkswagenAG_Presentation_12-July-2019.pdf;
https://www.volkswagenag.com/presence/investorrelation/publications/presentations/2019/11_november/2019.11.22_US%20RS%20Volkswagen%20AG.pdf.

[9] https://www.volkswagenag.com/presence/investorrelation/publications/presentations/2020/01-januar/January_2020_VWAG_Investor_Roadshow.pdf

[10] https://www.volkswagenag.com/presence/investorrelation/publications/presentations/2020/06-juni/2020_DB_Investor_Meeting_Volkswagen_Group_of_America_Final_V2.pdf

13

connection with" element if they set forth: (a) facts about the plaintiffs' transactions and the market on which the ADRs trade and (b) facts about the company's likely consent to sales of ADRs in the U.S. market. *Toshiba II*, 424 F. Supp. 3d at 828. Defendants do not dispute the sufficiency of the Complaint's allegations on these points; instead, they ask the Court to reject *Toshiba II* as "not persuasive" because one of the many factors it considered was that the Bank of New York Mellon held 1.3% of Toshiba's outstanding stock. (MTD fn. 7). But Defendants ignore the reason the court found the allegation meaningful: it is evidence that Toshiba was seeking access to U.S. capital markets. *Toshiba II*, 424 F. Supp. 3d at 828.

Second, Defendants assert that **no** plaintiff can **ever** bring Section 10(b) claims against a company whose stock they did not purchase. (MTD at 13-14). First, Defendants' assertion is inapt: the ADRs here entitle the holder to all the rights of a Volkswagen shareholder, including the right to receive a Volkswagen share on demand, or the ADRs could not be sold in the U.S. Second, Defendants' assertion ignores the that the Supreme Court has rejected the view that the "in connection with" requirement be read narrowly. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006). "Under our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction - whether by the plaintiff or by someone else." *Id.*

Defendants' reliance on *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004) (MTD at 13-14) ignores that the Second Circuit later cabined *Nortel* and that subsequent cases have rejected the expansive reading of *Nortel* Defendants urge here. In *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 102 (2d Cir. 2007), the Second Circuit limited *Nortel* to the "particular circumstances of the case", i.e. where "the third party makes self-referential public statements and the third party and the issuer are connected only by a 'business relationship.'" *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20-CV-08585 (LJL), 2022 WL

14

4085677, at \*17 (S.D.N.Y. Sept. 2, 2022). *Nortel*'s narrow scope does not mean that "an action under Rule 10b–5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security, or that only statements about a security issuer are actionable," the exact position Defendants advance here. *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 102 (2d Cir. 2007).[11] The Volkswagen whose common stock trades in Germany is not merely "in a business relationship" with the Volkswagen whose ADSs trade in the U.S. *They are the same company*.

A foreign company that affirmatively objects to the establishment of ADR programs and purposefully avoids U.S. capital markets might be able to defeat a plaintiff's allegations concerning the "in connection with" requirement. But Volkswagen is not such a company. Volkswagen tacitly consented to the ADR program and encouraged U.S. investors to purchase its ADSs, with great success. For these reasons, no court has ever held that that "in connection with" requirement was not met under circumstances similar to those here, where the fraud is indisputably material to investors and causes the share price decline that injured those investors.

### VWAG "Made" the Statements

The SEC's Rule 10b-5, which implements Section 10(b) of the Exchange Act, prohibits the "mak[ing]" of false statements or misleading omissions. 17 C.F.R. § 240.10b-5(b). In *Janus Capital Group Inc. v. First Derivative Traders*, the Supreme Court held that a legally separate investment advisor could not be liable for statements contained in an investment fund advisee's prospectus because the advisor did not "make" the statements.[12] 564 U.S. 135, 144 (2011). The

---

[11] These were also the facts in *Harbinger Cap. Partners LLC v. Deere & Co.*, 632 F. App'x 653, 656 (2d Cir. 2015) (MTD at 15).

[12] *Turquoise Hill* is not to the contrary. There, the minority shareholders owned almost 50% of the subsidiary. The subsidiary's directors owed duties to these minority investors, too. *Turquoise Hill*, 2022 WL 4085677, at \*20. Here, VWAG owns 100% of VWoA, so VWoA's duties flow only to VWAG.

investment advisor could not control the investment fund's statements because the fund's directors had their own fiduciary obligations to the fund investors. *Id.* The Supreme Court found it important that only one member of the fund's board of trustees was associated with the advisor. *Id.* at 138, 146 (noting that the fund's "board of trustees was more independent than the statute requires.").

*Janus* does not absolve parents of wholly-owned subsidiaries like VWAG because these subsidiaries' decisionmakers are fiduciaries of, and only of, the parent. Thus, the parent has ultimate authority over the statements. *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 418 (S.D.N.Y. 2011) (parent's ability to control subsidiary meant parent "made" statements); *IOP Cast Iron Holdings, LLC v. J.H. Whitney Cap. Partners, LLC*, 91 F. Supp. 3d 456, 473 (S.D.N.Y. 2015) (similar). [13]  Indeed, a court **has already held** VWAG's power and control over VWoA sufficient to find VWAG "made" VWoA's statements under *Janus*. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 66281, at *18 (N.D. Cal. Jan. 4, 2017). Here, a VWAG official affirmatively took responsibility for the making statements: "**We** didn't mean to mislead anyone. The whole thing is just a marketing action to get people talking." ¶123.

### D.   Defendants Made Materially False Statements

Defendants do not dispute that their statements were false, but instead assert that they were immaterial. Neither Rule 9(b) nor the PSLRA require the plaintiff to plead a false statement's materiality with particularity.[14] Thus, Plaintiffs need only satisfy Rule 8's plausibility standard.

---

[13] *In re Optimal U.S. Litig.*, No. 10 CIV 4095 SAS, 2011 WL 4908745, at *5 (S.D.N.Y. Oct. 14, 2011) a decision interpreting *Janus* in its immediate wake, incorrectly concluded that the relationship between a parent and a wholly-owned subsidiary was similar to the relationship between an investment adviser and a fund at issue in *Janus*. Later decisions rejected *Optimal*'s approach. *See, e.g., EnergySolutions, Inc.*, 814 F. Supp. 2d at 418, *supra.*

[14] Falsity is subject to Rule 9(b), which requires that a party "state with particularity the circumstances constituting fraud," namely "identif[ying] with some precision the date, place and time of active misrepresentations[.]" *Karp v. First Connecticut Bancorp, Inc.*, No. CV RDB-18-

16

Statements are material if "a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Pirate*, 580 F.3d at 240 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)). Whether a statement is material requires a "delicate assessment", id., that depends on the context in which the statements are made. *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618 (S.D.W. Va. 2012). "Resolving a question of materiality against the plaintiff at the motion to dismiss stage is inappropriate unless 'no reasonable jury could find it substantially likely that a reasonable investor would find the fact at issue material in the 'total mix' of information.'" *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 304 (4th Cir. 2019).

"[C]onclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991). A car dealer's assertion that a sale price is "fair" is immaterial puffery, but an investment bank's assessment that a transaction price is "fair" to minority shareholders can be materially misleading. *Id.* at 1093-94.

In general, changing a brand's name is expensive and risky. ¶140. As the *New York Times* recognized, a name-change for an "automaker as established as Volkswagen [] would clearly be a huge undertaking." ¶142. Indeed, a Tesla director explained that unlike a logo change, a name change is "absolutely serious." ¶119. A securities analyst covering Volkswagen published a bullish research note based on the name-change, finding that it "underscores VW's clear commitment to its EV brand and massive EV endeavors over the coming years." ¶118. Financial newspaper

---

2496, 2019 WL 4643799, at *2 (D. Md. Sept. 24, 2019). In addition, the PSLRA requires that a complaint "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Singer*, 883 F.3d at 439.

17

*Barron's* agreed that the name change is "a [b]ig [d]eal." ¶110. Defendants acknowledged as much, touting the name change as a "public declaration of the company's future-forward investment in e-mobility." ¶109. "Vol*t*swagen" was only "*[s]imilar* to Volkswagen" because it had "a renewed focus on electric driving." ¶114.

Changing VWoA's name to Voltswagen does not just demonstrate a commitment to electric vehicles: it shows VWoA's gas-powered cars are already legacy products. To reinforce that non-electric cars were second-class vehicles, Defendants promised that unlike its EVs, its gas-powered cars would not bear a badge identifying them as "Voltswagen" cars. ¶113.

Rejecting gas-powered cars to attract EV customers fits Defendants' disclosed plan. Defendants had long sought to convince investors that they should view Volkswagen through the same lens as Tesla: as an EV company. VWAG CEO Diess emulated Tesla's CEO's mannerisms (officially "Techno King").

While Defendants point out that certain journalists initially suspected that the name change *might* be a joke, they ignore what happened next: Defendants falsely told those journalists that VWoA truly was changing its name to Voltswagen. With Defendants' assurances in hand, reporters, the public, and investors understandably believed the name-change was real. Indeed, while Defendants cite three examples of April Fools' Day jokes (MTD at 18), in none of these instances did the company confirm the story's accuracy. And they all occurred on April 1, not two days prior in March.[15] As the name indicates, April Fools' Day is a ***day*** in ***April***. Further, those

---

[15] Defendants incorrectly claim that BMW UK pulled its prank on March 31. Defendants do not appear to realize that the timestamp on tweets is from the user's time zone, not the tweeter's. Defendants evidently accessed the tweet in California. Were the Court to access it from the Eastern Time Zone, the tweet would show as having been published on April 1 at 2:25 AM. Given that the tweet comes from BMW UK, it was likely published from the UK, where the local time was 7:25 AM on April 1.

pranks were implausible as well as immaterial given the commercial contexts in which they occurred. Tesla billed its "Model W" as a revolutionary watch that can be adjusted to account for time zones, a feature watches already have, which "requires [the] wrist strength of an orangutan." BMW UK's prank, which was issued on April 1 in the UK, casually announced without fanfare that the company had developed and would make available a paint that could charge a vehicle using light from the moon. A technological breakthrough of this magnitude would be announced on the front page of the *New York Times*, not tossed off as an aside in a press release.[16] In the third, IHOP announced that it was changing its name to IHOb to promote its burgers, while simultaneously making clear the change was only "for the time being." There was no deception: reporters recognized that the name change was as a temporary publicity stunt.[17] The commercial context of these pranks is also distinguishable from the commercial context here: the intensely competitive and ever-shifting landscape of the EV market in which legacy OEMs were fighting to stake their claim among revolutionary EV-only players like Tesla. To be sure, none of these other jokes prompted analyst reports, the outrage of well-respected journalists, or SEC investigations.

Further, "when a stock is traded in an efficient market, the materiality of disclosed information may be measured *post hoc* by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000); *accord KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-CV-02393-MGL, 2016 WL 3981236, at *6 (D.S.C. July 25, 2016). When Defendants said VWoA was changing its name to Voltswagen,

---

[16] Seconds of internet research would confirm that even a full moon emits (reflects) about 0.3% of the energy provided by direct sunlight. If solar panels (or "paint") were efficient enough to charge a car over a 12-hour night with a full moon, cars would take less than 3 minutes to charge during the day.

[17] https://www.businessinsider.com/ihop-ihob-name-change-burgers-2018-6 ("The change to IHOb won't be permanent — the chain said in a press release that it was just 'for the time being.'"

the price of VWAGY shot up 10%, to $37.75/ADR. ¶¶120, 136. This change increased Volkswagen's market capitalization by more than $20 billion. Then, when Defendants admitted that VWoA had not changed its name, the price of VWAGY fell more than 5% over two trading days to close at $35.58 on April 1. ¶155. That the stock price increased when Defendants made false statements, and decreased when they were corrected is classic evidence of materiality.

Finally, the reactions of journalists (*e.g.*, "this was not a joke, it was deception," "everyone took it seriously, creating confusion about the company's intentions and moving the shares" ¶¶16); law professors (*e.g.,* "this is not the sort of thing that a responsible global company should be doing…there was nothing to indicate [ ] this is really a joke, *unlike other gigs that have been out there.*" ¶126); marketing experts (*e.g.,* the Volkswagen brand is "too serious and the subject too important for [Volkswagen] to be playing around" ¶133); a former SEC chief economist (¶135); securities analysts (*e.g.,* "many got fooled…ultimately it's going to potentially have some ramifications" ¶17); and the SEC itself (who commenced an investigation of Volkswagen following the disclosure that its statements were false ¶¶143-44) confirms that Defendants statements were ***materially*** misleading.

### E.    Defendants Made False Statements With Scienter

In evaluating scienter, "courts must, as with any motion to dismiss, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Courts then use "context and common sense", *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 783 (E.D. Va. 2015), to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. It suffices "if a reasonable person would deem the inference of scienter cogent and at least as

20

compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Where plaintiff's inference and a non-culpable inference are equally plausible, a "tie" goes to the plaintiff. *Id.*

"[T]he term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *Pirate*, 580 F.3d at 241. Further, "the fact that a defendant publishes statements when in possession of facts suggesting that the statements are false is "classic evidence of scienter.'" *Id.* at 243. Defendants are liable even if the target of their deception was not primarily investors. *In re Glob. Brokerage, Inc.*, No. 1:17-CV-00916-RA, 2019 WL 1428395, at *17 (S.D.N.Y. Mar. 28, 2019); *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 72 (D. Mass. 2014) (defendants' involvement in scheme to defraud customers supported scienter).

Defendants indisputably made statements knowing they were false. On March 29, they stated that VWoA was changing its name to Voltswagen, and on March 30, that VWoA **had** changed its name. ¶¶113-14. In truth, Defendants had not changed VWoA's name and had no intention to. This suffices for scienter.

Defendants hardly dispute that they made their statements intending to deceive. Even if they did, each of Defendants actions in connection with the "hoax" bespeaks a calculated plan to deceive. First, instead of straightforwardly announcing the purported name change on April Fools' Day, on March 29 Defendants placed a press release on Volkswagen's website that read like an early draft of a press release that was not meant to be issued until April 29. A name change of this magnitude would be accompanied by a contemporaneous media blitz, which would be costly. But by postdating the initial press release, Defendants caused the public to infer why there was no media blitz: it was supposed to begin on April 29. ¶113. Second, Defendants created an anonymous Gmail account to distribute the press release and draw reporters' attention to the press release.

21

Third, when the first article about the press release was published, Defendants removed the press release, further piquing reporters' interest. Thus, Defendants created the impression that through an anonymous source, reporters had discovered facts that Volkswagen had no intention to disclose at the time—in other words, that the reporters had scored a scoop. Finally, in responding inquiring journalists, Defendants continued to lie, (ultimately outraging journalists at the U.S.'s most widely read news outlets). It is worth reporting that the U.S. subsidiary of one of the world's largest car companies was changing the name it had held for 66 years. But responsible reporters called Volkswagen to confirm that the name change was true. When they did, Defendants lied to them. As Defendants understood, or were reckless in not knowing, the journalists would widely report the name-change as a piece of hard news, precisely because no April Fools' Day prank would ever go so far. Thus, each step of Defendants' plan demonstrates their calculated effort to deceive. Defendants intended to mislead the public, including investors, and succeeded in doing so.

Even if Defendants did not intend to deceive investors, Defendants at least recklessly disregarded the possibility that their statements would deceive investors. Plaintiffs can allege scienter by showing that the defendants' conduct was reckless, i.e. "'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Singer v. Reali*, 883 F.3d 425, 443 (4th Cir. 2018).

Investors are among those who receive and rely on public corporate statements. "[M]arket professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1251 (N.D. Ga. 2019) (statement made in speech at university, statements made on website even if "not found prominently on the front page of the company's website."); *In re Carter-Wallace, Inc. Sec.*

22

*Litig.*, 150 F.3d 153, 156 (2d Cir. 1998) ("technical advertisements in sophisticated medical journals"); *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 834 (N.D. Cal. 2019) (privacy policy disseminated to users); *Sinclair*, 2020 WL 571724, at *5 (FCC filings). Courts have found actionable statements made to university students, physician customers, app users, or the Federal Communications Commission. *Equifax*, 357 F. Supp. 3d at 1251 & n. 420.

Accordingly, even if Defendants did not specifically intend to deceive investors, they were at the very least reckless in not knowing that investors would see and rely upon their false statements. "[T]he basic purpose behind [the Exchange Act] [is] to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*[.]" *Lorenzo*, 139 S. Ct. at 1103. Carving out an a-textual exception to the time-tested rules mandating accurate disclosures for corporate publicity stunts is inconsistent with the Exchange Act.

This case closely resembles *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 929 (N.D. Cal. 2020). In the *Tesla* case on August 7, 2018, with no prior warning, Elon Musk "tweeted" that he was considering taking Tesla private for $420 per share, claiming he had "funding secured," though he had not secured any funding. The *Tesla* Court easily upheld plaintiffs' securities fraud complaint and later entered partial summary judgment in plaintiffs' favor on falsity and scienter.

The facts that led the *Tesla* Court to conclude Musk acted with scienter resemble facts in this case. In *Tesla*, Musk's twitter audience initially took the tweet as a joke, given that $420 is a thinly veiled reference to marijuana. That the statement was initially perceived as a joke was not exculpatory because, like Defendants here, Musk reassured investors that his statements were true.

Musk himself revealed the truth to the *New York Times* at most 10 days after his initial announcement.[18] Musk must have always intended to come clean; hundreds of billions of dollars

---

[18] The *NYT* report was published on August 17 and summarized a "recent" interview with Musk.

23

in funding do not materialize on short notice. Here, Defendants assert that they did not commit securities fraud because they always intended to reveal the truth. *Tesla* shows why Defendants' "coming clean" is not exculpatory: even a fraud that runs mere days can benefit a party- and harm investors. In *Tesla*, Musk's fraud caused short-sellers' financial losses, which gave him emotional satisfaction. *Tesla*, 477 F. Supp. 3d at 930.[19] Here, the purpose of Defendants' stunt was to temporarily place Volkswagen's EVs at the center of the public eye. Defendants came clean because they completed the stunt. Their disclosure is no more exculpatory than that of an executive who conceals the truth until a transaction is completed[20] or temporarily conceals a problem to buy time until she can find a solution.[21]

Additionally, as in *Tesla*, Defendants' inclusion of details in connection with the purported name-change supports scienter. In *Tesla*, Musk revealed some of the details of the going-private transaction. 477 F. Supp. 3d at 929. Here, Defendants revealed the logistics of the name-change campaign, right down to the badges that would appear on "Voltswagen" EVs.

Finally, Defendants contest scienter on the grounds that on occasion, courts find that some knowingly false statements are not made with scienter. Drawing upon extraordinary and dissimilar

---

[19] In the cases Defendants cite, that the defendants themselves corrected the statements when new information arrived weighed against the inference that the defendants knew their statements were false made. *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 192 (4th Cir. 2009)(company's self-disclosure shows "corporate agents lacked sufficient information to report a range of impairment until the April disclosure"); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 888 (4th Cir. 2014) (serial disclosures of the scope of accounting problems supported inference that company was disclosing problems as they were discovered). Defendants knew their statements were false and hardly deny that they intended to deceive.

[20] *See In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 300-01 (S.D.N.Y. 2010) (company's disclosure of extent of bonus pool to be paid to acquired company's employees until after merger closed was securities fraud).

[21] *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 212 L. Ed. 2d 233, 142 S. Ct. 1227 (2022) (Google parent company had motive to conceal hack of company until after media spotlight on tech companies had moved on).

cases, Defendants assert that it is sometimes possible for an insider to make statements, knowing that they were false, without scienter. The cases Defendants cite demonstrate that this rare exception applies to **inadvertent** misstatements. In *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 550 (4th Cir. 2017), the defendant stated once, in passing, that a given contract accounting for 4.9% of the company's revenue had been "renewed", though the contract's terms had changed materially. Because the contract was so small, that a contract was "renewed" is consistent with some material changes, and because there was no reason to think the new contract would be less profitable, the Fourth Circuit found it more likely that the officer said "renewed" on that one occasion because he slipped up. And in *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 626 (4th Cir. 2008), an officer's use of a general term, rather than a more specific one, was not made with scienter because the two terms were "more or less interchangeable" and use of the more specific term would disclose competitive information the company had told investors it would preserve. That these cases are rare and involve attenuated facts is telling. "[W]here a plaintiff identifies 'numerous allegedly misleading statements and omissions that were not caused by the use of imprecise language or the execution of a legitimate business decision,' such allegations may support a strong inference of scienter." *In re 2U, Inc. Sec. Class Action*, No. CV TDC-19-3455, 2021 WL 3418841, at *8 (D. Md. Aug. 5, 2021) (quoting *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 610 (4th Cir. 2015)).

Defendants carefully planned their detailed and specific misstatements to maximize publicity for Volkswagen's EVs. Defendants' misstatements are nothing like the inadvertent slip-ups that occurred in the cases they cite.[22]

---

[22] Defendants claim that companies routinely use false statements of fact to sell their product, but they can only point to Geico's campaign that its product is "so easy a caveman can do it." This statement is not false (or "false") because it cannot be read literally. For starters, Geico's reference

Next, Defendants assert that because *Singer* and *Zaks* happened to involve large stock drops and long class periods, these two factors are prerequisites to finding scienter. They are not, either in the Fourth Circuit or elsewhere. *Tesla*, 477 F. Supp. 3d at 931 (10-day class period, stock price declines of 2.5-9%); *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 653 (E.D. Va. 2021), *reconsideration denied,* No. 3:20CV75 (DJN), 2021 WL 2349904 (E.D. Va. Apr. 13, 2021) (stock price movements of approximately 5%; "[a]lthough the price drops that Plaintiffs point to fall short of the double-digit drops seen in many securities fraud cases, at this stage Plaintiffs have pled sufficient loss causation"); *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1077 (E.D. Wash. 2016)(denying motion to dismiss in case with 27-hour class period). Moreover, Defendants' argument ignores that Volkswagen is a massive 85-year-old-company with global operations whose market capitalization was well over $100 billion during the Class Period. Stock price movements of 10% and 5% are far more unusual in companies of this magnitude than in smaller and less established companies. And while this case is not nearly as large or consequential as Volkswagen's years-long effort to deceive regulators and investors about its vehicles' nitrogen oxide emissions, *Volkswagen*, 2017 WL 66281, the securities laws do not impose a minimum size or odiousness requirement. *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1159-60 (D. Or. 2015) (paying for positive articles about company to be published under aliases "Wonderful Wizard" and "Kingmaker"); *Hornblower & Weeks, Inc. v. Blue Marlin Breweries, Inc.*, No. 98 CIV. 6242 KNF, 2000 WL 1371329, at *2 (S.D.N.Y. Sept. 22, 2000) (creating fake *Success* Magazine cover featuring defendant).

---

to "cavemen" is not to humans who are currently alive, but to humans who lived in the Paleolithic era, https://tinyurl.com/2p79upyb. Geico's "cavemen" are not alive to test Geico's products. Defendants' false assertion that Volkswagen would change its name to Voltswagen can only be read literally.

Defendants also assert that the defendants in *Singer* and *Zaks* both stood to gain from their fraud, which they label the "most important[]" factor. Defendants have *Zaks* exactly backwards. In *Zaks*, the district court had dismissed the case because the defendants had shown through documents subject to judicial notice that they had not sold any stock. The Fourth Circuit reversed ***because*** the plaintiffs did not allege any stock sales that would have made these documents relevant. 780 F3d at 607-08. *Zaks*' holding presupposed that the plaintiffs had not alleged a motive through stock sales (or otherwise). The plaintiffs did not allege a motive in *Singer*, either. *Singer*, 883 F.3d at 443 (summarizing plaintiffs' scienter allegations).

Finally Defendants assert that statistics counsels in favor of dismissal. Defendants point out that Fourth Circuit has affirmed 83% of the dismissals of cases alleging securities fraud following the PSLRA. First, this does not mean that 83% of such cases are dismissed. Defendants' misleading analysis excludes all cases in which district courts within the Fourth Circuit denied motions to dismiss in part or in whole. That most cases are affirmed and not reversed on appeal is common knowledge.[23] More importantly (and stating the obvious) this Court must judge this case on its facts, not statistics.

### F.    The Complaint Sufficiently Alleges Loss Causation

To plead loss causation, plaintiffs must allege "'a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct,' which may be accomplished by alleging facts establishing that the defendant's 'misrepresentation or omission was one substantial cause of the investment's decline in value.'" *Singer v. Reali*, 883 F.3d 425, 445 (4th Cir. 2018). It is enough to plead "the defendant company itself made a disclosure that publicly revealed for the

---

[23] *See, e.g.,* "Just the Facts, U.S. Courts of Appeals" Dec. 2016, Table 2, (showing U.S. Courts of Appeals reversal rates in private civil cases between 2011 and 2015 ranged from 10.4 to 14.2%) available at https://www.uscourts.gov/news/2016/12/20/just-facts-us-courts-appeals.

first time that the company perpetrated a fraud on the market by way of a material misrepresentation or omission" and caused the company's stock price to decline. *Id.*

Volkswagen's stock price rose 10% when Defendants published a press release announcing the name-change. It fell 5% when Defendants revealed that the name change had been a publicity stunt. This is a textbook case of loss causation.

Defendants contest loss causation by pointing to movements in other securities or on other dates and ask this court to infer that these changes indicate a non-fraud related explanation for movement in the price of Volkswagen ADSs. Defendants' assertions are inappropriate in the loss causation context where a court is required to inferences in plaintiffs' favor. Courts only consider a defendants' suggested inferences in assessing scienter. "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 609 (E.D. Va. 2015).

Not only are Defendants' assertions inappropriate at the motion to dismiss stage, they are also incorrect. Defendants assert that a three-day rally in the price of Volkswagen's ADSs from April 4 (closing at $37.10, still down $0.60 from March 30) through April 7 (it closed at $35.50 on April 8) negates materiality. But it is black letter law that a stock price increase after a fraud-related decline has no impact on the plaintiffs' claims unless the defendant can show ***in discovery*** that the rally results from the *same news* as the initial decline. *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 40 (2d Cir. 2012). Defendants could not in any event meet this burden because the rally resulted from broader market forces; the S&P 500 Automobile Index ("Index")

28

rose 4.5% on April 4, or more than the 4.33% increase in Volkswagen's ADRs' price.[24] Defendants also point to a rally in late May that culminated in one day on which the price of Volkswagen's ADSs surpassed their closing price on May 30. That rally, too, coincided with an increase in the Index. Defendants do not even try to show the causes of either rally; and after the June rally, the price of Volkswagen's ADRs quickly fell to less than $34 where it has stayed to this day. [25]

Defendants attack the Complaint's purported "telling omission" of trading volume of Volkswagen ADSs March 31, 2021 and assert that volume was low by comparing it to volume from the prior week (MTD at 28). Aside from the fact that there is no requirement to plead high trading volume, a look at Volkswagen's trading volume in context belies Defendants' assertion. The volume of Volkwagen's ADSs soared beginning March 15 (Power Day); peaked on March 17; and then declined *every single day* thereafter—until the March 30 "Voltswagen" press release. Thus, as Defendants intended, the false press release revived flagging interest in Volkswagen ADSs.[26] Trading volume on March 30 saw the sixth highest volume of any day in 2021. And on the date of the corrective disclosure, volume of Volkswagen common ADSs was 340% of the 2021 average (*supra* n.28).

---

[24] The Fourth Circuit dismissed the complaint in *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 186 (4th Cir. 2007) because the corrective disclosures were not related to the facts the plaintiffs alleged were false. If the Fourth Circuit thought the recovery was legally meaningful, it would have discussed it in the merits, not the hortatory epilogue in which it actually appeared.

[25] In *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021), Tesla's stock price recovered $13 of a $14 price drop on the next trading day after the corrective disclosure *and stayed there for at least a week*. In *Acticon*, the Second Circuit explained why cases like *Immucor* and *Manulife* were not decided correctly. "[I]t is improper to offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud if the stock recovers value for completely unrelated reasons [because] [i]n the absence of fraud, the plaintiff would have purchased the security at an uninflated price and would have also benefitted from the unrelated gain in stock price." *Acticon*, 692 F.3d at 41.

[26] the trading volumes for March 29-April 1, 2021, were, respectively, 284%, 607%, 354%, and 340% of the average daily trading volume in 2021. Trading volume on the rallies Defendants cite never reached more than 187% of average daily trading volume in 2021.

Finally, Defendants attack materiality based on the prices of the ADSs that represent Volkswagen's preferred shares ("Preferred ADRs") (MTD at 26).  But the fact that the prices for common and preferred ADSs did not move in tandem does not show immateriality; instead, it points to a difference between the market for the two securities. For example, as the article Defendants cite states (MTD fn. 11), Preferred ADSs have no voting rights, potentially an important consideration for a company with a history of catastrophic mismanagement and fraud like Volkswagen. Further, trading volume in common stock ADSs was more than three times that of Preferred ADSs. The differences in the two securities and the liquidity in their markets is sufficient to undermine Defendants' assertions, which are inappropriate at the pleading stage to begin with.

## IV.    SECTION 20(a)

Volkswagen does not challenge the allegations that it controlled the other Defendants. Instead, it argues only that the Court should dismiss the Section 20(a) claims because the complaint does not plead a Section 10(b) primary violation. Because the Complaint pleads a primary violation, the Court should deny Volkswagen's motion to dismiss the Section 20(a) claim.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Dated: October 3, 2022

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

_/s/ Sara Fuks_
Sara Fuks (*pro hac vice*)

30

275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
sfuks@rosenlegal.com


*Lead Counsel for Plaintiffs*

**THE LAW FIRM OF CARLTON F. BENNETT, PLLC**

/s/_____
Carlton F. Bennett
120 South Lynnhaven Rd. Ste.100
Virginia Beach, VA
Tel: (757) 486-5454
cbennett@carltonbennettlaw.com

*Local Counsel for Plaintiffs*

31