**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| *In re Volkswagen AG Securities Litigation* | **Case No. 1:22-cv-00045-RDA-TCB** |
| | **CLASS ACTION** |

**REPLY IN SUPPORT OF MOTION TO DISMISS**
**AMENDED COMPLAINT**

MCGUIREWOODS LLP

Garrett H. Hooe (VSB No. 83983)
Gateway Plaza
800 Canal Street
Richmond, Virginia 23219
Tel:  804-775-1065
Fax:  804-698-2079
ghooe@mcguirewoods.com

SULLIVAN & CROMWELL LLP

Robert J. Giuffra, Jr. (*pro hac vice*)
Sharon L. Nelles (*pro hac vice*)
125 Broad Street
New York, NY 10004
Tel:  212-558-4000
Fax:  212-558-3558
giuffrar@sullcrom.com
nelless@sullcrom.com

Laura Kabler Oswell (*pro hac vice*)
1870 Embarcadero Road
Palo Alto, California 94303
Tel.:  650-461-5600
Fax:  650-461-5700
oswelll@sullcrom.com

*Counsel for Defendants Volkswagen AG, Volkswagen*
*Group of America, Inc., Scott Keogh, and Mark Gillies*

November 17, 2022

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT.................................................................................................................................2

I.     PLAINTIFFS' OPPOSITION CONFIRMS THAT THEIR SECURITIES FRAUD CLAIM CANNOT BE BASED ON UNSPONSORED ADRS.......................................2

     A.    Plaintiffs' Claim Is Impermissibly Extraterritorial. ..........................................3

     B.    The Complaint Fails to Plead the Required Connection Between VWGoA's Joke and Unsponsored VWAG ADRs...................................................................................5

II.    PLAINTIFFS CANNOT MAINTAIN A SECURITIES FRAUD SUIT BASED ON VWGOA'S TWO-DAY APRIL FOOLS' MARKETING CAMPAIGN......................8

     A.    Plaintiffs Have Not Pleaded Scienter as to Any Defendant...............................8

     B.    VWAG Did Not Make a Statement. ..................................................................13

     C.    The "Voltswagen" Joke Did Not Misstate Any Material Fact. .....................15

     D.    The "Voltswagen" Joke Did Not Harm Investors. ..........................................19

CONCLUSION ...........................................................................................................................19

## PRELIMINARY STATEMENT

Plaintiffs allege that an April Fools' Day joke was securities fraud.  In trying to justify that improbable claim, Plaintiffs' Opposition is notable for what it does not say:  It does not assert that *any* Defendant, including the two Individual Defendants Scott Keogh and Mark Gillies, was involved in or even aware of the Plaintiffs' purchases of unsponsored American Depositary Receipts (ADRs), which reflect an interest in VWAG shares issued outside the United States.  It does not offer a single reason why anyone at VWGoA or VWAG would have wanted investors to buy those unsponsored ADRs on the basis of a one-letter change in Volkswagen's name, only to sell those ADRs 36 hours later after the name change would be revealed as a joke.  And it does not explain why any reasonable investor would make an investment decision based on such a name change, particularly in the immediate run-up to April Fools' Day.  Without a single allegation showing that any Defendant stood to gain from deceiving investors or misstated a material fact, Plaintiffs cannot maintain a Section 10(b) claim.  Whether the "Voltswagen" campaign was a good joke or a bad joke, it wasn't securities fraud.

An April Fools' Day joke is not fraud, and the Court should dismiss the Complaint for four independent reasons.

*First*, Plaintiffs claim that a foreign company that issues only foreign stock can be subjected to securities fraud claims any time third parties in the United States offer securities that reference that stock, even without the issuer's consent.  But Section 10(b) prohibits conduct connected only to domestic securities.  Plaintiffs' claim based on unsponsored ADRs, not issued with VWAG's approval or involvement, is neither "domestic" nor "connected" to Defendants.  The Court should decline Plaintiffs' request that it adopt such a theory of securities liability, as it is not a good reading of the relevant and controlling law.

*Second*, Plaintiffs claim that any company that makes a joke as part of a marketing campaign has committed securities fraud so long as some consumers believed the joke. Here, Plaintiffs ask the Court to do the unprecedented. It is black letter law that to be liable for securities fraud, a defendant must intend to deceive investors. Here, the indisputable purpose of the joke was to highlight VWGoA's truthful commitment to electric cars. And Plaintiffs do not allege that either Individual Defendant or any other corporate agent sold stock, received compensation, or benefitted in any way from the joke. In fact, Plaintiffs do not allege any facts that come close to pleading scienter as to *any* Defendant. As to VWAG, the Complaint does not even allege that any VWAG employee knew of the "Voltswagen" joke or made a statement to the public. Plaintiffs' Opposition offers nothing to address this fundamental flaw.

*Third,* Plaintiffs fail to plead a material misstatement. Instead, they point to one statement that was not material (VWGoA's joke about changing one letter in its name) and a host of true statements about VWGoA's commitment to electric vehicles. As a result, the Complaint fail to establish that any reasonable investor would be misled by the joke.

*Finally*, far from alleging a plausible theory of loss causation, Plaintiffs accept that the share price of unsponsored VWAG ADRs was higher after the April Fools' joke than before it began. And Plaintiffs have no explanation for the rebound in the share price after April Fools' Day, which undercuts any claim that the "Voltswagen" joke caused any losses.

## ARGUMENT

**I.    Plaintiffs' Opposition Confirms That Their Securities Fraud Claim Cannot Be Based on Unsponsored ADRs.**

To overcome a motion to dismiss, Plaintiffs must allege fraud that is connected to domestic securities transactions. Plaintiffs concede that no Defendant engaged in domestic transactions in this case. But they maintain that their claim can move forward because four U.S.

banks issued *unsponsored*—in other words, without involvement by VWAG—ADRs that reference VWAG's stock, which is issued and traded in Germany.  Plaintiffs assert that those unsponsored ADR transactions were sufficiently "domestic" and "connected" to VWAG to subject Defendants to liability under the U.S. securities laws.  (Opp. 8.)

Plaintiffs cannot have it both ways.  If Plaintiffs' ADR trades were domestic transactions between American investors and U.S. banks, Defendants have no connection to those transactions.  If, instead, those ADR trades were "equivalent to" transactions involving VWAG's stock issued and traded in Germany, there is nothing "domestic" about those ADRs.  Either way, VWAG lacks the required connection to any domestic activity. This alone is reason to dismiss Plaintiffs' claims.  *See Souryal* v. *Torres Advanced Enters. Sols., LLC*, 847 F. Supp. 2d 835, 843 (E.D. Va. 2012) (dismissing complaint challenging extraterritorial conduct under Rule 12(b)(6)).

### A.    Plaintiffs' Claim Is Impermissibly Extraterritorial.

In *Morrison* v. *National Bank of Australia*, the Supreme Court held that Section 10(b) applies only to domestic securities transactions.  561 U.S. 247, 267 (2010).  Plaintiffs try to evade *Morrison*'s clear holding by pursuing claims based on U.S.-traded unsponsored ADRs that simply reference VWAG's stock, which is issued and traded in Germany.  The Second Circuit rightly rejected such an end-run in *Parkcentral Global Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 215–16 (2d Cir. 2014), and this Court should do the same here.

Plaintiffs in *Porsche* pursued a claim based on "'securities-based swap agreements' relating to the stock of Volkswagen AG." 763 F.3d at 201.  Like the ADRs here, the value of those swap agreements "depended on prices of VW stock recorded on foreign exchanges."  *Id*.  In dismissing the suit, the Second Circuit explained that allowing such a claim to move forward would "require courts to apply [Section 10(b)] to wholly foreign activity clearly subject to regulation by

foreign authorities solely because a plaintiff in the United States made a domestic transaction, *even if the foreign defendants were completely unaware of it*." *Id*. at 215 (emphasis added).

*Porsche* clearly forecloses Plaintiffs' suit. (Defs.' Mem. in Support of Mot. to Dismiss ("Defs.' Br.") 10–12.) Plaintiffs assert that unsponsored ADRs are "equivalent to a share of foreign common stock." (Opp. 8.) If Plaintiffs can pursue a claim based on those ADRs, which are offered without VWAG's approval or involvement, then there is nothing a foreign company can do to avoid a U.S. securities fraud suit. That result would "seriously undermine *Morrison*'s insistence that [Section 10(b)] has no extraterritorial application." *Porsche*, 763 F.3d at 215.

Plaintiffs ask this Court to reject *Porsche*, and to allow a securities-fraud suit to move forward any time a transaction takes place within the United States and bears some relationship, however tangential, to foreign securities, pointing to cases that have criticized *Porsche*. (*See* Opp. 9–10 (citing *Stoyas* v. *Toshiba Corp.*, 896 F.3d 933, 949 (9th Cir. 2018); *SEC* v. *Morrone*, 997 F.3d 52, 60 (1st Cir. 2021)).) But the Fourth Circuit often looks to Second Circuit law when resolving securities fraud suits. *See Matrix Cap. Mgm't Fund, LP* v. *BearingPoint, Inc.*, 576 F.3d 172, 189–90 (4th Cir. 2009); *Cozzarelli* v. *Inspire Pharm.*, 549 F.3d 618, 629 (4th Cir. 2008).

Moreover, Plaintiffs' criticism of *Porsche* is misplaced. According to Plaintiffs and the decisions they rely on, *Porsche's* "predominantly foreign" test departs from *Morrison's* supposed exclusive focus on transactions. As the Second Circuit recently explained, however, *Porsche* "uses *Morrison*'s focus on the transaction, rather than the surrounding circumstances, and flexibly considers whether a claim—*in view of the security and the transaction as structured*—is still predominantly foreign." *Cavello Bay Reinsurance Ltd.* v. *Shuben Stein*, 986 F.3d 161, 166–67 (2d Cir. 2021) (emphasis added). By considering the actual features of the transaction at issue,

*Porsche* prevents third parties in the United States from circumventing *Morrison* by relying on transactions tied to foreign securities. That approach is faithful to the Supreme Court's guidance and should be followed here.

Plaintiffs also suggest that, even if *Porsche* applies, it should be limited to the specific swap agreements at issue in that case. (Opp. 10–11.) The Second Circuit has already rejected that cramped reading of the decision, and has applied *Porsche*'s "predominantly foreign" test to many different types of investments. *See, e.g.*, *Prime Int'l Trading* v. *BP P.L.C.*, 937 F.3d 94, 106 (2d Cir. 2019) (futures contracts "pegged to North Sea oil" traded on U.S. exchanges); *Cavello Bay*, 986 F.3d at 167 (shares of a foreign company issued through a private offering in New York). Those decisions recognize that *Porsche* stands for the fundamental principle that territorial limits on U.S. law cannot be evaded by simply trading securities in the United States that, like unsponsored ADRs, imitate or track foreign-issued or -traded transactions.

Plaintiffs also minimize the inevitable consequences of rejecting *Porsche* by suggesting that foreign conflicts can be addressed by "jurisdiction and the 'in connection with' requirement." (Opp. 10 n.7.) But *Morrison* held that foreign conflicts should be avoided by applying Section 10(b) only to domestic transactions, not by punting the issue to other legal doctrines. And Plaintiffs' assurances about the "in connection with" requirement are hard to swallow given their attempt to read those words out of the statute in this very case. *Infra*, at 5–7.

**B.     The Complaint Fails to Plead the Required Connection Between VWGoA's Joke and Unsponsored VWAG ADRs.**

Plaintiffs' claim based on unsponsored ADRs fails for a second and independent reason: there was no connection between VWGoA's April Fools' joke and any transaction in unsponsored ADRs. The Complaint does not adequately allege that VWAG participated in, facilitated, or was even aware of unsponsored ADR programs. Indeed, Plaintiffs allege nothing

specific to VWAG, and admit that unsponsored ADRs are generally issued without the involvement of the foreign issuer.  (Compl. ¶ 52.)  Given those meager allegations, the Complaint must be dismissed.

Plaintiffs' Opposition offers three responses, but none has merit.  *First*, Plaintiffs note that VWAG "recently sponsored a U.S. ADR program," and therefore could have prevented additional ADR transactions.  (Opp. 12.)  The fact that VWAG previously sponsored an ADR program in the United States, years before the April Fools' campaign, does nothing to support Plaintiffs' claim.  Just the opposite.  Before 2018, when VWAG sponsored an ADR program, it was an active participant in the U.S. securities market and was subject to Section 10(b) precisely because of its affirmative decision to sponsor ADRs, which required making annual filings with the SEC.  *See In re Volkswagen "Clean Diesel" Litig.*, 2017 WL 66281, at *5 (N.D. Cal. Jan. 4, 2017) ("Volkswagen sponsored the ADRs and thus was directly involved in the domestic offering of the ADRs.").[1]  By terminating its ADR program, VWAG affirmatively withdrew from the U.S. securities markets.  That decision had consequences, including severing the connection that once existed between VWAG and sponsored ADR transactions.

*Second*, Plaintiffs argue that the Court should assume VWAG's consent to unsponsored ADR programs based on an unrelated comment letter submitted by Deutsche Bank to the SEC over a decade ago, asserting that U.S. banks *typically* obtain an issuer's consent before

---

[1]    *Volkswagen "Clean Diesel" Litigation* held that, under *Porsche*, VWAG's decision to sponsor an ADR program meant the ADRs were not "predominantly foreign."  2017 WL 66281, at *5–6.  As the SEC has explained, the concerns addressed by the *"predominantly foreign"* test "may be more persuasive in challenging . . . the 'in connection with' requirement." *Brief of United States as Amicus Curiae* at 16, *Toshiba Corp.* v. *Auto. Indus. Pension Tr. Fund*, No. 18-486 (May 20, 2019).  According to the SEC, if an issuer "can show that it chose to list and transact its securities only in foreign markets precisely to avoid U.S. securities regulation and litigation, it would be more difficult . . . to prove [the] fraud was 'in connection with' domestic ADR purchases." *Id*. at 17.

offering unsponsored ADRs to investors.  (Opp. 12; *see* Compl. ¶ 65.)  This letter and its supposition of general practices *by banks* has nothing to do with VWAG and comes nowhere close to plausibly alleging that VWAG is connected to Plaintiffs' ADR transactions.

Even assuming that Plaintiffs had alleged VWAG's tacit "consent" to an unsponsored ADR program, that still would not establish the required "connection with" unsponsored ADR transactions.  Plaintiffs identify only one case to support their "consent" theory. (Opp. 13–14 (citing *Stoyas* v. *Toshiba Corp.*, 424 F. Supp. 3d 821 (C.D. Cal. 2020).)  The district court in *Stoyas* held that the "in connection with" requirement was satisfied because a complaint alleged that a single issuer of unsponsored ADRs held 1.3% of the foreign company's stock.  *Id.* at 828.  But even taking *Stoyas* on its terms, that critical allegation is missing here, as Plaintiffs do not allege that any single ADR-issuer owns a large percentage of VWAG stock.

*Third*, without any support in their Complaint for their "in connection with" argument, Plaintiffs resort to new allegations about investor presentations that VWAG supposedly delivered in the United States.  (Opp. 12–13.)  But Plaintiffs cannot rely on allegations beyond the Complaint to overcome a motion to dismiss.  *Bragg* v. *Hackworth*, 2021 WL 508596, at *6 (E.D. Va. Feb. 13, 2012).  Furthermore, the investor presentations cited in Plaintiffs' Opposition are irrelevant because none mention ADRs or any domestic security.

Ultimately, if Plaintiffs were right, it would be nearly impossible for foreign companies to avoid U.S. securities liability, even when those foreign companies take no steps to affiliate themselves with U.S. markets or, like VWAG, affirmatively withdraw from U.S. markets. Indeed, Plaintiffs fully embrace the breadth of their theory, stating that "[a] foreign company that *affirmatively objects* to the establishment of ADR programs and *purposefully avoids* U.S. capital markets *might* be able to defeat a plaintiff's allegations concerning the 'in connection with'

requirement."   (Opp. 15 (emphasis added).)   Plaintiffs are wrong because that approach runs contrary to *Morrison* and would eviscerate Section 10(b)'s "in connection with" requirement.

## II.       Plaintiffs Cannot Maintain a Securities Fraud Suit Based on VWGoA's Less Than Two-Day Long April Fools' Marketing Campaign.

Regardless of whether Plaintiffs can pursue a claim based solely on unsponsored ADRs, their claims must be dismissed because the "Voltswagen" joke was, plain and simple,  not securities fraud.  Plaintiffs seek to hold Defendants liable for a marketing joke that (i) lasted less than two days, (ii) took place immediately before April Fools' Day, and (iii) was designed to promote VWGoA's focus on electric cars—a focus that was indisputably true.  No Defendant stood to gain from any misplaced overreactions to the joke, nor did any Defendant have reason to believe investors would react to the joke name change at all.  Plaintiffs offer no well-pleaded allegations to the contrary.

Plaintiffs' unprecedented claim fails for four independent reasons.  *First*, Plaintiffs have alleged no plausible (let alone compelling) inference of scienter.  *Second*, they have not alleged that VWAG made any statements at all as part of the joke.  *Third*, they have not identified any specific statement made during the "Voltswagen" campaign that was both material to investors *and* false or misleading.  And *fourth*, they have not offered any theory of how the joke affected the price of unsponsored ADRs in VWAG's shares issued and traded in Germany.

## A.       Plaintiffs Have Not Pleaded Scienter as to Any Defendant.

1.       As the Fourth Circuit has repeatedly explained, "[t]o allege fraud against an individual defendant, the plaintiff must allege facts supporting a strong inference of scienter as to *that person*," and "[t]o the extent a plaintiff alleges corporate fraud, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one *authorized agent of the corporation*."  *Yates* v. *Muni. Mort. & Equity LLC*, 744 F.3d 874, 885 (4th Cir. 2014) (summarizing

-8-

the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"))

(emphasis added).  Plaintiffs fail to defend their scienter allegations with respect to either of the

Individual Defendants or any authorized agent of VWAG or VWGoA.  In fact, the portion of the

Opposition discussing scienter does not identify *any* allegations specific to *any* individual. (*See*

Opp. 20–27.)  And nowhere in the Opposition or the Complaint do Plaintiffs even mention any

authorized agent of VWAG.  These omissions alone are enough to dismiss this suit.  *See, e.g.*,

*Smith* v. *Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 716 (E.D. Va. 2003) (dismissing claim

where plaintiffs failed to "attribute particular statements to each Defendant").

Even putting aside those facial deficiencies, Plaintiffs advance no plausible theory

of scienter.  Plaintiffs fail to allege "with particularity" facts that would allow the Court "to draw

a strong inference, at least as compelling as any opposing inference," *Yates*, 744 F.3d at 885, that

the Defendants engaged in "intentional or willful conduct designed to deceive or defraud investors

by controlling or artificially affecting the price of securities." *Ernst & Ernst* v. *Hochfelder*, 425

U.S. 185, 199 (1976).  Plaintiffs' Complaint is devoid of allegations that Defendants intended to

induce investors to make purchase or sale decisions.  On Plaintiffs' telling, the only misinformation

to the market was that VWGoA was changing its name from "Vol*k*swagen" to "Vol*t*swagen."  As

the Complaint acknowledges, VWGoA always intended to reveal that joke within days of making

it.  (Compl. ¶ 156 ("Defendants knew at all times that the Company had no plans to change its

name to Voltswagen.").  So for Plaintiffs' theory to hold up, VWGoA must have intended to induce

investors to buy stock on the mistaken belief that the company would be renamed "Voltswagen,"

even though the joke name change would be debunked a few days later and those spelling-oriented

investors would presumably then sell their shares.  That theory is not plausible.  As Defendants

have already explained, the Complaint does not identify any motive on the part of any of

Defendants to induce such a 36-hour bump in the VWAG share price. (Defs.' Br. 20–25.) For example, the Complaint does not allege that any Individual Defendant or corporate agent sold stock, received compensation, or benefitted in any other way during the two days of the joke. *See, e.g.*, *Hallet v. Li & Fung, Ltd.*, 1996 WL 487952, at *4 (S.D.N.Y. Aug. 27, 1996) (denying a motion to dismiss because defendants allegedly "orchestrated . . . a publicity campaign in order to keep stock prices high *until they sold their shares*") (emphasis added). Nor does it point to any other possible reason for Defendants to mislead investors.

Plaintiffs' Oppositions offers no response to this fundamental defect in their claim. On the contrary, they acknowledge that the "purpose" of the joke "was to temporarily place Volkswagen's EVs at the center of the public eye." (Opp 24.) Indeed, the joke benefitted VWGoA only by exposing consumers to *truthful* information about its commitment to electric vehicles. (*See* Compl. ¶ 137.) Plaintiffs failure to explain why any Defendant would intend to mislead investors to act on the basis of a temporary name change, which would be quickly revealed as a joke, is another reason for dismissal.

2.      To try to evade the PSLRA's pleading requirements, the Opposition raises a number of conclusory allegations unrelated to any Individual Defendant or corporate agent of VWGoA. To begin, Plaintiffs assert that it is enough that the Defendants knew that VWGoA was not in fact changing its name to "Voltswagen." (Opp. 21, 24–25.) Not so. Plaintiffs conflate the requirement to plead scienter with the separate requirement to plead a false or misleading statement (as discussed below, also unmet, *see infra*, at 15–19). The Fourth Circuit has consistently emphasized the difference between those elements. *See, e.g.*, *Maguire Fin., L.P.* v. *PowerSecure Int'l, Inc.*, 876 F.3d 541, 547–48 (4th Cir. 2017). Although Plaintiffs try to distinguish cases like *Maguire Financial* on their particular facts, (Opp. 25), what matters is their reasoning: "An

inference that an executive had enough knowledge to be aware that he was making an inaccurate statement might support an inference that he made a material misrepresentation but does not necessarily suggest an intent to mislead." *Id*. at 548. Plaintiffs have no response to that established distinction.

Plaintiffs also claim that all of the Defendants were "reckless in not knowing that investors would see and rely upon their false statements." (Opp. 22–24.) As an initial matter, "severe recklessness" under Section 10(b) requires more than allegations that a defendant merely should have known that its conduct might mislead an investor. *Ottmann* v. *Hanger Ortho. Grp., Inc.*, 353 F.3d 338, 344 (4th Cir. 2003); *see Ernst & Ernst*, 425 U.S. at 200. Acts are reckless under Section 10(b) only when they are "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or *so obvious that the defendant must have been aware of it*." *Ottmann*, 353 F.3d at 343 (emphasis added).

Under the correct recklessness standard, Plaintiffs' argument is flawed for several reasons. *First*, no Individual Defendant or corporate agent ignored a known or obvious risk that investors would be misled by the "Voltswagen" joke, because the primary content of the joke was entirely consistent with VWGoA's *true* commitment to electric vehicles. *Second*, as Plaintiffs recognize, companies have engaged in similar marketing stunts in recent years. (Opp. 18–19 (discussing pranks by IHOP, BMW, and Tesla).) None of those jokes led to investor reactions of any kind. *Third*, VWGoA terminated the "Voltswagen" campaign before April Fools' Day. (Compl. ¶ 121.) That undermines any possible inference of recklessness: after VWGoA became aware that some members of the press were misconstruing the joke, the company ended it early. *Fourth*, Plaintiffs' allegation that "Defendants . . . recklessly disregarded the possibility that their

statements would deceive investors" (Opp. 22) is particularly implausible here because VWGoA—the only company involved in the joke—*has no investors*. It sells Volkswagen-branded cars to dealers for sale to consumers. Even so, according to Plaintiffs, it was reckless for Defendants not to consider the effect of a marketing gimmick on investors who purchased unsponsored VWAG ADRs from U.S. banks. Plaintiffs fail to explain how the Individual Defendants' or other VWGoA employees' failure to consider that attenuated possibility constituted "an extreme departure from the standard of ordinary care." *Philips* v. *LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999).

*Finally*, Plaintiffs rely on a handful of decisions that supposedly justify conflating a joke with "a mental state embracing intent to deceive, manipulate, or defraud." *Ottmann*, 353 F.3d at 343. (Opp. 23–24.) But in each of Plaintiffs' cases (unlike here) the intent to induce reasonable investors was readily apparent. Plaintiffs devote the most attention to *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 929 (N.D. Cal. 2020). As they acknowledge, however, the misstatements in *Tesla* by Elon Musk, Tesla's CEO and largest shareholder, discussed the price of the company's shares (Opp. 23), and Musk had the clear motive to "cause[] short-seller's financial losses." (Opp. 24.) Musk's purpose could be achieved only by inducing the short-sellers into relying on a misrepresentation and engaging in market activity accordingly. By contrast, nothing about VWGoA's effort to "place Volkswagen's EVs at the center of the public eye" with a short-lived April Fools' Day joke turned on investor reaction to the joke name change, and no Individual Defendant or corporate agent had any motive to induce any investor to buy or sell unsponsored VWAG ADRs based on the name change in the brief period before the joke was revealed.

Plaintiffs' remaining cases similarly apply the general rule that a defendant must intend to induce investors, and the defendant in each had an obvious motive for doing so. (Opp. 24, n.20 & 21.) In one case, the defendant concealed a material fact from investors during a merger

and revealed the truth only *after the merger was completed*.  *In re Bank of Am. Corp. Sec. Litig.*, 757 F. Supp. 2d 260, 279–83, 300 (S.D.N.Y. 2010).  In the other, a technology company that issued securities tried to hide a major breach from the public to ward off any scrutiny of its data security policies.  *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706–07 (9th Cir. 2021).  In both cases, unlike here, defendants stood to gain from misleading investors and did not intend to reveal the truth in a matter of days.  And of course, in neither case was there are an obvious innocent motivation for the conduct, like the desire to make a playful April Fools' joke to promote the company's brand.

\*        \*        \*

At bottom, Plaintiffs try to meet the PSLRA's demanding scienter standard by describing a playful marketing campaign in the language of securities fraud.  According to Plaintiffs, telling a joke is a "knowing" and "intention[al]" falsehood, revealing a joke is a "corrective disclosure," and publicizing a joke "bespeaks a calculated plan to deceive."  (Opp. 21, 29.)  But that misses the forest for the trees.  There has never been a securities case anything like this, and for good reason:  corporations that make temporary jokes to market their products do not typically intend to induce investor reaction, and Section 10(b)'s scienter requirement cannot be met where, as here, the Complaint does not allege that any Defendat intended to induce a securities transaction.

**B.    VWAG Did Not Make a Statement.**

In addition to the failure to allege that VWAG acted with scienter, Plaintiffs' claim against VWAG must be dismissed because VWAG did not make any misstatement alleged in the Complaint.  (Defs.' Br. 17.)  To be the "maker" of a statement under Section 10(b), a defendant must have "ultimate authority over the statement, including its content and whether and how to communicate it."  *Janus Cap. Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011).

-13-

No facts alleged in the Complaint suggest VWAG had any involvement in making the "Voltswagen" joke. The joke related to *VWGoA's* name only, was allegedly managed by the Individual Defendants (both of whom are VWGoA employees), and was not publicized by VWAG, either inside or outside the United States. (Compl. ¶¶ 150, 189.) The Complaint alleges only one statement made by a VWAG employee, but that statement occurred *after the joke was revealed*. (Opp. 16 (citing Compl. ¶ 123).) This is patently insufficient under *Janus*.

To get around these facts, Plaintiffs ask this Court to create a categorical rule whereby the parent of a subsidiary is always the "maker" of the subsidiary's statements. (Opp. 16.) But Plaintiffs cite no authority for that proposition—which would require yet another significant expansion of securities liability. Under existing law, courts routinely hold that parents of corporate subsidiaries are not "makers" of a subsidiary's statements. *See, e.g.*, *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *21 (S.D.N.Y. Sept. 2, 2022) ("Rio's ability—as a majority stockholder—to influence Turquoise Hill's statements is distinct from showing that Rio, in fact, exerted "ultimate control" over the statements at issue in this case."); *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 262–63 (S.D.N.Y. 2020) (same); *McIntire* v. *China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 137–38 (S.D.N.Y. 2013) (same).

Plaintiffs argue that this Court should set those decisions aside because some involved parents with majority stakes short of 100%. To Plaintiffs, less-than-full ownership matters because the subsidiary's directors owe duties to the minority shareholders. (Opp. 16.) But Plaintiffs cite no case adopting that reasoning. Instead, in each case cited by Plaintiffs the court analyzed the parent's control over the *specific statements* at issue. *See, e.g.*, *In re Volkswagen "Clean Diesel" Litig.*, 2017 WL 66281, at *18 (noting the allegation that "VWAG . . . developed, reviewed, and approved the marketing and advertising campaigns designed to sell the illegal

-14-

cars"); *IOP Cast Iron Holdings LLC* v. *J.H. Whitney Cap. Partners, LLC*, 91 F. Supp. 3d 456, 473–74 (S.D.N.Y. 2015) (holding that a parent "negotiated the Stock Purchase Agreement without any meaningful participation from [the subsidiary's] own managers"); *City of Roseville Emps. Ret. Sys.* v. *EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 418 (S.D.N.Y. 2011) (explaining that the parent had "authority to determine when and whether to sell the shares being sold").  Here, the Complaint does not allege that VWAG was even aware of the "Voltswagen" joke before it ended.

      **C.**      **The "Voltswagen" Joke Did Not Misstate Any Material Fact.**

      Under the PSLRA, a securities fraud plaintiff must "specify *each statement* alleged to have been misleading," and must plead facts demonstrating those specific statements are both (i) material and (ii) false or misleading.  15 U.S.C. § 78u-4(b)(1) (emphasis added); *In re Marriott Int'l, Inc.*, 31 F.4th 898, 901 (4th Cir. 2022).  Plaintiffs have not cleared that hurdle.  They identify various statements that are material but not false (*i.e.*, VWGoA's commitment to electric cars), and one statement that is false but not material (*i.e.*, VWGoA's joke about changing one letter in its name).  That mix-and-match pleading cannot mask the obvious conclusion that no reasonable investor would find the change in one letter in company's name to be material.

      **1.**      ***Statements about VWGoA's Commitment to Electric Cars***:  Plaintiffs assert that "Defendants do not dispute that their statements were false."  (Opp. 16.)  That is incorrect.  As Defendants clearly explained, "if investors who saw the 'Voltswagen' materials formed the impression that VWGoA was serious about pursuing the electric vehicle market, they were in no way misled."  (Defs.' Br. 19.)  That is because every statement made during the "Voltswagen" campaign concerning VWGoA's electric car business was true.  Consider the factual representations made by VWGoA in the March 30 Press Release, (Compl. ¶ 113):

- "This month, the company welcomes the arrival of ID.4, its first long-range all electric, zero direct emission SUV, in dealerships across America."

- "As well as being designed to compete with mainstream compact SUVs, the ID.4 is the first product to be sold nationwide that confirms the company's commitment to sustainable mobility."

- "Volkswagen Group became the first major automaker to support the goals of the Paris Climate Agreement, with an added target of a 30 percent reduction in the company's carbon footprint by 2025, and net-carbon neutrality by 2050."

- "A resulting commitment to sell one million EVs worldwide by 2025 will see more than 70 electric models launched across the VW group brands by 2029."

- "The company further signaled its intentions by becoming one of five brands that signed up in 2019 to California's proposed fuel economy regulations, which aim to impose stricter CO2 standards in an effort to help combat climate change."

To the extent any investor saw the "Voltswagen" campaign and formed a new impression about the company's overall plans or strategy, it was those statements that drove their decision. Plaintiffs do not allege that a single one of those statements was false. On the contrary, Plaintiffs accept that the "Voltswagen" campaign "underscore[d] VW's clear commitment to its EV brand and massive EV endeavors over the coming years." (Opp. 6.)

**2.**     ***Statements About the Name Change***:     Because VWGoA's statements about its electric-car business were indisputably true, Plaintiffs' only alleged falsity is that VWGoA planned to change one letter in its name. And *that* falsity is immaterial for two separate reasons.

*First*, a reasonable investor would not have unquestioningly believed the name change, when the joke took place in the run-up to April Fools' Day. Plaintiffs accept that many companies have made April Fools' jokes in the past. For one of those jokes—IHOP's temporary rebranding as "IHOb"—the company similarly joked about changing its name to generate attention for an existing product. The question here is whether, in the context of an established history of

corporate April Fools' jokes, reasonable investors would have been misled into believing VWGoA's joke was definitively real. The answer is clearly no. *See Philips*, 190 F.3d at 615 (explaining that statements must be "examined in context").

Plaintiffs resist that outcome by trying to distinguish this case from other marketing campaigns. They point out that VWGoA's joke began a few days before April Fools' Day. (Opp. 18.) But "a reasonable investor is [not] an ostrich, hiding her head in the sand from relevant information." *Greenhouse* v. *MCG Cap. Corp.*, 392 F.3d 650, 656 (4th Cir. 2004). A company's decision to generate a little more buzz by starting a joke two days before April Fools' Day would not shield it from a reasonable investor's skepticism.

Plaintiffs also claim that other April Fools' jokes were less believable, either because "reporters recognized" those jokes or because the "pranks were implausible as well as immaterial given the commercial contexts in which they occurred." (Opp. 19.)[2] Plaintiffs' argument hinges on a highly technical view of jokes that departs considerably from the expected reaction of a reasonable investor. *See Raab* v. *Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) (affirming dismissal of a complaint because "[a]nalysts and arbitrageurs rely on facts in determining the value of a security"). If there were any doubt about the line-drawing problems created by their mechanical approach, Plaintiffs explain that prior jokes were not actionable only because a reasonable investor (1) would rely on publicly available data showing that the moon emits less light than the sun, (Opp. 19 n.16); and (2) would know that cavemen did not outlive the

---

[2] Plaintiffs accept "that certain journalists initially suspected that the name change *might* be a joke," but argue that "Defendants falsely told journalists that [VWGoA] truly was changing its name to Voltswagen." (Opp. 18.) Even taken as true, those allegations are irrelevant to the materiality inquiry because a reasonable investor would expect a company to keep up its marketing joke until it is revealed. These statements also cannot be considered, consistent with Plaintiffs' proposed class period. Plaintiffs allege that VWGoA's draft press release on March 29, 2021 misled investors and started the class period, not that its subsequent denials on March 30 did so.

Paleolithic era, (Opp. 25 n.22).  The much simpler explanation is that those examples are not actionable *because they are recognizable as jokes*.

*Second*, even if a reasonable investor would have believed that VWGoA's April Fools'-adjacent name change was true, a company rebranding is material only to the extent it signals something meaningful about the company.  For example, Facebook's recent decision to rebrand as Meta might have mattered to investors because it signaled the company's commitment to virtual reality technology.[3]  But once again, a reasonable investor who saw the "Voltswagen" campaign would be left with an accurate impression of VWGoA's business and priorities.  As Plaintiffs recognize, much of the press surrounding the rebranding speculated that the joke was intended to highlight VWGoA's truthful commitment to electric cars.  (Opp. 18.)   And to the extent investors inferred anything else from the "Voltswagen" joke, those inferences would be indistinguishable from the "commonplace commercial puffery" that is not actionable in a securities suit.  *Raab*, 4 F.3d at 290 n.1.  If VWGoA had issued statements saying "we care about the environment" or "we're a forward-thinking company," those statements would be unactionable puffery.  There is no reason for a different result when the company communicates comparable ideas through a  name change.

When Plaintiffs do address the significance of VWGoA's (joke) name change, they contend only that the name change somehow signaled to investors that VWGoA's "gas-powered cars are already legacy products." (Opp. 18.)  That allegation appeared nowhere in the Complaint. It is also nonsensical.  VWGoA would have no reason to disparage one set of vehicles to promote

---

[3] *See* Brian Merchant, *The Real Reason Facebook Changed Its Name*, The Atlantic (Oct. 28, 2021), https://www.theatlantic.com/ideas/archive/2021/10/facebook-metaverse-mark-zuckerberg/620538/.

the other, and no reasonable investor would understand its joke in that way. When Home Depot markets its electric drills, it is not signaling to the market that it has given up on screwdrivers.

### D.    The "Voltswagen" Joke Did Not Harm Investors.

Plaintiffs suggest that it is never proper to dismiss for failure to plead loss causation when the Complaint alleges a stock decline following a corrective disclosure. (Opp. 28.) That is not the law in this or any Circuit. Plaintiffs bear the burden of proving loss causation, and therefore must "allege a sufficiently direct relationship" between the alleged fraud and their injuries to overcome a motion to dismiss. *Katyle* v. *Penn Nat. Gaming.*, 637 F.3d 462, 472 (4th Cir. 2011).

Plaintiffs cannot carry their burden here. They do not dispute that the price of unsponsored VWAG ADRs traded at a higher price after the joke was revealed than before it began, or that the price rebounded immediately after April Fools' Day, two trading days after the joke was revealed. (Opp. 28.) They also acknowledge that the price of common and preferred ADRs moved in different directions when the joke was revealed, an outcome at odds with their theory that the market responded to VWGoA's joke name change. (Opp. 30.) Those undisputed facts undercut the any "direct relationship" between the joke and the price of unsponsored ADRs.

\*        \*        \*

VWGoA is not the first company to make a joke as part of a marketing campaign. Yet Plaintiffs can point to no case holding that such a joke is actionable in a securities-fraud suit. That is because the securities laws protect the marketplace from conduct aimed at defrauding investors, not playful, short-term jokes that were never designed to induce investment and that would be ignored by reasonable investors deciding where to put their money.

### CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint with prejudice for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and the PSLRA.

MCGUIREWOODS LLP

*/s/ Garrett H. Hooe*
Garrett H. Hooe (VSB No. 83893)
Gateway Plaza
800 Canal Street
Richmond, Virginia 23219
Tel: 804-775-1065
Fax: 804-698-2079
ghooe@mcguirewoods.com

SULLIVAN & CROMWELL LLP

Robert J. Giuffra, Jr. (*pro hac vice*)
Sharon L. Nelles (*pro hac vice*)
125 Broad Street
New York, NY 10004
Tel: 212-558-4000
Fax: 212-558-3558
giuffrar@sullcrom.com
nelless@sullcrom.com

Laura Kabler Oswell (*pro hac vice*)
1870 Embarcadero Road
Palo Alto, California 94303
Tel.: 650-461-5600
Fax: 650-461-5700
oswelll@sullcrom.com

*Counsel for Defendants Volkswagen AG, Volkswagen Group of America, Inc., Scott Keogh, and Mark Gillies*

November 17, 2022

-20-

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2022, I electronically filed the foregoing with the

Clerk of Court using the Court's CM/ECF filing system, which will send notification of electronic

filing (NEF) to all counsel of record.

/s/ Garrett H. Hooe
Garrett H. Hooe (VSB No. 83983)
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel:  804-775-1065
Fax:  804-698-2079
ghooe@mcguirewoods.com

*Counsel for Defendants Volkswagen AG, Volkswagen Group of America, Inc., Scott Keogh, and Mark Gillies*