1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

--------------------------------x
                                :
BETTY JO PHEIFFER, et al.       : Civil Action No.:
                                : 1:22-cv-45
              Plaintiffs,       :
       v.                       :
                                :
VOLKSWAGEN AG,                  : February 1, 2023
                                :
              Defendant.        :
--------------------------------x

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE PLAINTIFFS:    SARA E. FUKS, ESQ.
                       The Rosen Law Firm PA
                       275 Madison Ave
                       34th Floor
                       New York, NY 10016

                       CARLTON F. BENNETT, ESQ.
                       The Law Firm of Carlton F. Bennett,
                       PLLC
                       120 S. Lynnhaven Road Suite 100
                       Virginia Beach, VA 23452
FOR THE DEFENDANT:     GARRETT HOOE, ESQ.
                       McGuireWoods
                       800 East Canal Street
                       Richmond, VA 23219

                       ROBERT J. GIUFFRA , JR., ESQ.
                       Sullivan & Cromwell LLP (NY-NA)
                       125 Broad Street
                       New York, NY 10004-2498

OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                 United States District Court
                                 401 Courthouse Square
                                 Tenth Floor
                                 Alexandria, VA 22314

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

**P R O C E E D I N G S**

(Court proceedings commenced at 10:02 a.m.)

THE COURTROOM CLERK:  Civil action 22-45.  Betty Jo Pheiffer, et al. versus Volkswagen AG.

Will counsel please note your appearances for the record.

MR. HOOE:  Good morning, Your Honor.  May it please the Court.  Garrett Hooe with McGuire Woods from Richmond, Virginia on behalf of the defendants.  It's my pleasure to introduce for oral argument today, Mr. Robert Giuffra from Sullivan and Cromwell.

THE COURT:  Good morning.

MR. GIUFFRA:  Good morning, Your Honor.  It's a privilege to be here.

THE COURT:  Yes, sir.  Good morning.

MR. BENNETT:  Good morning, Your Honor.  Carlton Bennett, Virginia Beach, Virginia, local counsel.  It's my honor to introduce Sarah Fuks from New York City, who will be making the argument today.

THE COURT:  Good morning.

MR. BENNETT:  Thank you, Your Honor.

THE COURT:  Counsel, just to sort of give you a perspective as to where the Court believes we are on this case, I'm going to treat this like a traditional appellate

Pheiffer v. Volkswagen AG

3

oral argument.  I think that's the best way to do it.  What I'm going to do is I'm going to allow 20 minutes for the proponent of the motion and then I'm going to allow 20 minutes for the opponent of the motion, and then I'll allow five minutes at the back end for the proponent of the motion.

As you all are aware, this case originates as a case where we're trying to decide the context and the significance of the pleadings, not so much the facts.  We don't need a lot of factual information.  The facts are what they are, as far as the case is concerned.  And I will let you know that the Court is well aware of the arguments that you placed in your brief.  What you'll probably find with me, and I don't think any of you have ever appeared before me, is that I will ask a question or two from time to time just to sort of let you know what the focus of the Court is.  And, obviously, I will expect good answers.

Please be aware and be assured that I am aware of the facts and aware of the positions of the parties.  And so, you can basically jump into your legal arguments as we begin the disposition of the matter.  So 20, 20, and 5.  All right.

MR. GIUFFRA:  Good morning, Your Honor.  Robert Giuffra from Sullivan and Cromwell, also from New York.

THE COURT:  I bet you're surprised that you're getting a case on the docket this quick, huh?  Things in New York sort of fester for two and three, or four years before

Pheiffer v. Volkswagen AG

4

you get to this stage.

MR. GIUFFRA:  I think that's right, Your Honor.  You have a beautiful courtroom.

THE COURT:  I've only had it for about a month-and-a-half, so, thank you.

MR. GIUFFRA:  I represent Volkswagen Group of America and its German parent Volkswagen AG, as well as Scott Keogh and Mark Gillies.  Mr. Keogh is a marketing person at Volkswagen and Mr. Gillies was the communications person.

As I mentioned to opposing counsel this morning, this is a case that might best be given in a law school examination case because it's an unprecedented case over some April Fools' marketing that Volkswagen did.  And our theory, Your Honor, is that there is no plausible theory of fraud that has been pled here, because it's a -- taking the pleadings as true, a 36-hour fraud.

In a typical securities case, the company or the fraudster will put false information about the company, say that it has financial statements that will show that the profits are higher than one would expect, or that it's got some new business that's going to be very successful, and you inflate the company's stock price for months, if not years.

Here, taking the allegations of the complaint as true, at best, this was a fraud when it was concocted that would only last until April Fools' Day.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

Pheiffer v. Volkswagen AG

5

THE COURT:  Aren't most April Fools' jokes done on April Fools' Day, April 1st?

MR. GIUFFRA:  This one, Your Honor, started in the run-up, and there's a history of doing these kinds of things in the run-up.  We think Your Honor should dismiss the case on any one of five separate grounds.  As Your Honor knows, the Private Securities Litigation Reform Act asked the Court to be a gatekeeper and it raised specific, heightened pleading standards for security cases.  And in this case, we think the Court should dismiss, first of all, because that no scienter has been pled, meaning fraudulent intent, by Mr. Keogh or Mr. Gillies.  Clearly, again, no plausible theory why someone would have a fraud that they knew at the outset of the fraud they would reveal that the name change was not going to happen.

THE COURT:  Aren't there some facts in the record to suggest that your client had had some difficulties in the industry, had paid some $35 million fine or something or the other, and there was a competitive circumstance that they were interested in sort of overcoming with Tesla, and so, they wanted to get out in front of things?

MR. GIUFFRA:  Your Honor, if you look at the allegations of the complaint and the press release that was issued, it talks about a whole series of things:  The fact that Volkswagen was wanting to get into doing electronic

Pheiffer v. Volkswagen AG

6

vehicles, that Volkswagen wanted to comply with the Paris climate accord. All of those things are true and the other side doesn't contest that. The only thing the other side contests is that the name change from a K to a T, not in Volkswagen AG, the parent, but in the subsidiary's name somehow was a fraud knowing full well it would change. So when you look at the entire press release, it's quite clear that it was intended to promote Volkswagen's commitment to electric vehicles, which was true. There's no question about that.

THE COURT: Don't the pleadings suggest that there's some vertical relationship between the parent company and the company that was primarily responsible for putting out the press releases?

MR. GIUFFRA: The parent company owns the sales subsidiary and the allegations are related to the supposed name change of the sales subsidiary. There's no allegation in the complaint that anyone from the parent had anything to do with this particular marketing campaign. And the only reference to the parent in the complaint is on the 30th of March when the parent put out a -- told the Wall Street Journal that this was -- this was -- the name change was not happening.

So there's no -- there's no allegation that the parent was involved in this marketing campaign and there's no

Pheiffer v. Volkswagen AG

7

statement by the parent.  The statements were made by the subsidiary, and under a Supreme Court case called *Janus*, that's another reason why the Court should dismiss the case.

Now, under the Private Securities Litigation Reform Act, Congress directed that the plaintiff must come forward with allegations that support a strong inference of scienter, fraudulent intent.  And in this particular case, and in doing so under the Supreme Court's decision in *Tellabs*, the Court needs to weigh the allegations and determine which is a more plausible inference that you draw from the allegations of the complaint; and if the more plausible inference is that it was not fraud, then you should dismiss the complaint.

Now, here the plaintiff does not plead any plausible benefit to Mr. Keogh or Mr. Gillies from this particular supposed fraud.  They never traded any Volkswagen ADRs, they never traded Volkswagen securities, they don't allege insider trading during the two-day or 36-hour fraud.  They don't allege that Volkswagen Group of America's financial statements were somehow impacted by this 36-hour joke.  In fact, Volkswagen Group of America doesn't issue any financial statements.  Those are issued by Volkswagen AG.  Volkswagen Group of America is not a public company.

THE COURT:  But you would agree that Mr. Keogh at least did say, I think his quote was, "The upside is, obviously, the social media responses.  It's been the biggest

Pheiffer v. Volkswagen AG

8

numbers we have ever seen."

MR. GIUFFRA:  That's absolutely correct, Your Honor. And it was a desire, no question, for publicity, just like when International House of Pancakes said it was going to change its name to the International House of Hamburgers.  It was a marketing campaign.  There's no allegation in this complaint that this had anything to do with securities, or that anyone thought about securities, or that anyone even knew there were ADRs.

There's not an allegation that they said:  Oh, we've got to do this because we want to juice our stock price. There is no allegation.  It's all about marketing to customers and marketing to customers that Volkswagen was committed to doing electric vehicles, which was true.  The plaintiff doesn't contest that.

And in fact, Your Honor, when it became clear to the press, and it was a lot of issues about the press actually buying into the joke, and it went too far, and I think this undercuts any notion of fraudulent intent, the joke was cut short.

THE COURT:  Isn't scienter, though, or fraudulent intent, typically one that is assessed from a factual standpoint rather than from a pleading standpoint?

MR. GIUFFRA:  No, Your Honor.  Under the Private Securities Litigation Reform Act, Congress directed that the

Pheiffer v. Volkswagen AG

9

Court evaluate scienter based on the pleadings of the complaint. And the pleadings in this complaint as to Mr. Keogh and also Mr. Gillies are sparse. In a typical case, and I do these cases, usually you have pages and pages of allegations. A person got an email, a person traded stock, a person had all of these motivations that were focused on the securities. In this particular case, they have two allegations about both of these gentlemen.

The first one they cite the press release where Mr. Keogh says we're changing the name, and then for Mr. Gillies they quote another newspaper article saying that he told the AP reporter that the name change was true. Now, by the end of the day, so this was in the middle of the -- the press release comes out on the 30th, and then by the end of the day they say it's not true. So it's -- normally when people do a fraud, you don't do a fraud that's going to last, you know, literally hours. You do a fraud that's going to impact the stock price for many, many years.

And so, again, under the Private Securities Litigation Reform Act, you need to look at the pleadings and make that weighing that Justice Ginsberg talked about in the *Tellabs* case.

THE COURT: In the *Tellabs* case, isn't it true that there was not the same arguable relationship between the parent and the subsidiary, that there was nothing to suggest

Pheiffer v. Volkswagen AG

10

that the parent there knew what was going on?

MR. GIUFFRA:  Well, in this case, there's no allegations at all that the parent knew what was going on. The only allegation about the parent at all in the complaint is the newspaper article, the Wall Street Journal, saying that someone in Germany said there wasn't a name change.  That's it.  And so, under the Supreme Court decision in *Janus*, the mere fact that there is a parent-subsidiary relationship would not be enough to ascribe what the subsidiary did to the parent.  You have to have some allegations, for example, that the parent oversaw the campaign, approved the campaign.

But even in that case, there's no allegation here this had anything to do with securities at all.  Nothing. It's a marketing campaign directed at customers and consumers.

THE COURT:  Isn't the real purpose of securities litigation, and while we have these checks and balances and cases that talk about this, is that you want to avoid the potential manipulation of stock prices.

Isn't that the real core issues that we have to deal with?

MR. GIUFFRA:  There's no allegation in this case there was an intention to manipulate the stock price.  They don't cite a single -- for example, if they had documents where someone said let's do this marketing campaign because we want to have a day-and-a-half fraud where we can cause the

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

Pheiffer v. Volkswagen AG

11

stock price to go up, that would be something that would be sufficient -- you can try to plead scienter from that.  They have nothing.  They have two -- they have newspaper articles. One in -- the AP story and the other one, the actual press release.  They have no specific allegations.  In a -- in a securities case, Congress made the judgment that these cases needed to be dealt with at the threshold on motions to dismiss.  That's why there's a discovery stay that's put in place, and the Court then is the gatekeeper, and you have to look at the allegations of the complaint and do that weighing. But in this case, there is no allegation that decided anything whatsoever to do with securities.

Now, the only cases that they cite, and I think they're very revealing, are the Tesla case.  It's a very, very different case.  In Tesla, the motivation for Mr. Musk, and it was pled in the complaint, was that he wanted to hurt people who were short selling Tesla's stock.  So it was focused on securities, not consumers who might buy electric cars.  The fraud was one that lasted for, you know, for a very long time. It was not something that lasted for a very short time, which makes no sense as a fraud.  And the fraud directly referenced the price of Tesla's shares going in a private -- going private securities transaction at $420 a share.

THE COURT:  Hasn't the Supreme Court said that the duration of the fraud isn't necessarily the thing that's going

Pheiffer v. Volkswagen AG

12

to resolve the case, it's whether or not fraud or scienter can be proven?

MR. GIUFFRA:  Your Honor --

THE COURT:  Or pled in this case.

MR. GIUFFRA:  Your Honor, you have to look at the duration of the fraud to determine whether someone had fraudulent intent.  If an officer put out a statement or a company put out a statement, We are going to earn a billion dollars next year, and it was a bankrupt company, and they put that out for as long -- they wanted to keep that out there as long as they could to keep the stock price up, knowing full well it was false; that's different than in the run-up to April Fools' Day doing a marketing campaign which companies do, and then pulling back the marketing campaign after the press is, you know, overreacting to the marketing campaign, knowing full well when you initially start the marketing campaign that you're going to pull it back in a few days that is not what is a normal fraud case.  It's the opposite of a normal fraud case.

Fraudsters want to embed false information into a company stock price for as long as they possibly can, and they do so, typically, in order to trade stock and have some benefit.  Here there's no allegation that Mr. Gillies or Mr. Keogh even knew there were, you know, ADRs that were issued.

Pheiffer v. Volkswagen AG

13

The other cases that the plaintiff cite, they cited a case involving Apple, which is the -- excuse me, Alphabet. And in that case, the company concealed data -- a data breach for months.  That's not this case.

In another case, they cited the Bank of America case, which was 2010 in New York.  The defendant withheld information until after a merger.  There's no Volkswagen Group of America transaction in ADRs or any securities.  Volkswagen Group of America doesn't issue any securities.

So the plaintiffs cannot establish, based on these pleadings, that there was any -- and, again, the standard is a strong inference of fraudulent intent, and they can't prove it on these facts.

THE COURT:  What your opponent colleague is going to suggest that the fraudulent intent or the scienter that we're talking about, can be suggested by the fact that your client doubled down on the April Fools' joke, that that's a suggester or an indicator that they were buying into their own fraud. That's the theory of their case.

What would you say to that, sir?

MR. GIUFFRA:  What I would say to it, Your Honor, is what happened was it was a draft press release that was pulled down, which actually supports the notion that this was an April Fools' joke, because it happened right before April Fools' Day, and companies don't normally change their names,

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

Pheiffer v. Volkswagen AG

14

put up a press release, and then take it down.  And then the next day, they issue that press release and by the end of the day it was deemed to be pulling it back which, again, you know, suggests that it wasn't a fraudulent -- there was no fraudulent intent.

Again, go back to the point when the idea was made to do this marketing campaign, it was done with the full intention that the truth will be revealed no later than April Fools' Day.  I can't think of another securities fraud case in the history of the United States where the -- where someone who wanted to commit fraud did so with the full intent and understanding at the moment where they announced the fraud, they were going to reveal the fraud in a day or two, particularly in the context of April Fools' Day.

Now, I think, Your Honor, when you look at this, there's no allegation that anyone involved in this, Mr. Gillies or Mr. Keogh, had any reason to think that this would affect ADRs.  If you think about the question of materiality, so that's -- scienter is the first ground for dismissal, materiality is the second.

In materiality, the mere fact that a statement is false does not make it actionable under the securities laws. It needs to be materially false.  And in that context the Court needs to consider the context of the statement.  Here the statement was done right in the run-up to April -- April

Pheiffer v. Volkswagen AG

15

Fools' Day. It was done in -- Volkswagen had previously done April Fools' Day marketing. There was doubt among reporters as to whether this was real. And, in fact, much of the press release, and I think this is important, Your Honor, in paragraph 113, where the press release is, were accurate statements. It was drawing attention to a new electric vehicle Volkswagen was putting out. Volkswagen did have ambitions and it has invested billions of dollars in electric vehicles, and Volkswagen is committed to the Paris climate accord, and the other side doesn't challenge that. The only misstatement that they cite is the name change from K to T, which was, in fact -- all that sought to do was to communicate to the market that Volkswagen, truthfully, was committed to electric vehicles, which is true. And it's hard to imagine that a reasonable investor, which is a test for materiality, would be persuaded by a draft press release that was suddenly withdrawn and the name change was only for the subsidiary, not for the parent company.

So, Your Honor, I think that's the second ground. It's almost a form of puffery where you state we're very committed to electric vehicles, we're spending billions of dollars on it. That's all true. The other side doesn't contest it. And then you say, we're so committed, we're going to change our name from Volkswagen to Voltswagen, and that really is just a way of signaling that we're very committed.

Pheiffer v. Volkswagen AG

16

And then a day or two later, with full intent, you're going to pull back and reveal that that was an April Fools' joke.  That is not securities fraud.

In the Musk case, it was done in connection with a claim that going private securities transaction.

Your Honor, should I go on to the issue, which I think is a pretty technical issue but an important one, about whether the nature of the securities here --

THE COURT:  I like technical stuff, so you can proceed.

MR. GIUFFRA:  The issue, Your Honor, here is, it's twofold.  Volkswagen AG, the parent, in 2018 filed something with the SEC and said we don't want to sponsor ADRs.  We do not want to be in the U.S. securities markets.  And at that point, some banks, without any involvement by Volkswagen AG, did these ADRs.  Now, what is an ADR?  An ADR is, essentially, a receipt that's issued by a bank.  The actual securities are traded in Germany.  And Volkswagen wanted to avoid any involvement in the U.S. securities market.

THE COURT:  But the bottom line is, I understand that these trades were, at least in some respects, manipulated on the New York Stock Exchange anyway.

MR. GIUFFRA:  No, Your Honor, the trades were engaged by the over-the-counter market and the courts have held that the over-the-counter markets are not registered

Pheiffer v. Volkswagen AG

17

exchanges like the New York Stock Exchange, and Volkswagen had no involvement in those transactions.  Volkswagen didn't sponsor the ADR program, in fact, they tried to stop it. Volkswagen was not the counterparty in the transaction with the plaintiffs.  There's no allegation that Volkswagen sought to induce any ADR investor.  There's no allegation that Mr. Gillies or Mr. Keogh knew there even were unsponsored ADRs.  There's no allegation that Volkswagen consented to the banks issuing these --

THE COURT:  With all these banks engaging in these transactions, and I think that that's acknowledged and conceded by everyone, I would assume that Volkswagen, being as big of a company as it is, and having some idea as to what's going on with regard to the assets that it has, would be aware that these things, even though they are not authorized, are actually being manipulated through exchanges in the United States.

MR. GIUFFRA:  Well, again, it's the over-the-counter market, but Volkswagen had no ability, and no company has an ability to stop unsponsored ADRs.  And in fact, in 2008 when the SEC changed the regulation, and we cite this in our brief, there was consideration given to having a requirement that a company consent to having any ADRs issued by it, and the SEC rejected that.  So the only action by Volkswagen that's in the record is Volkswagen withdrawing its sponsorship of ADRs.  And

Pheiffer v. Volkswagen AG

18

so, part of the problem here and the reason why this case does -- and, again, this is the more technical, I think you can decide the case on scienter, but the issue that we face here is that the company did not want to be in the U.S. securities market and wasn't in a position to stop these banks.

The other side cites, at best, they say:  Well, back in 2008 Deutsche Bank issued some letter in an unrelated case having nothing to do with Volkswagen saying in 2008 it was customary to get the company's consent to go forward with unsponsored ADRs.  That was the same time when the SEC rejected the requirement that you have to consent to unsponsored ADRs, and Volkswagen withdrew its consent for sponsored ADRs.

So that's not something that I think that they can plausibly rely upon.  In fact, Your Honor, and I have -- if I can approach, I can actually hand up to the Court.  This is the amicus brief that was submitted by the solicitor general in the SEC.

Can I approach, so you can have a copy of it?

THE COURT:  You may.

MR. GIUFFRA:  You may not have it.

This was an amicus brief that was submitted by the SEC in connection with a case involving Toshiba.  And to sort of lay out the legal landscape, there is a circuit conflict between the Second Circuit, which the Fourth Circuit often

Pheiffer v. Volkswagen AG

19

looks to in dealing with securities cases, which is in New York, and the Ninth Circuit on how to deal with cases like this one.

And in the Ninth Circuit in a case involving Toshiba, the Court said, "Unsponsored ADRs could be a basis for having a claim in the U.S."

In another case involving *Porsche*, which involved Volkswagen, and I argued the case in the Second Circuit. The Second Circuit held that it was not sufficient that the underlying transaction occur in the United States, but you needed to establish that the transaction was predominantly a foreign -- if the transaction was predominantly foreign, then you would not apply the securities laws because the idea behind *Morrison* is to avoid conflicts between U.S. and non-U.S. securities law. And the Second Circuit has applied that ruling in a case involving securities-based swap agreements, which occurred in the United States, but were on foreign securities. They've applied it in connection with restricted stock for foreign companies, and also crude oil futures.

Now, in *Toshiba* the solicitor general and the SG said, okay, you know, we think maybe that the Second Circuit got it wrong although it told the Supreme Court not to address the issue. But then what it did was it focused on the "in connection with" requirement under the securities law. And in

Pheiffer v. Volkswagen AG

20

order to plead a case, again, under the technical securities laws, you've got to establish that the party that engaged in the fraud did so in connection with the securities that were at issue. In this case it would be unsponsored ADRs and the SG made the point, which is directly on point in this case that if you had a situation where a company wanted to avoid the U.S. securities markets and wanted to only list its securities outside the United States to avoid U.S. securities or regulation, which is exactly what Volkswagen did in 2018 when it withdrew its sponsorship of ADRs, which is an undisputed fact in the record, it would be more difficult in case, say, for respondents to -- this is page 17 of the amicus brief -- to prove that there's a fraud. In that case it was an accounting fraud. This is a marketing campaign, was in connection with a domestic ADR purchase.

So, Your Honor, I think if you look at the "in connection with" requirement, again, Volkswagen didn't sponsor these ADRs, it actually withdrew its sponsorship of ADRs five years ago. It didn't trade unsponsored ADRs, it didn't -- sought to induce anyone to buy unsponsored ADRs. The other side cites, and they don't cite this in the complaint the fact that Volkswagen had done some investor presentations in the United States. Well, people when they want to buy Volkswagen stock buy in Germany, they buy the underlying securities. Plus, Volkswagen does bond offerings in the United States.

Pheiffer v. Volkswagen AG

21

There's no connection between this marketing campaign and any effort to induce anyone to buy unsponsored ADRs, securities that were created without any involvement by Volkswagen whatsoever.  And so, you know, we think that that's another ground for the Court to dismiss the case.

THE COURT:  Counsel, what I'm going to do is I'm going to let your opponent colleague have her time and then I'll let you come back in rebuttal.

MR. GIUFFRA:  Thank you so much, Your Honor.

THE COURT:  Thank you, sir.

MS. FUKS:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. FUKS:  It's a privilege to be here.  So I understand that Your Honor is familiar with the facts of the case, but I do want to highlight some of the background in the facts that defendants failed to mention in its papers.  Then I would like to address the *Morrison,* and "domestic transactions," "in connection with" element, and then I would like to go on to the real substance of falsity and scienter.

Of course please interrupt me if you have any questions.

THE COURT:  Yes, ma'am.

MS. FUKS:  So the corporate defendants in this case are Volkswagen AG and Volkswagen Group of America.  And Volkswagen Group of America is wholly-owned by Volkswagen AG.

Pheiffer v. Volkswagen AG

22

And the complaint alleges that not only did VW AG own 100 percent of Volkswagen America, it appointed all of its directors and officers, it was involved in its daily affairs, and it controlled the content of its public statements, and these are similar allegations that the Court found sufficient in the Volkswagen diesel securities class action to demonstrate control, and to demonstrate attribution of the statements under --

THE COURT:  Are there any facts in the record or in the pleadings, I guess a better way of putting it, would suggest that the subsidiary had any direction or control, or any of the things that we usually see from the parent company and the professing of this campaign?

MS. FUKS:  In connection with the campaign, when you look at the surrounding circumstances of the electric vehicle campaign, and so you have the CEO of Volkswagen AG, Herbert Dice, who is making all of these statements about electric vehicles, he speaks in connection with Power Day, which is on March 15th, two weeks before the class period.  And so, he's heavily involved in this EV campaign.  And it's not just in Germany, it's in America.  And if you look at the news articles, for example, if you look at the AP article, it does state that Volkswagen in Germany told -- made some of these statements to the press.  And *Janus*, and cases that have interpreted it, say that you look at attribution from the

surrounding circumstances.  And here it's clear that everybody involved thought that it was coming, not only from this -- which, you know, they characterize it as some type of detached subsidiary in America, it was coming from the parent in Germany as well.

THE COURT:  Is there anything in the pleadings to particularly connect the parent to what the subsidiary was doing?

MS. FUKS:  Aside from those surrounding circumstances, no, there is not.  We do have the general allegations of the point that the parent appointed the directors and officers, and they do control the public statements.  Those are -- those are our allegations.  So then you have the individual defendants in this case:  Scott Keogh, who is CEO of Volkswagen America, and Mark Gillies, the head of product.

THE COURT:  So at a minimum, from your perspective, even if it was a joke, Keogh was buying into the joke by making the statements he made with regard to how much this campaign had enhanced the approach that Volkswagen and Voltswagen were taking?

MS. FUKS:  Yes, Your Honor.  And so, you look at the fact that more important than anything for Volkswagen is rebuilding its reputation following Dieselgate.

Since 2017, the company pled guilty to fraud and

Pheiffer v. Volkswagen AG

24

conspiracy and other charges in connection with rigging its vehicles to spew illegal levels of NOx polluting the environment. And consumers and investors, they all lost trust in Volkswagen. The company paid about 35 billion in fines. And it's against this backdrop of Dieselgate that Volkswagen positions itself as the leader --

THE COURT: What your opponent colleague is going to say is even though Volkswagen was found responsible for doing things that they should not have done in one context, it doesn't necessarily mean that this is a stock manipulation case in this context.

MS. FUKS: Of course, Your Honor. This is just setting the stage for what their motivation is to re-establish the company. Unfortunately, you know, and I'll get to this later. The scienter standard is recklessness. It's reckless conduct, and even though they may not have specifically intended to inflate the price of the company stock, investors were harmed. The stock inflation was a collateral consequence of their reckless conduct. And I believe that it's sufficient. I don't want to get --

THE COURT: Which I think supports your colleague's statement that this is a law school examination, because usually when we're talking about scienter, we're not talking about recklessness. They are usually two different contexts, but it seems that the case law has carved out a recklessness

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

Pheiffer v. Volkswagen AG

25

standard, even in the context of assessing scienter.

MS. FUKS:  Yes, absolutely.  Absolutely. Recklessness is scienter.  And for all the cases involving insider sales and stock manipulation, well there are just as many cases that don't involve those.  I mean it's black letter law that you don't have to allege a specific concrete motive. You don't have to allege insider sales.  The securities laws were enacted to protect investors, and not a caveat emptor. So certainly reckless conduct suffices for scienter.

THE COURT:  Where is the line between, in this case, what we would say or what you would argue is reckless conduct and other cases which talk about puffery.  In other words, we're just saying things to enhance our brand.

What would you say is the fine line or even bright line is between the two?

MS. FUKS:  Well, puffery is vague statements of optimism.

This is a case where defendants double down on their lies.  So, I mean, the class period starts on March 29th.  And so, Volkswagen publishes on its website this press release that is dated incorrectly, April 29th.  Okay.  So it's on the website for about an hour before the company takes it down. But in addition to the press release appearing on the website, Volkswagen emails it from an anonymous email address to a slew of high profile journalists.  And so, the press release, it

Pheiffer v. Volkswagen AG

26

not only says that Volkswagen is changing one letter in its name, but it has all of these specific things, these specific actions, that Volkswagen is going to take in connection with the rebranding.  Efforts that would cost millions of dollars.

THE COURT:  Is there anything in the record to suggest, and I don't know -- in the pleadings, I guess at this point, to suggest that double downing, as the term has been used, occurred from the parent or the subsidiary?

MS. FUKS:  Well, you know, it looks like the double downing did occur from the subsidiary, but you also have certain articles, and it's ambiguous, in some of the articles, you could argue, from reading the articles, that it did come from the parent because certain of the articles say that, well, we called Volkswagen and Volkswagen told us, officials from Volkswagen, told us that their subsidiary in America is changing its name.  So I mean we would argue that those statements, and this is an issue that can be determined in discovery, you know, but at the pleading stage we would argue that this ambiguity is sufficient to connect the parent to --

THE COURT:  Refresh my memory.  Was the ambiguity referenced in the pleadings?

MS. FUKS:  Yes, it was.  We have quotations from these articles that highlight the fact that Volkswagen AG in Germany.  And, yes, at the end of the day when the hoax was revealed, you do have Volkswagen in Germany saying, "We're

Pheiffer v. Volkswagen AG

27

sorry."  So Volkswagen in Germany is taking responsibility for this by saying, "We're sorry."  If they have the power to retract it, then clearly they have the power to disseminate it in the first place.

I mean just so -- so getting back to this specific press release.  It's not just this one letter.  It's not just, as defendants say in their brief, investors who were focused on spelling.  It's not just the spelling, okay.  They said the new cars are going to have a new logo, it's going to distinguish them from the gas-powered vehicles.

THE COURT:  The new generation of vehicles, I think it's termed.

MS. FUKS:  Right.  So this is a material change.  I know that I'm jumping around a bit but, you know, this is material.

If you look at other companies doing rebranding, the complaint cites the example of Tropicana and they changed their orange juice label, and it cost them millions of dollars and their revenue went down by 20 percent.  So in the mind of an investor they see this and they say, Okay, wow, this is a great campaign.  This campaign is going to translate into greater revenue for Volkswagen, and which, of course, is going to translate into a higher stock price.

So I mean perhaps not the most, you know, sophisticated of a take.  Maybe not a correct take, but

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

Pheiffer v. Volkswagen AG

28

certainly this is -- this is, you know, securities laws are here to protect investors like this.  I mean, you know, but if you look at -- if you look at the media -- so back to the joke.  So, okay, they put it on the -- they put it on the website, March 29th.  They take it down after an hour, they email journalists, the journalists publish all of these articles.  But before they publish the articles, they go to the company, they go to Mr. Gillies, he confirms to them, to the AP multiple times, yes, this is going to occur.  Okay.  Then the next day they put the press release back on the website.  More articles are published.  Okay.  By the time this -- so this is a 36-hour joke, but it increases the price of Volkswagen ADS by 10 percent.

Then, when they come out and on -- after the market closes, after the market closes on March 30th, it's on the company's website, 7:45 p.m. Wall Street Journal publishes a news exclusive and they say VWAG says we're sorry, this was a hoax.

Okay.  The journal article notes that caused the company's stock price to increase.  Then over the next two days the company's stock falls five percent.  The materiality, the increase and the decline in the price of the company's stock, that's classic evidence of materiality on the motion to dismiss.

THE COURT:  How do you deal with your -- I'm

Pheiffer v. Volkswagen AG

29

actually switching gears a little bit and I apologize if I am getting you off the outline of your argument.

How do you get around the suggestion by your opponent colleague that the "stocks," I'm using that term in quotes, that were traded were not ones that were traded under traditional stock exchanges in the United States?  How do you get around that?

MS. FUKS:  Okay.  So absolutely.  So the American depository shares are backed, they are backed by foreign shares in Volkswagen.  So the reality of the marketplace is that you do not have unsponsored ADRs where the company was not contacted by the banks to obtain non-objection --

THE COURT:  The suggestion is that this was something that was done by the banks and wasn't directly or even implicitly authorized by Volkswagen.  That's the suggestion in response.

MS. FUKS:  So I mean, first of all, what you have to allege is plausible consent.  And this is subject to Rule 8 simple pleading standards.  And our complaint satisfies plausible consent, whether or not Volkswagen -- the actions that they took, that's an issue for discovery.

THE COURT:  Why are there different classifications of stocks if we're not going to treat them differently?

MS. FUKS:  So you have sponsored ADRs and you have unsponsored ADRs, and the fact that they didn't sponsor the

Pheiffer v. Volkswagen AG

30

ADRs, no Court has ever said that you cannot bring a securities case just because the ADRs are unsponsored. And you have the *Toshiba* case, the Supreme Court -- I mean the Ninth Circuit said in *Toshiba* under analogous circumstances that the allegations are sufficient to show *Toshiba's* plausible participation. And I think so -- I mean what I would like to do is sort of walk you through some of these -- some of the legal standards that have been established by the courts, and because I think it can get very confusing in deciphering the difference between domestic transaction and "connection with." So I just would like to go through this.

So in 2010 in *Morrison*, the Supreme Court said that you can have a 10(b) claim against -- in connection with domestic transactions and other securities. So the securities they don't have to be traded on a national exchange, that's fine. So what we have here is a domestic transaction in other securities. And *Morrison* said that to determine whether a transaction is domestic, you look at where the purchases and sales took place. That's where you end the inquiry. And all the circuit courts that have interpreted *Morrison* have said to determine whether a transaction is domestic, you look at where the parties incur irrevocable liability.

And defendants don't contest this. Okay. Here the parties incurred irrevocable liability in the U.S. Plaintiffs put their share orders in through their U.S. brokers and the

Pheiffer v. Volkswagen AG

31

ADSs are issued through the depository institutions, which are all in New York.  So defendants say it's not enough that the transactions are domestic and they cite the Second Circuit's case, *Park Central*, that's the *Porsche* case, which says that even if you satisfy *Morrison* in some cases, the facts are still so predominantly foreign that it's -- the conduct is extraterritorial.  You can't apply 10(b).

THE COURT:  And they applied a three standard test of potential conflict of foreign laws and procedures in applying Section 10(b), the geographic location where the alleged statements were made, and whether foreign authorities have already taken the lead in investigating the matter.  I think was the test that was set out in that case, correct?

MS. FUKS:  Yes.  So here you have no foreign authorities investigating the matter, first of all.  But every circuit court that has considered *Park Central*, the First Circuit, the Third Circuit, the Ninth Circuit, they've all rejected *Park Central* as inconsistent with *Morrison*.

If you look at the *Park Central* case, you have to look at the character of the securities at issue, which is very, very different than the character of the securities at issue here.  Okay, those securities were derivative swaps, okay, where you have two parties that have absolutely nothing to do with Volkswagen and they essentially bet on the price of whether Volkswagen shares are going to go up or down.  These

Pheiffer v. Volkswagen AG

32

swaps are wholly unconstrained to the amount of Volkswagen shares that are out there. Here, the only shares that were available for sale -- the only ADSs that were available for sale were constrained by the shares that Volkswagen -- the foreign shares that Volkswagen issued.

So I mean in cases that have looked at *Park Central* say it's extremely limited to its facts. Even the *Park Central* court says you can't apply this rule in a perfunctory matter. These derivative swaps are very different. And by the way, in footnote 9, in the *Park Central* case, the Court actually noted that the derivative swaps they could have referenced Volkswagen's ADRs, but they didn't. They only referenced the foreign securities.

THE COURT: The *Absolute Activist* case out of New York is an interesting case. How do you think it has any application to this case?

MS. FUKS: Um?

THE COURT: I'll kind of outline it for you. That may not have been a fair question. The *Absolute Activist* case tries to lay out a test that says, "Title to the shares was transferred within the United States that the purchaser incurred irrevocable liability within the United States to take and pay for a security; or three, that the seller incurred irrevocable liability within the United States to deliver a security."

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

Pheiffer v. Volkswagen AG

33

How does the case impact with what we're doing?

MS. FUKS:  Yes, Your Honor.  I'm sorry I forgot --

THE COURT:  That's okay.

MS. FUKS:  -- which case.

So that's exactly what our case is, irrevocable liability occurred in the United States.

THE COURT:  Is that a conjunctive or a disjunctive test?

MS. FUKS:  That's a disjunctive test, I believe.  So I don't believe that there's any dispute here that irrevocable liability did not incur in the United States.  Really, you know, what defendants' dispute is that the transactions were in connection with the purchase and sale of the security.

You know, I mean just, again, going back to the *Toshiba* case, so in *Toshiba* the Court, on remand, the Court upheld the 10(b) claim against a company whose shares traded in Japan.  These were unsupported ADSs.  And they said, "All you have to do is allege defendants' plausible consent to the sale of ADSs in the U.S.  We have done that here.  We have shown that, first of all, Volkswagen AG made investor presentations.  Even though we don't specifically allege those in the complaint.  A Google search shows that Volkswagen is making investor presentations.  And even though they don't reference ADRs, well, of course, the purpose of the presentations is to, you know, elicit investment.

Pheiffer v. Volkswagen AG

34

If you look at the volume of the shares, the foreign shares traded in Germany versus the amount of the shares versus the shares that are traded on the OTC, you have ten times more shares traded on the OTC in -- which is located in New York in the United States, than you have in the German shares.

So clearly, I mean, Volkswagen is a very sophisticated company.  They know that U.S. investors are purchasing these shares.  They cannot simply have it both ways.  They certainly could have objected to the establishment of unsponsored ADRs.

THE COURT:  I'm going to give you two or three minutes and try not to interrupt you to close up your argument.

MS. FUKS:  Okay.  I mean so we've already discussed, you know, the false statements and materiality.  So, you know, the Fourth Circuit says you don't resolve a question of materiality against the plaintiff at the motion to dismiss stage, unless it's clear no reasonable jury could find that the facts at issue was material to an investor.  You know so if you want to look at materiality, you just have to look at the reaction from the press, from Wall Street.  Okay.  You have a Wall Street analyst, Dan Ives, of Wedbush, one of the top investment firms, publishing a bullish research note after Volkswagen makes this announcement, and that increases the

Pheiffer v. Volkswagen AG

35

stock price.

I mean -- and, you know, Dan Ives, once they revealed the hoax, you know, he said he's never seen anything like this in 21 years on Wall Street. He said everybody got fooled. He predicted ramifications. You have, you know, University of Michigan business professor saying the use of deceit is especially damning for Volkswagen, even though it's a two-day joke, it caused harm.

You have the former SEC chief economist saying the press release couldn't have been considered humor, it was issued two days before April Fools' Day, nobody thought it was a hoax. You have Business Insider saying if there was any winking or nudging, it was a loss on the media and the public. Wall Street took it seriously. Volkswagen's stock popped more than 10 percent. These are just -- I think that certainly the reaction -- and then you have, of course, the SEC investigating Volkswagen. And so, I think if you look at, well, what's a proxy for whether a reasonable juror would find this possibly material, I think all of these reactions are certainly suitable proxies for materiality.

So I mean, I think, we have, you know, amply established all of the elements and that many of these things, these sponsorships, Volkswagen's consent, you know, the scienter, the intent, these are issues that have to be vetted in discovery, but I certainly think that we have met the

Pheiffer v. Volkswagen AG

36

pleading standards.

THE COURT:  Thank you, ma'am.

MS. FUKS:  Thank you, sir.

THE COURT:  Up to five minutes in rebuttal.

MR. GIUFFRA:  Thank you, Your Honor.

Your Honor is the gatekeeper on this motion.  And let me start, go through each of the arguments that were made. There were no statements made by Volkswagen AG, there's no allegation in the complaint that Volkswagen AG was involved in the marketing, there's no allegation particularized that Volkswagen AG even knew about the campaign.

In the Volkswagen diesel case, which was referenced before, there were pages and pages of allegations about Volkswagen being involved in the marketing campaign.  The device was developed in Germany, completely different case.

As to Mr. Keogh, this was a good marketing campaign. It was not securities fraud.  It was intended to promote the truthful commitment to electric.  Now, they do not allege and the other side just conceded, we do not specifically allege that he intended to commit securities fraud.  That was what was conceded by the other side, that was conceded by the other side.  There's no allegation of a specific intention by Mr. Keogh or Mr. Gillies to inflate the stock price.  That should be the end of the case.

THE COURT:  But they also make reference to the fact

that it is arguably reckless.

MR. GIUFFRA:  That's correct, Your Honor.

THE COURT:  And this is a subset of scienter in the context of these kinds of cases.

MR. GIUFFRA:  In the Fourth Circuit, the standard for recklessness in security's cases, which is different than most, is severe recklessness.  It has to be so highly unreasonable and an extreme disruption of the standards of ordinary care.  It's beyond recklessness, it's extreme recklessness and they can't plead that.

The press release was all true except for the one letter name change.  Volkswagen was committed to electric, Volkswagen did invest billions into electric.  And Volkswagen, again, if you want to say, well, someone had fraudulent intent, the campaign was retracted early after it was clear that the press was over-reporting about it, and that it basically bought the joke more than folks intended.  If you were engaged in fraud, you would want to keep the fraud going, not retract it because the people who were reading the press release were overreacting to it.

So the end of the campaign confirms that this was not a case of fraudulent intent.  And, again, as the plaintiff conceded, there's no particularized allegations that anyone involved in this thought it was going to have anything to do with securities, nothing, not one word.

Pheiffer v. Volkswagen AG

38

So I'm not aware of another securities case where someone was able to establish scienter when they don't even have an intention to impact the stock price of a company. It was intended to affect consumers which is what it did. They were -- they cited the case in the complaint. Mr. Keogh talking about all the buzz in social media about REV. That was what the intention was, it was to affect consumers, not to affect stockholders, and that was conceded by the other side.

This claim about the press release having anything that's false, not true. They don't allege specifically that anything in the press release was not true, other than the name change. There's no motive for this fraud whatsoever if you're going to reveal that the name change is not happening within no more than 36 hours. It makes no sense. I'm not aware of another securities fraud case in the history of the United States where the people at the outset of a fraud intended to tell people the truth a day-and-a-half later. Not one. And if you look at the Elon Musk case, it involved a securities transaction, not something that occurred here.

In terms of the stock price, the stock price we covered very quickly after this was -- after it was -- after the relevant events. We think the stock price went down, not because of this but because of other things.

THE COURT: The case law suggests that how much the stock moved or may not have moved is not necessarily the key

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

to resolving the issue.  It could go up, it could be all kinds of considerations and reasons why stock prices change.  So that is not the preeminent consideration.

MR. GIUFFRA:  In fact, Your Honor, in this case there are ordinary ADRs on ordinary Volkswagen shares, and then there are preferred ADRs on Volkswagen shares.  The preferred ADRs went up during this period.  The ordinary ADRs went down, which is what the plaintiffs' owned.  So that suggests that there's not a correlation, but you're correct that doesn't matter in terms of the relevant standard.  You have to look at the words and say, are these the kind of words that a reasonable investor would think.

And I think, Your Honor, the puffery analogy is correct.  We're a great company.  We're very committed to electric vehicles.  That's not an actionable misstatement.  We're so committed we're changing our name from Volkswagen to Voltswagen.  That's a puffery statement, Your Honor, and that's not actionable and there's dozens of cases that say that.

In terms of how do we deal with the issue between the Ninth Circuit and the Second Circuit, Your Honor, I think you would focus, as the SG indicated, on the "in connection with" requirement in that *Toshiba* brief, which I handed up. There's no involvement by Volkswagen AG in these unsponsored ADRs.  Volkswagen AG, specifically in 2018, withdrew its

Pheiffer v. Volkswagen AG

40

sponsorship of ADRs. It's hard to imagine how you can do anything more to make it clear you weren't consenting. And, in fact, Your Honor, in footnote 9 of our opening brief, we cite the SEC when it amended the rules governing ADRs, not having a provision that allowed you to consent. There's no consent requirements. So if I'm a public company, and I don't want any ADRs, I can't do anything about it if banks want to issue them. I can't do anything about it under the regulations. And that's footnote 9 of our brief.

And so, Your Honor, we think they do not satisfy scienter, which candidly, the other side really conceded the main point, there was no intention to affect the stock price by the individual defendants. That's the principle, the best and simplest way to deal with this case.

Second, there's materiality. And then Your Honor can delve into the more complicated issues about whether sponsored ADRs provide a basis for -- to bring its attention to a 10(b) case. But I do think that for unsponsored ADRs on these facts for Volkswagen specifically declined to sponsor ADRs just four years ago, that they do not satisfy the "in connection with" requirement. We urge the Court to dismiss the complaint. Thank you very much.

THE COURT: Thank you, Counsel.

The matter was very well presented by both sides of the case. The Court is going to take the matter under

41

advisement.  I'm pretty efficient.  I should have something to you resolving the motion before the Court within three weeks or so.  All right.

MR. GIUFFRA:  Thank you very much, Your Honor.

THE COURT:  Very good.  Thank you.  Safe travels.

MR. GIUFFRA:  Thank you very much.

MS. FUKS:  Thank you, Your Honor.

**(Proceedings adjourned at 10:58 a.m.)**

Pheiffer v. Volkswagen AG

42

CERTIFICATE OF REPORTER

I, Tonia Harris, an Official Court Reporter for the Eastern District of Virginia, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the Motions Hearing in the case of **BETTY JO PHEIFFER, et al. versus VOLKSWAGEN AG,** Civil Action No.: 1:22-cv-45, in said court on the 1st day of February, 2023.

I further certify that the foregoing 42 pages constitute the official transcript of said proceedings.

In witness whereof, I have hereto subscribed my name, this February 13, 2023.

____/s/_____
Tonia M. Harris, RPR
Official Court Reporter