IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
|  | ) |  |
| IN RE VOLKSWAGEN AG | ) | Civil Action No. 1:22-cv-00045 (RDA/WEF) |
| SECURITIES LITIGATION | ) |  |
|  | ) | <u>CLASS ACTION</u> |
|  | ) |  |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on the Motion to Dismiss ("Motion") filed by Defendants Volkswagen Aktiengesellschaft ("Volkswagen AG" or "Volkswagen"), Volkswagen Group of America, Inc. ("VWGoA" or "Company"), Mark Gillies, and Scott Keogh (collectively, "Individual Defendants"). Dkt. 22. This matter has been fully briefed and argued and is now ripe for disposition. Considering the Motion, including the supporting memorandum (Dkt. 23), Lead Plaintiff Laszlo Rozsavolgyi's ("Lead Plaintiff") and named Plaintiff Thomas Wells's ("Named Plaintiff") opposition brief (Dkt. 33), and Defendants' reply brief (Dkt. 36), as well as the arguments raised by counsel at the hearing held before this Court on February 1, 2023, this Court GRANTS Defendants' Motion to Dismiss for the reasons that follow.

I.   BACKGROUND

A.   Factual Background[1]

Lead Plaintiff's Amended Complaint alleges that VWGoA and the Individual Defendants violated § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 ("Rule 10b-5"). Dkt. 21 ¶ 183. The Complaint also alleges that Volkswagen AG and the Individual Defendants violated § 20(a) of the Exchange Act as control persons of VWGoA and

---

[1] For purposes of considering the Motion, the Court accepts all facts contained within the Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

are therefore directly liable for the alleged actions taken by VWGoA in violation of § 10(b) and Rule 10b-5.  *Id.* ¶¶ 186-92.

This matter matures as a class action on behalf of persons or entities who purchased publicly traded American Depositary Shares ("ADSs") of Volkswagen AG between March 29, 2021 and March 30, 2021 (the "Class Period") following VWGoA's publication of allegedly false and misleading statements that the Company would be changing its name from Volkswagen to *Volts*wagen.

Volkswagen AG, an automotive Original Equipment Manufacturer, is a German corporation with its principal place of business in Wolfsburg, Germany.  *Id.* ¶ 32.  It sells its vehicles in the United States by way of its wholly owned subsidiary VWGoA, which is headquartered in Herndon, Virginia and sells its vehicles through a network of approximately 1,000 independent dealers across America.  *Id.* ¶¶ 32-34.  Defendant Scott Keogh has served as the Chief Executive Officer and President of VWGoA since 2018, while Defendant Mark Gillies has served as Head of Product and Technology Communications of VWGoA since 2011, including as acting head of communications during the Class Period.  *Id.* ¶¶ 36-37.

*Securities at Issue*

By way of background, it is noted that Volkswagen AG's ordinary shares trade publicly on the German-based Frankfurt stock exchange under the ticker symbol 766400.  *Id.* ¶ 42.  These shares are also sold on the over the counter ("OTC") market in the United States under the ticker symbol "VWAGY" for common shares and "VWAPY" for preferred.  These securities are ADSs, which represent ownership in shares that trade on a foreign exchange but are otherwise controlled by a depositary institution in the United States.  For example, holders of a VWAGY ADS receive beneficial ownership of one-tenth of one ordinary share in Volkswagen AG.  *Id.* ¶ 44.  Upon

purchase of an ADS, the holder receives an American Depositary Receipt ("ADR")—a negotiable certificate evidencing ownership interest in the ADS which has been deposited with a U.S. bank. An ADR trades in U.S. dollars and clears through U.S. settlement systems to avoid requiring that the purchase of the security be made with foreign currency.  *Id.* ¶ 50 (citing SEC Investor Bulletin at 1).  An ADR is an "instrument that represents a specified amount of a foreign security that has been deposited with a foreign branch or agent of the depositary, known as the custodian." *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 207 n.9 (2d Cir. 2014). ADSs and ADRs are used "interchangeably" to evidence a holder's beneficial ownership interest in a company's shares that trade on a foreign exchange.  *Id.*  A depositary bank creates an ADR program in which ADSs may be traded in a U.S. market when the foreign issuer of the underlying shares, or an investor already holding such shares, delivers the shares to the depositary bank or its custodian in the foreign issuer's home country.  SEC Investor Bulletin at 1.  The bank will then issue ADRs to an investor seeking to purchase the securities in the United States and that investor will be able to trade those securities on a U.S. exchange or an OTC market.  *Id.*

U.S. banks that provide ADRs to U.S. market participants do so either on a sponsored or unsponsored basis.  A foreign issuer, like Volkswagen AG, may elect to sponsor ADRs in U.S. markets through "active participation of the issuer of the underlying security."  *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 367 (3d Cir. 2002).  "An issuer who sponsors an ADR enters into an agreement with the depositary bank and the ADR owners [which] establishes the terms of the ADRs and the rights and obligations of the parties, such as the ADR holders' voting rights."  *Id*. Whereas, "[a]n unsponsored ADR is established with little or no involvement of the issuer of the underlying security."  *Id.*  Unsponsored arrangements still require that the depositary bank operating in the United States file a Form F-6 with the SEC to register the ADRs.  American

Depository Receipts, Securities Act Release No. 33-6984, Exchange Act Release No. 34-29226, 56 Fed. Reg. 24,420, 24,422 (May 23, 1991) (hereinafter "1991 SEC ADR Release").

These ADR programs are traditionally classified into three levels. SEC Investor Bulletin at 2. Level 1 ADR programs encompass both unsponsored and sponsored ADR programs whereby the ADR trades exclusively on an OTC market. *Id.* The entity registering the ADR—the issuer of the underlying security if sponsored or the depositary bank if unsponsored—must file a Form F-6 with the SEC. *Id.* Level 2 ADR programs include only sponsored programs, trade on a national securities exchange rather than an OTC market, and, in addition to requiring the issuer to file Form F-6, requires that the foreign issuer register and file annual reports on Form 20-F with the SEC. *Id.* Level 3 ADR programs are exclusively reserved for sponsored ADRs but also allow the foreign issuer to raise capital from the trading of the securities in U.S. markets. *Id.* The foreign issuer must register the ADRs on a registration statement and make annual reports on Form 20-F. *Id.*

Volkswagen ADRs currently trade as unsponsored Level 1 ADRs in an OTC market after having been registered with the SEC on Form F-6 by four depositary institutions: Deutsche Bank Trust Company Americas ("Deutsche Bank"), JPMorgan Chase Bank, N.A. ("JPMorgan"), Bank of New York Mellon ("BNYM") and Citibank N.A. ("Citi"). During the Class Period, Lead Plaintiff allegedly purchased 8,150 Volkswagen AG ADSs[2] on the OTC market and named

---

[2]   While there appears to be some observations noted in briefing that Lead Plaintiff purchased preferred ADSs and Lead Plaintiff's PSLRA certification notes that he purchased "preferred stock," it remains unclear whether he purchased ordinary or preferred ADSs. His PSLRA certification provides that on March 30, 2021, he purchased Volkswagen ADSs at $38.42 per share and sold such stock in part on April 1, 2021 for $36.06 per share and on April 12, 2021 for $34.90 per share. Dkt. 9-2 at 2; Dkt. 9-3 at 2. However, this Court takes judicial notice of the fact that the price of preferred stock never reached these figures and instead, these share prices appear to align with the price ranges of the ordinary shares. *See* Dkt. 9-3 at 2 (classifying shares purchased by Lead Plaintiff as "VWAGY" which is the ticker for the ordinary shares). Moreover,

plaintiff Thomas Wells purchased 42 ordinary ADSs on the OTC market (together "Plaintiffs"). Dkt. 21 ¶¶ 26, 28-29, 31, 57; *id.* at 66.[3]

*Events Giving Rise to Lead Plaintiff's Claims*

This dispute comes on the heels of Volkswagen AG having paid over $35 billion in fines in connection with what has been dubbed "Dieselgate"—in which Volkswagen, beginning in September of 2015, "intentionally installed illegal software in its vehicles to cheat diesel emissions tests." Dkt. 21 ¶ 2. Until 2018, Volkswagen AG had sponsored ADR programs with U.S. depositary banks but on August 13, 2018, it terminated its sponsored ADR programs. *Id.* ¶ 53. Nevertheless, Volkswagen AG's ordinary shares continued to trade in the United States through unsponsored ADR programs initiated by the four U.S. aforementioned banks: Deutsche Bank; JPMorgan; BNYM; and Citi. Plaintiffs allege that these depositary banks did not offer unsponsored ADSs "without the express or implied consent" of Volkswagen AG. *Id.* Specifically, Plaintiffs allege that the SEC provides foreign issuers like Volkswagen AG the opportunity to object to the establishment of an unsponsored ADR program, and Volkswagen AG did not expressly object to any of the programs. Plaintiffs further allege that at least one of the banks has sought affirmative consent from an issuer to jumpstart an unsponsored ADR program as an industry practice. *Id.* ¶¶ 65, 67 (citing Letter from Edwin Reyes, Managing Director Deutsche Bank Trust Company Americas, to Nancy M. Morris, SEC Secretary, at 4 (April 21, 2008), https://tinyurl.com/2khxbark ("DB Comment Letter")).

---

the Amended Complaint makes no mention that Lead Plaintiff purchased preferred stock. This Court addresses the implications of this confusion *infra*.

[3] The initial named plaintiff, Betty Jo Pheiffer, purchased 411 *ordinary* ADSs. Dkt. 1-2 at 3.

In August 2020, five years after "Dieselgate," Defendant Keogh discussed the Company's efforts to "win [customers] back," not with "a token press release or a news article" but by "proving to them that we're a good company, that we're doing the right thing," in order to "be a well-liked and well-trusted brand." *Id.* ¶ 81.  That year, the Company launched the ID.3, a passenger car and the first model to utilize its Modular Electric Drive Toolkit. *Id.* ¶ 89.  Electric vehicle ("EV") sales represented 8.8% of VWGoA's total sales in North America. *Id.* ¶ 90.  In a 2020 letter to Volkswagen shareholders, the CEO of Volkswagen AG, Herbert Diess, emphasized the Company's anticipated production of the ID.4 electric SUV beginning in 2022 and its focus on delivering more EVs to customers. *Id.* ¶ 87.  That letter also dedicated an entire page to the statement "Data and electricity are driving us now." *Id.*

Plaintiffs allege that following apparent lackluster positioning in the North American EV market, the Company ramped up its competitive marketing with Tesla.  For instance, in September of 2020, Defendant Keogh addressed Tesla in an interview with the Wall Street Journal: "Do we have the exact range of Tesla? No, but we have a better price point." *Id.* ¶ 92 (quoting William Boston, "Volkswagen Takes Aim at Tesla with Electric ID.4 SUV," *Wall Street Journal* (Sept. 23, 2020)).  And on March 15, 2021—two weeks prior to its anticipated U.S.-launch of the ID.4— Volkswagen held a "Power Day" event allegedly meant to mimic Tesla's "Battery Day" in which the Company outlined its competition strategy with Tesla. *Id.* ¶ 93.  Diess also "enthusiastically" marketed the Company's EV plans over Twitter in an effort to compete with Elon Musk, the rival CEO of Tesla. *Id.* ¶ 96.

Following the "Power Day" event, on March 16, 2021, VWGoA announced the arrival of the ID.4 to the United States:

> [T]his month marks a major milestone in Volkswagen's story: the arrival of the ID.4, the company's first long-range electric SUV in dealers across America. Just

as electric vehicles will transform the way we drive, Volkswagen has refreshed the way it sells vehicles to embrace a more sustainable future…'The launch of the ID.4 represents a huge inflection point for the Volkswagen Brand, and its foray into becoming a major player in the electric vehicle space', said Tyler Olson, EV sales strategy and dealer development head for Volkswagen of America.

*Id.* ¶ 105.  In a March 17, 2021 interview, Diess highlighted the need for Volkswagen "to earn the trust of the customer" in light of the need "to manage this change" in EV production.  *Id.* ¶ 99.

On March 29, 2021, just over three months after General Motors announced it would change its corporate logo from "GM" to "gm" with a new shape and color scheme to emphasize its new marketing strategy to sell EVs, *id.* ¶ 103, VWGoA published on its website a press release marked as "draft" announcing it would be changing its name to "Voltswagen."  *Id.* ¶ 106.  The announcement indicated that it expected the name change to take effect in May.  *Id.* ¶ 108.  The draft press release was dated April 29, 2021 and remained on the Company's website for approximately one hour before it disappeared.  *Id.*  But many news outlets, including the Associated Press, USA Today, CNBC, and the Washington Post became aware of the release and reported on the name change.  *Id.*  CNBC's article confirmed the authenticity of the release with "[a] person familiar with the company's plans."  *Id.* ¶ 108.  So did the Associated Press.  *Id.* ¶ 112 ("AP spokesperson Lauren Easton confirmed that the *Associated Press* was *repeatedly assured* by Volkswagen that its U.S. subsidiary planned a name change.)(internal quotation marks and citation omitted).  The Associated Press described the release as "premature" and linked its timing to the fact that VWGoA had begun taking reservations for the newly announced ID.4—the "only new electric model sold in the United States."  *Id.* ¶ 111.

The next day, VWGoA published another press release entitled "Voltswagen: a new name for a new era of e-mobility" again announcing the name change—this time dated March 30, 2021—and confirming the name change would begin in "May 2021."  *Id.* ¶ 113.  This time, the

release appeared complete after CNBC had reported the draft release "was incomplete, citing the need for an additional quote and photography from the automaker's plant in Chattanooga, Tennessee." *Id.* ¶¶ 108, 113. In that announcement, the Company presented a new logo and an explanation for the change:

> More than a name change, "Voltswagen" is a public declaration of the company's future-forward investment in e-mobility. By definition, Volts are the derived units for electric potential between two points. The new name and branding symbolize the highly-charged forward momentum Voltswagen has put in motion, pursuing a goal of moving all people point-to-point with EVs.

> "We might be changing out our K for a T, but what we aren't changing is this brand's commitment to making best-in-class vehicles for drivers and people everywhere," said Scott Keogh, president and CEO of Voltswagen of America. "The idea of a 'people's car' is the very fabric of our being. We have said, from the beginning of our shift to an electric future, that we will build EVs for the millions, not just millionaires. This name change signifies a nod to our past as the peoples' car and our firm belief that our future is in being the peoples' electric car."

> This month, the company welcomes the arrival of ID.4, its first long-range all-electric, zero direct emission SUV, in dealerships across America. As well as being designed to compete with mainstream compact SUVs, the ID.4 is the first product to be sold nationwide that confirms the company's commitment to sustainable mobility.

> That's been the mission since the larger Volkswagen Group became the first major automaker to support the goals of the Paris Climate Agreement, with an added target of a 30 percent reduction in the company's carbon footprint by 2025, and net-carbon neutrality by 2050. A resulting commitment to sell one million EVs worldwide by 2025 will see more than 70 electric models launched across the VW group brands by 2029.

> With the introduction of the "Drive Bigger" brand platform in 2019, Volkswagen of America, as it was then, communicated a long-term vision of striving for a higher purpose, challenging us all to move beyond self-interest and to consider being part of something bigger. The company further signaled its intentions by becoming one of five brands that signed up in 2019 to California's proposed fuel economy regulations, which aim to impose stricter $CO_2$ standards in an effort to help combat climate change.

> Voltswagen means thinking big, acting boldly and leading progress. In 1955 Volkswagen of America was founded, and from the beginning the company dared to be different from other automakers. VW first won the love the American public

with the Type 1 Beetle, which eventually overtook the Ford Model T as the world's best-selling car, which more than 23 million sold.  By establishing a storied legacy of breaking from convention and emphasizing a true driver-vehicle connection, Volkswagen of America in its time has become synonymous with humility, wit and humor, while the actual namesake translates to "the people's car."

*Id.* ¶¶ 113, 151.   The announcement also described its future business plans, including implementing the name change:

> As our newly launched ID.4 campaign demonstrates, the humanity at the core of this brand remains its enduring legacy," said Kimberley Gardiner, senior vice president, Voltswagen of America brand marketing. "The tone of Voltswagen will be a consistent thread between the branded communications for our growing electric fleet to our gas vehicles. Over the course of the next few months, you will see the brand transition at all consumer touch points. This is an exciting moment for us, and we have been working through every avenue to make the transition clear, consistent, seamless and fun for all."

> The company will preserve elements of Volkswagen's heritage by retaining its iconic VW Dark Blue color for gas-powered vehicles and Light Blue to differentiate the new, EV-centric branding. Starting today, new branding will roll out across all of the company's advertising, website and social media channels. Moving forward, "Voltswagen" will be placed as an exterior badge on all EV models with gas vehicles sporting the VW emblem only. Exterior and interior signage will soon roll out to all Voltswagen properties and dealerships across the US.

*Id.*  To complement the press release, Volkswagen also tweeted the same day:

> We know, 66 is an unusual age to change your name, but we've always been young at heart. Introducing Voltswagen.  Similar to Volkswagen, but with a renewed focus on electric driving. Starting with our all-new, all-electric SUV the ID.4 – available today. #Voltswagen #ID.4.

*Id.* ¶¶ 114, 151.   A video animating the "k" in "Volkswagen" transforming into a "t" also accompanied the tweet.  *Id.*

Again, early in the day, reporters confirmed with Volkswagen the authenticity of the name change.  The Guardian wrote "With the cat out of the bag, VW was forced to admit the story was true."  *Id.* ¶ 116.  The Associated Press also confirmed with Defendant Gillies that the Company

seriously intended the name change.  *Id.* ¶¶ 123, 154; *see also id.* ¶ 125 (automotive publication Carscoops allegedly confirmed the same with the Company).

The March 30 press release remained on the Company's website until after market close on March 30, 2021, at which time the Company removed the statement. After the press release was removed, the Wall Street Journal reported that Volkswagen intended the name change to be "an April Fools' gag."  *Id.* ¶ 121.  The Wall Street Journal quoted a Volkswagen spokesperson based in Germany as saying "we didn't mean to mislead anyone.  The whole thing is just a marketing action to get people talking."  *Id.* ¶ 123.

Plaintiffs allege that following both the March 29 and March 30 press releases, Volkswagen's ADS price enjoyed a "dramatic increase."  *Id.* ¶ 120.  One securities analyst issued a "bullish research note" in response, stating "we believe the name change underscores VW's clear commitment to its EV brand and massive EV endeavors over the coming years."  *Id.* ¶¶ 11, 118. A member of Tesla's board of directors also lauded the name change in a tweet, calling it "more than changing corporate logo, e.g., GM" and that Volkswagen was "absolutely serious" in "show[ing] their commitment to electric."  *Id.* ¶¶ 11, 119.  From the time CNBC first reported the name change on March 29 until Volkswagen retracted the name change, Volkswagen ADSs increased over 10%.  *Id.*  Over the next two trading days, Volkswagen ADSs representing common shares fell $2.17, over 5%, from its $37.75 closing price on March 30.  *Id.* ¶¶ 136, 155.

The Amended Complaint further alleges that Volkswagen reaped considerable "free publicity" for the ID.4 from the name change.  *Id.* ¶¶ 139, 152.  For instance, Forbes reported that the new name garnered 6,045 mentions across various major social media platforms, reaching 150 million people by the evening of April 1 and equating to "millions of dollars in publicity."  *Id.* ¶ 137.  Defendant Keogh commented that "the upside is, obviously, the social media response has

been the biggest numbers we've ever seen." *Id.* ¶¶ 138, 160.  Moreover, Volkswagen allegedly did not incur costs typically associated with corporate name changes such as "legal costs, marketing and advertising costs, implementation costs and the costs of new branded materials." *Id*. ¶ 140.

The name change retraction also drew ire from the public, including from multiple law professors, journalists, and a former SEC chief economist, due to the perceived seriousness of rebranding.  *Id.* ¶¶ 122-35.  On April 29, 2021, *Reuters* reported that the SEC had begun investigating VWGoA around the events leading up to and following the name change announcement and a German outlet confirmed the SEC launched the investigation in "early April" of 2021.  *Id.* ¶ 143.

The gravamen of Plaitiff's complaint is that Defendants intentionally issued false and misleading statements regarding Volkswagen's name change and that the alleged deception caused losses for investors holding ADSs in Volkswagen when the Company reneged on the announcement.  In bringing a 10b-5 action, Plaintiffs allege Defendants "knew at all times that the Company had no plans to change its name to Voltswagen." *Id.* ¶ 157.  Defendants' conduct was allegedly motivated by their desire to promote the ID.4 "without having to incur the costs and risks associated with rebranding" in its competition with Tesla for North American market share.  *Id.* ¶¶ 158-59.  Lastly, Plaintiffs allege that Defendants' conduct, in light of their stated commitment to rebuilding trust with investors and consumers following "Dieselgate," was reckless as "an extreme departure from the standards of ordinary care" and the risk of misleading investors and consumers was "so obvious that Defendants must have been aware of it." *Id.* ¶ 161.

### B.  Procedural Background

On January 14, 2022, initial named Plaintiff Betty Jo Pheiffer filed a Complaint against Defendants.  Dkt. 1.  On March 15, 2022, lead Plaintiff Laszlo Rozsavolgyi filed a motion to be appointed lead plaintiff and to appoint lead counsel.  Dkt. 7.  This Court appointed Rozavolgvi as Lead Plaintiff on March 30, 2022.  Dkt. 16.  In accordance with the Court's briefing order issued on April 11, 2022, Lead Plaintiff filed the Amended Complaint on June 3, 2022.  Dkt. Nos. 20; 21.  On August 2, 2022, Defendants filed a Motion to Dismiss the Amended Complaint accompanied by a supporting memorandum.  Dkt. Nos. 22; 23.  Lead Plaintiff filed his opposition brief on October 3, 2022.  Dkt. 33.  Defendants filed their reply brief on November 17, 2022.  Dkt. 36.

### II.  STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the sufficiency of a complaint.  *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011).  "[T]he reviewing court must determine whether the complaint alleges sufficient facts 'to raise a right to relief above the speculative level[,]'" and dismissal is appropriate only if the well-pleaded facts in the complaint "state a claim that is plausible on its face." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (2009) (citing *Twombly*, 550 U.S. at 556).

At the motion-to-dismiss stage, a plaintiff need only "allege facts sufficient to state all the elements of [his] claim," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), and "the district court must 'accept as true all well-pled facts in the complaint and construe them in the light most favorable to [the plaintiff].'" *Dao v. Faustin*, 402 F. Supp. 3d 308, 315

(E.D. Va. 2019) (quoting *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 632 n.1 (4th Cir. 2015)).  Still, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted.  *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995); *see also E. Shore Mkts., Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) ("[W]hile we must take the facts in the light most favorable to the plaintiff, we need not accept the legal conclusions drawn from the facts . . . Similarly, we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.").  And "[g]enerally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion." *Linlor v. Polson*, 263 F. Supp. 3d 613, 618 (E.D. Va. 2017) (citing *Goldfarb*, 791 F.3d at 508).  However the Court may also consider, without converting the motion into one for summary judgment, "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record . . . items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned."  5B Wright & Miller, *Federal Practice & Proc.* § 1357, at 375-76; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (citing *id.* in the context of a securities fraud case brought under § 10(b)).

When a plaintiff alleges a claim under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), that claim faces a heightened pleading standard imposed by Congress and Federal Rule of Civil Procedure 9.  "To survive a motion to dismiss, private securities fraud plaintiffs must clear the hurdle of the Private Securities Litigation Reform Act of 1995 ('PSLRA')," *Matrix Cap. Mgmt. Fund, LP* v. *BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).  In making a private securities fraud claim, a plaintiff must allege that "(1) the defendant[s] made a false statement or omission of material

fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir. 1994).

As to the first element, in addition to requiring that the alleged facts meet the plausibility standard to survive a motion to dismiss, the PSLRA demands that private securities fraud plaintiffs allege: "(1) each misleading statement; (2) the reasons each statement was misleading; and (3) when an allegation regarding such a statement is based on information and belief, 'with particularity *all facts* on which that belief is formed.'" *Teachers' Retirement Sys. of LA v. Hunter*, 477 F.3d 162, 173 (4th Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(1)).  Ultimately, the Court "need only determine . . . whether [the] complaint alleges *sufficient facts* upon which a *reasonable belief* can be formed that [the defendants'] representations or omissions were misleading." *Id.*  As to the second element, the PSLRA requires the plaintiff to plead sufficient facts to raise a "strong inference of scienter."  *Id.* (citing § 78u-4(b)).

Courts analyze the remaining two elements of a securities fraud claim under the traditional pleading rules cabined in Federal Rules of Civil Procedure 8 and 9.  These "fraud-based claims must satisfy Rule 9(b)'s heightened pleading standard."  *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 196 (4th Cir. 2018) (citing *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455-56 (4th Cir. 2013)).  "Rule 9(b) requires that 'a party must state with particularity the circumstances constituting fraud or mistake.'"  *Id.* (quoting Fed. R. Civ. P. 9(b)).  This standard contemplates  that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012)).  Further, when a plaintiff fails to plead fraud with particularity under Rule 9(b)'s pleading requirements, the omission "is treated as a failure to state

a claim under Rule 12(b)(6)." *Harrison v. Westinghouse Savanna River Co.*, 176 F.3d 776, 783 n.5 (4th Cir. 1999).

## III.  ANALYSIS

In evaluating the elements of Plaintiffs' claims against Defendants, the Court takes judicial notice of the stock prices between the time shortly before CNBC first reported on the name change and the period shortly after Volkswagen confirmed to the public it would not be changing its name, without subjecting the instant Motion to summary judgment review.  *See Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004) (("We note that we, as well as the district court, may take judicial notice of published stock prices without converting a motion to dismiss into a motion for summary judgment." (citing *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000))).  Defendants provide these prices in Exhibit 1 of their brief in support of the Motion. *See* Dkt. 23-1 at 1-3.

### A.  Applicability of § 10(b) to Unsponsored ADRs

Relying on *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), Defendants begin by arguing that § 10(b) does not reach the unsponsored ADRs held by Plaintiffs because those securities do not trade on domestic exchanges and are the product of predominantly foreign transactions.  And even if the securities could qualify as domestic, Defendants suggest that VWGoA's statements were not made "in connection with" Plaintiffs' transaction in ADRs because those ADRs are unsponsored and therefore too far removed from having a "transactional nexus" with Volkswagen AG's publicly-listed German shares.

Plaintiffs counter that a transaction, for purposes of the Exchange Act, may be deemed "domestic" if a party becomes irrevocably committed to the transaction, or title changes, in the United States.  Plaintiffs argue that each major step involved in obtaining the ADRs occurred in

the United States through U.S. institutions, thereby establishing that title changed in the United States.  Plaintiffs further maintain that Defendants rely on a minority view reading of *Morrison* in *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014) and that the facts here distinguish that opinion.  Lastly, Plaintiffs argue that § 10(b)'s "in connection with" requirement should be applied broadly and that false statements contained in press releases are actionable under Fourth Circuit precedent.

Section 10(b) in relevant part provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.

15 U.S.C. § 78j(b).  To enforce § 10(b), the SEC enacted Rule 10b-5, which specifies the breed of behavior that may be deemed in violation of the United States securities laws:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange

(a) [t]o employ any device, scheme, or artifice to defraud,

(b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  "Rule 10b-5 . . . was promulgated under § 10(b), and 'does not extend beyond conduct encompassed by § 10(b)'s prohibition.'"  *Morrison*, 561 U.S. at 261-62 (quoting

*United States v. O'Hagan*, 521 U.S. 642, 651 (1997)).  An inquiry into "what conduct § 10(b) reaches . . . is a merits question" as opposed to a question of subject-matter jurisdiction. *Id.* at 254.

In *Morrison*, the Supreme Court replaced the deeply entrenched and convoluted "conduct-and-effects test" with a bright-line rule for assessing whether the limbs of § 10(b) reach a given set of allegations.  561 U.S. at 267.[4]  Applying the canon or presumption against extraterritorial application of a statute, Justice Scalia, writing for the majority in *Morrison*, held that § 10(b) covers "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  *Id.*  As to the first prong of *Morrison*, the Exchange Act distinguishes a securities transaction made in an OTC market in the United States from a transaction made on a "securities exchange."  *See* Securities Exchange Act of 1934, 48 Stat. 881, *as amended*, 15 U.S.C. § 78a *et seq.* (describing that the Exchange Act "provide[s] for the regulation of securities exchanges *and* of over-the-counter markets . . . [and] to prevent inequitable and unfair practices on such exchanges *and* markets" (emphases added)); *United States v. Georgiou*, 777 F.3d 125, 134-35 (3d Cir. 2015) (reasoning that because "national securities exchange" is explicitly listed in § 10(b) but the OTC

---

[4]  The Supreme Court issued its *Morrison* decision on June 24, 2010 and Congress amended, through the Dodd-Frank Act ("Dodd-Frank"), the extraterritorial reach of § 10(b) on July 21, 2010.  The new amendment extended the SEC's reach abroad "when a version of the conduct-and-effects test is met." *SEC v. Scoville*, 913 F.3d 1204, 1217-18 (10th Cir. 2019).  Courts agree that given the tight timeline between the publication of *Morrison* and the enactment of Dodd-Frank, "the more reasonable assumption is that *Morrison* was issued too late in the legislative process to reasonably permit Congress to react to it." *Id.* at 1218.  Regardless, the conduct-and-effects test applies solely to SEC civil enforcement actions and not private suits like the instant case.  *See* 15 U.S.C. § 77v(c) (expanding jurisdiction under § 10(b) for extraterritorial conduct in "an action or proceeding brought or instituted by the Commission or the United States").  Therefore, this amendment remains in equilibrium with *Morrison*'s application to private suits. *See Morrison*, 561 U.S. at 285 n.12 (Stevens, J., concurring) ("The Court's opinion does not, however, foreclose the Commission from bringing enforcement actions in additional circumstances, as no issue concerning the Commission's authority is presented in this case.  The Commission's enforcement proceedings not only differ from private § 10(b) actions in numerous potentially relevant respects, but they also pose a lesser threat to international comity.").

markets are excluded, OTC exchanges "are not national securities exchanges within the scope of *Morrison*").

Courts interpreting the second prong of *Morrison* look for "allege[d] facts indicating that irrevocable liability was incurred or that title was transferred within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012). To indicate "the point at which the parties become irrevocably bound, " the inquiry turns on "where, physically, the purchaser or seller committed him or herself, not where, as a matter of law, a contract is said to have been executed." *United States v. Vilar*, 729 F.3d 62, 77 n.11 (2d Cir. 2013); *Absolute Activist*, 677 F.3d at 68. However, a circuit split has arisen over whether a domestic transaction is both necessary and sufficient to satisfy *Morrison*'s second prong or if a domestic transaction must also not appear "predominantly foreign."

In *Parkcentral*, the Second Circuit segregated securities fraud claims deemed "predominantly foreign" from transactions that would otherwise qualify as "domestic transactions in other securities," observing that "a rule making [§ 10(b)] applicable whenever the plaintiff's suit is predicated on a domestic transaction, regardless of the foreignness of the facts constituting the defendant's alleged violation, would seriously undermine *Morrison*'s insistence that § 10(b) has no extraterritorial application." 763 F.3d at 215-17. Although the *Parkcentral* analysis does not "purport to proffer a test that will reliably determine when a particular invocation of § 10(b) will be deemed appropriately domestic or impermissibly extraterritorial," it considered (1) the potential conflict with foreign laws and procedures in applying § 10(b); (2) the geographic location where the alleged statements were made; and (3) whether foreign authorities have already taken the lead in investigating the matter. *Id.* at 216. The First, Third, and Ninth Circuits have either explicitly or implicitly rejected that qualification as the product of "an open-ended, under-defined

multi-factor test, akin to the vague and unpredictable tests that *Morrison* criticized and endeavored to replace with a 'clear,' administrable rule." *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 950 (9th Cir. 2018) (citation omitted) (quoting *Morrison*, 561 U.S. at 257-59, 269-70); *see also SEC v. Morrone*, 997 F.3d 52, 60 (1st Cir. 2021) (explicit rejection of *Parkcentral* "predominantly foreign" invention) ("*Toshiba I*"); *Georgiou*, 777 F.3d at 137 (solely examining whether "the purchase or sale of any [] security in the United States" had occurred for purposes of satisfying the second prong of *Morrison*).[5]  Despite the tension between *Parkcentral* and other courts' applications of *Morrison*, the Supreme Court elected not to grant a writ of certiorari in an appeal from the Ninth Circuit on this very issue.[6]  *See Toshiba Corp. v. Auto. Indus. Pension Tr. Fund*, 139 S. Ct. 2766 (2019) (cert. denied) ("Toshiba Cert Petition").

   1.  "Transactions in Securities Listed on Domestic Exchanges"

Plaintiffs do not argue the unsponsored ADRs are listed on domestic exchanges.  Given there is no authority suggesting that securities traded on U.S. OTC markets qualify as "transactions

---

   [5]  Prior to *Parkcentral*, the Eleventh Circuit adopted the "irrevocable liability" test and has yet to disturb that approach in the wake of *Parkcentral*.  *See Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens*, 645 F.3d 1307, 1310-11 (11th Cir. 2011).  This Court is unaware of any other circuit courts of appeal that have addressed *Parkcentral*'s "predominantly foreign" principle, including the Fourth Circuit.  Nor is this Court aware of any other district courts sitting in this Circuit that have encountered this question.

   [6]  Contrary to the respondent's position in the Toshiba Cert Petition, *see* Brief in Opposition, *Toshiba Corp. v. Auto. Indus. Pension Tr. Fund*, 2018 WL 6584997, at *11 (S. Ct. Dec. 12, 2018), the Second Circuit did not depart from the *Parkcentral* test in *Myn-Uk Choi v. Tower Res. Cap. LLC*, 890 F.3d 60 (2d Cir. 2018).  There, the court noted that "*Morrison* clearly provided that the 'domestic transaction' prong is an independent and sufficient basis for application of the Securities Exchange Act to purportedly foreign conduct." *Id.* at 67.  But that statement merely relates to the anodyne view that *Morrison* permits § 10(b) to apply *either* to a security listed on a domestic exchange or to an unlisted security otherwise purchased or sold in the United States.  *Id.*  And if there were any question that the Second Circuit did not treat the *Parkcentral* test as gospel, the court quashed that concern in opinions following the Toshiba Appeal.  *Laydon v. Coöperatieve Rabobank U.A.*, 51 F.4th 476, 486 (2d Cir. 2022); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165-66 (2d Cir. 2021).

in securities listed on domestic exchanges," for purposes of the Exchange Act, this Court adopts the more salient holdings of the Ninth and Third Circuit. *Georgiou*, 777 F.3d at 134-35; *see also Toshiba I*, 896 F.3d at 945 ("The over-the-counter market on which Toshiba [unsponsored] ADRs trade is simply not an 'exchange' under the Exchange Act."); *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litig.*, No. 3:15-md-02672-CRB, 2017 WL 66281, at *4 (N.D. Cal. Jan. 4, 2017) ("The OTC market on which the Volkswagen ADRs trade is not a 'domestic exchange' and thus the first *Morrison* prong is not satisfied."). Because Plaintiffs allege that the ADRs are traded OTC in the United States, Dkt. 21 ¶¶ 26, 28-29, 31, such securities do not fall within the first prong of *Morrison*. This Court therefore looks to whether the ADR transactions satisfy the second prong.

### 2. "Domestic transactions in other securities"

It is this Court's view that the Supreme Court's holding in *Morrison* provides judges with a workable, consistent test for whether to apply § 10(b) to a particular securities transaction: "Section 10(b) reaches . . . the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 561 U.S. at 273. *Morrison* rejected prior long-standing Second Circuit precedent "that ha[d] produced a collection of tests for divining what Congress would have wanted, complex in formulation and unpredictable in application." *Id*. at 255-56. Instead, the Court emphasized a simplified inquiry, that under § 10(b), "it is the foreign location of the *transaction* that establishes (or reflects the presumption of) the Act's inapplicability, absent regulations by the [SEC]." *Id.* at 268.

The additional "predominately foreign" framework sketched in *Parkcentral* undermines the purpose of *Morrison* by muddying the "clear test that will avoid" "interference with foreign securities regulation"—"whether the purchase or sale is made in the United States." *Id.* at 269-70.

It effectively undermines the *Morrison* holding by using the same "divination" theory *Morrison* denounced. Indeed, the Supreme Court crafted its holding to comfortably address the concerns from *amici* of "interference with foreign securities regulation" in the application of § 10(b).[7] *Id.* at 269. Rather than fixating on the reach of § 10(b), this Court finds the rule contains a limiting principle which ensures that securities in which title passes abroad falls presumptively outside the contours of the statute for private plaintiff securities litigation. As the SEC itself opined as *amicus* in the Toshiba Appeal, the "*Parkcentral* court relied on amorphous and atextual presumptions about Congress's intent" while acknowledging that "its approach would not 'reliably determine when a particular invocation of § 10(b) will be deemed appropriately domestic or impermissibly extraterritorial." Brief for the United States as Amicus Curiae, *Toshiba Corp. v. Auto. Indus. Pension Tr. Fund*, 2019 WL 2185128, at **14-15 (S. Ct. 2019) ("SEC Brief").

This Court confirms these principles and relies solely on the "irrevocable liability" or "title transfer" standard long embraced by all circuit courts following *Morrison*. Under *Absolute Activist*, if a security is not traded on a United States exchange (as is the case here), the plaintiff must prove, as to the relevant securities transaction either: (1) "that title to the shares was transferred within the United States[;]" (2) "that the purchaser incurred irrevocable liability within

---

[7] This Court full-well comprehends Defendants' concerns over the potentially far-reaching application of § 10(b) under the second prong of the *Morrison* rule, but this Court will not affront its obligation to avoid playing policymaker and to defer to the Supreme Court's interpretation of the statute. Regardless, any concern expressed by the court in *Parkcentral* or by Defendants over the application of § 10(b) effectively dragging foreign issuers with no connection to the United States into U.S. courts is dispelled by the reality that a foreign issuer with no transactional nexus to the United States may move to dismiss a 10(b) suit for lack of personal jurisdiction. Moreover, Congress expressly extended the reach of SEC civil enforcement through a conduct and effects mechanism now housed in § 10(b) following the Dodd-Frank amendment. By opening that door, Congress has contemplated the concern that § 10(b) enforcement could conflict with the laws enforced by an issuer's foreign home jurisdiction but nonetheless empowered the SEC to enforce its provisions with respect to certain transactions that could theoretically be deemed "predominantly foreign" under *Parkcentral*.

the United States to take and pay for a security," or (3) "that the seller incurred irrevocable liability within the United States to deliver a security." 677 F.3d at 68-69.  Where the relevant security's value inextricably depends on the movement in value of an underlying security, courts apply the *Absolute Activist* test to that reference security as the guiding source of the irrevocability analysis. *See, e.g.*, *Stoyas v. Toshiba Corp.*, No. 2:15-CV-04194 DDP-JC, 2022 WL 220920, at *5 (C.D. Cal. Jan. 25, 2022) ("*Toshiba III*").

As part of that inquiry, courts ask if the broker placing the ADR order on behalf of an investor directly caused a U.S. depositary bank to create ADRs for distribution—*i.e.* purchase the underlying foreign-listed securities abroad before establishing the ADR program on a domestic trading market—or if the ADRs already existed on a domestic OTC market.[8]  If the latter is the case, those courts have been unwilling to apply § 10(b).  Other courts focus on the direct security

---

[8]  On summary judgment, the district court in *Toshiba III* found that the *Morrison* purchase or sale inquiry turns on the underlying stock transaction supporting the unsponsored "Level I" ADRs. *Toshiba III*, 2022 WL 220920, at **3-5.  It reasoned that because the New York-based bank purchasing the unsponsored ADRs did so directly from the Japanese stock market only once it had received direction from the broker-dealer to place the order, the purchase and sale of the underlying common stock occurred abroad.  As such, the holding effectively prevents the purchase of unlisted—unsponsored or sponsored—ADRs from ever qualifying as a transaction in the United States under *Morrison* if a broker's order directly causes the creation of new ADRs not already trading OTC in the United States.  *See* SEC Investor Bulletin at 2.  That approach would also cause *Morrison*'s bright-line rule to run amok because an ADR trading on a listed domestic exchange would unquestionably qualify as being subject to § 10(b).  *See, e.g.*, *In re Vivendi Univ'l, Sec. Litig.*, 765 F. Supp. 2d 512, 529 (S.D.N.Y. 2011) (finding that because sponsored ADRs were listed and traded on the New York Stock Exchange, those securities "thereby fall within any reading of *Morrison*"); *but see In re Alstrom SA Sec. Litig.*, 741 F. Supp. 2d 469, 472 (S.D.N.Y. 2010) (cautioning that *Morrison*'s first prong be read in context and that a security purchased or sold abroad that is also listed on a domestic exchange does not automatically fall under the purview of § 10(b)).  But under the *Toshiba III* holding, a listed ADR formed as a result of a broker causing a depositary bank to obtain the underlying foreign security abroad from the issuer would purportedly fail *Morrison*.  Deciding the reach of § 10(b) based on whether a security had just been created or had already been in existence trading on an OTC market seems, to this Court, to be a distinction without a meaningful difference and holds no apparent grounding in *Morrison*. Nevertheless, this issue is best left to be addressed at a different procedural stage.

at issue and whether transfer of title of *that* security, rather than any underlying reference security, occurred within the United States.  *See, e.g.*, *In re Volkswagen Prods Liability Litig.*, 2017 WL 66281, at *6 (acknowledging that, for purposes of satisfying the second prong of *Morrison*, neither party disputed that Volkswagen's sponsored ADRs, which traded OTC, "constitute domestic transactions," and moving directly on to § 10(b)'s "in connection" inquiry); *United States v. Martoma*, No. 12 CR 973 PGG, 2013 WL 6632676, at *5 (S.D.N.Y. Dec. 17, 2013) (finding second prong of *Morrison* satisfied where "it is undisputed that the [] ADRs at issue were traded on the NYSE, which means that the formation of contracts for those trades, the passing of title to those securities, and the incurring of liability on the part of sellers and purchasers of those ADRs occurred in the United States").

To adequately explore and resolve this question, this Court considers the recent *Toshiba* line of case law in the Second Circuit.  After *Toshiba I*, the Second Circuit remanded the case to the district court to address whether the second prong of *Morrison* covered the unsponsored ADRs—the same security involved here—at the class certification stage after discovery had been conducted.  At the motion-to-dismiss stage, the district court determined that unsponsored ADRs "issued by" a U.S.-based depository bank was sufficient to allege the title passed from seller to purchaser in a domestic transaction.  *Stoyas v. Toshiba Corp.*, 424 F. Supp. 3d 821, 826 (C.D. Cal. 2020) ("*Toshiba II*").  "Allegations regarding the location of the broker, the tasks carried out by the broker, the placement of the purchase order, the passing of title, and the payment made are relevant to the domestic transaction inquiry."  *Toshiba II*, 424 F. Supp. 3d at 827 (citing *Absolute Activist*, 677 F.3d at 68-70).  Only at the motion for class certification stage did the *Toshiba* district court test the validity of plaintiffs' allegations of domestic title transfer with a factual assessment. *Compare id.* at 828 *with Toshiba III*, 2022 WL 220920, at **3-5.

Just as in *Toshiba II*, this Court finds that, at the motion-to-dismiss stage, the allegations made by Plaintiffs here "provide sufficient indicia" that they "incurred irrevocable liability to purchase the ADRs in the United States." *Id*. Plaintiffs allege that Lead Plaintiff obtained his ADRs by directing his Florida-based brokerage to purchase ADSs and that broker then obtained ADRs on an OTC market, based in New York, thereby facilitating the transfer of title in the United States. Dkt. 21 ¶ 28. Plaintiffs also allege that Plaintiff Wells purchased his ADSs directly from an OTC market in New York through his Massachusetts-based broker. *Id*. ¶ 31. For both Plaintiffs, the Amended Complaint alleges that "the transfer of title to the securities took place within the territorial jurisdiction of the United States." *Id*. ¶¶ 28, 31. Plaintiffs have "allege[d] facts indicating that irrevocable liability was incurred" and "that title was transferred within the United States." *Absolute Activist*, 677 F.3d at 62. Any dispute as to whether those allegations are in fact true is a fact question best left for summary judgment. *See Toshiba II*, 424 F. Supp. 3d at 827 ("That discovery ultimately reveals that the ADR transaction involved an initial purchase of common stock in a foreign transaction, as Defendant contends, can be a matter properly raised at the summary judgment stage.").

Even under *Parkview*, Plaintiffs' allegations suggest that the alleged false statements occurred in the United States through Volkswagen's domestic subsidiary and its executives. The Amended Complaint further confirms that the SEC initiated an investigation into the matter but did not identify any foreign authorities that had become involved. Nor is there any basis to believe, at this early stage of the case, that a private securities fraud suit against Volkswagen would conflict with any German law.

As such, this Court finds sufficient allegations in the Amended Complaint to justify the potential application of § 10(b) and Rule 10b-5 in this case.

B.  Whether the Allegations Meet the Substantive Pleading Requirements of a Securities Fraud Claim

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the representation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014) (quoting *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

### 1.  Material Misrepresentation

*Individual Defendants and VWGoA*

Defendants maintain that Plaintiffs have not alleged any statement by Volkswagen AG and that any statement by its subsidiary is not legally attributable to the parent company under Rule 10b-5.  They add that the alleged false statements made by VWGoA and the Individual Defendants do not give rise to the requisite materiality inference demanded by Federal Rule of Civil Procedure 9(b) and the PSLRA.  Defendants argue that no reasonable investor would base their investment decisions on what the Company later called an April Fools' joke.  Nor were the statements materially misleading because a name change is immaterial given it reinforced what had already been made public—VWGoA's commitment to expanding its EV business.

Plaintiffs counter that Defendants do not dispute the falsity of their statements and that Federal Rule of Civil Procedure 9(b) only requires that a party "state with particularity the circumstances constituting fraud" including "identif[ying] with some precision the date, place and time of active misrepresentations."  Dkt. 33 at 22 n.14 (quoting *Karp v. First Conn. Bancrop, Inc.*, No. CV RDB-18-2496, 2019 WL 4643799, at *2 (D. Md. Sept. 24, 2019)).  Accordingly, Plaintiffs assert that materiality be subject to the plausibility standard recognized in Federal Rule of Civil

Procedure 8(a).  Under that rubric, they contend that circumstances surrounding Volkswagen's name change announcement and subsequent retraction plausibly evidence not only a false statement to the market, but one on which a reasonable investor would consider material in their investment decision.

A viable claim under § 10(b) and Rule 10b-5 requires that a plaintiff allege a "material misrepresentation or omission by the defendant." *Stoneridge*, 552 U.S. at 157.  The plaintiff "must identify a *factual* statement or omission—that is, one that is demonstrable as being true or false." *In re Marriott Int'l, Inc.*, 31 F. 4th 898, 901 (4th Cir. 2022) (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999)).  Any false statement must be about "something consequential" or "as the law puts it, material." *Longman*, 197 F.3d at 682 (internal quotation marks and citation omitted).  "Materiality is an objective concept" which requires courts to assess the "significance of an omitted or misrepresented fact to a reasonable investor."  *Id.* at 682-83; *Gasner v. Bd. of Sup'rs of the Cty. of Dinwiddie, Va.*, 103 F.3d 351, 356 (4th Cir. 1996).

Under the seminal Supreme Court decision in *Basic, Inc. v. Levinson*, a fact is material if there is a "substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." 485 U.S. 224, 231-32 (1988).  Courts need not ascribe "childlike simplicity," *Id.* at 985 (quoting *Flamm v. Eberstadt*, 814 F.2d 1169, 1175 (7th Cir. 1987)), to the reasonable investor but should examine whether investors would have considered the alleged false information significant.  In making an examination of the "total mix" of information available to public investors, "a court ruling on a 12(b)(6) motion may look to 'documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely." *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 656-57 (4th Cir. 2004) (quoting *Morris v.*

*Wachovia Sec., Inc.*, 277 F. Supp. 2d 622, 629 (E.D. Va. 2003)).  This Court therefore must assess whether "a reasonable jury could find it 'substantially likely' that a reasonable investor would believe that the disclosure of the untrue fact[] (and nothing but the disclosure of the untrue fact[]) would alter the 'total mix' of information available to the reasonable investor."  *Id.* at 657.

While this Court is unaware of any case in which an announced name change unilaterally constituted the basis for an alleged false statement under § 10(b) and Rule 10b-5, courts have provided a telling sample of the varieties of actionable and non-actionable false statements.[9] "Mere business 'puffery,' for example, lacks the materiality essential to a securities fraud allegation." *SS Richmond LLC v. Christopher A. Harrison*, No. 3:22-cv-405, 2022 WL 16835870, at *11 (E.D. Va. Nov. 9, 2022) (citing *Howard v. Haddad*, 962 F.2d 328, 331 (4th Cir. 1992)); *see also Carlucci v. Han*, 886 F. Supp. 2d 497, 522 (E.D. Va. 2012) ("Indefinite statements of corporate optimism, also known as puffery, are generally non-actionable, as they do not demonstrate falsity.").  These include statements relating to "healthy growth," "achieving our objectives" and "competitive advantages." *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 767 (E.D. Va. 2004).  An actionable false statement "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also In re Cable & Wireless, PLC Sec. Litig.*, 321 F. Supp. 2d 749, 766-67 (E.D. Va. 2004) (finding "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the

---

[9] In *Kerr v. Exobox Tech. Corp.*, the court declined to find that a name change was material to the plaintiff's investment decisions because the plaintiffs failed to provide any allegations as to materiality other than alleging that the defendant filed a false name with the Nevada Secretary of State.  *Kerr*, No. H-10-4221, 2012 WL 201872, at **12-13 (S.D. Tex. Jan. 23, 2012).

speaker," are those "that no reasonable investor could find [] important to the total mix of information available").

There are two primary false statements in the Amended Complaint, each of which requires similar analysis by this Court: (1) the actual name change announcement and (2) the Company's initial reassurances to numerous journalists that the name change was no joke and which were reported publicly soon thereafter.  The first name change announcement occurred on March 29, 2021—three days prior to April 1, 2021.  Dkt. 21 ¶ 103.  And while such an announcement could conceivably be understood as a mistaken publication, the Company published a slightly manicured version of the announcement the following day—two days prior to April Fools'—only to retract it later that day after market close.  *Id.* ¶ 120.  The name change carried all the signs one would expect of an official corporate name change: a clearly stated purpose behind the change which aligned with prior actions taken by the Company; a specific go-forward plan detailing the effects of the name change on the Company's business model; and related rebranding and displays to accompany the announcement—all devoid of even a scintilla of humor or hyperbole.  *Id.* ¶¶ 150-51.[10]  When reporters from numerous outlets contacted the Company to confirm the seriousness

---

[10]  The examples of corporate "joke campaigns" provided by Defendants, for one, do not form the basis for any legal precedent and therefore hold no weight before this Court.  But even if one accepts the argument that no such lawsuits existed with respect to these "joke campaigns" because they were clearly not legally actionable, each of those campaigns can be easily distinguished from the instant matter.  Tesla announced its "Model W" watch on April 1, immediately cluing to the public fanciful undertones.  More telling is that the actual press release is laced with playful phraseology and imagery.  *See* Tesla Press Release, *Announcing the Tesla Model W* (Apr. 1, 2015) https://tinyurl.com/4nabx5pn (stating "[w]arning, current version requires wrist strength of an Orangutan" and depicting a three dimensional pop out of Big Ben off the face of the watch).  BMW's announcement video of lunar paint capable of charging a car during sundown also occurred on April 1 and the company quickly confirmed the nature of the joke later that day.  *See* BMW UK (@BMW_UK) Twitter (Apr. 1, 2019), https://tinyurl.com/bdd7vun3.  That video did not include a detailed rollout of the product and the product itself was shocking due to its unprecedented nature.  And the International House of Pancakes ("IHOP") name change to "IHOb" to promote its burger line in June of 2018 was not a false statement as the company

of the announcement, Defendant Gillies and other Company representatives, assured them the name change was no joke. *Id.* ¶¶ 106, 112, 125; *see In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 927 (N.D. Cal. 2020) (finding Elon Musk's tweet an actionable statement against Tesla in light of a Tesla representative confirming three times to analysts that the statement was true).[11] The name change announcement constituted a factual false statement.

In evaluating the reports and articles referenced in the Amended Complaint, this Court finds that the false statements are also significant to the "total mix" of information available to the reasonable investor and therefore meet the materiality threshold.  While it is true that the press release documents an already known Company-wide agenda to ramp up production of EVs, the false statement represented the Company going to even greater lengths to promote its EV business. Indeed, the name change announcement states that "'Voltswagen' is a public declaration of the company's future-forward investment in e-mobility"—implying that no such declaration had previously been made.  *Id.* ¶ 150.  The announcement also expressed the Company's "goal of moving all people point-to-point with EVs," insinuating a move away from its legacy gas-powered vehicles.[12] *Id.*  The degree of specificity around the roll-out of the name change and associated

---

cautioned that the name change was "for the time being" which portrayed a soft name change. Kate Taylor, *IHOP Has Revealed Why it Changed its Name to IHOb, and it Represents a Massive New Strategy for the Chain*, Business Insider (Jun. 11, 2018), https://tinyurl.com/3x429db8.

[11] *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)*, does not erect a protective forcefield against any statements made by Defendant Gillies.  *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426 (7th Cir. 2015) ("Nothing in *Janus* undid the long-standing rule that a 'corporation is liable for statements by employees who have apparent authority to make them.'"); *Tesla*, 477 F. Supp. 3d at 926 ("It is beyond dispute that a corporation can be liable for the fraud committed by its officers, so long as the officer commits it within the scope of his or her employment.").

[12] Defendants argue that VWGoA had "no reason to disparage one set of vehicles to promote the other, and no reasonable investor would understand its joke in that way."  Dkt. 36 at 18.  They further attempt to analogize the relationship between Volkswagen's gas-powered and

branding changes for the Company's entire EV fleet across North America distinguishes this case from the sort of allegations which constitute puffery, those "lacking in specificity" and too "vague" for investors to rely upon in making investment decisions. *See In re Neustar Sec.*, 83 F. Supp. 3d 671, 680 (E.D. Va. 2015). Plaintiffs' allegations make a compelling case that Volkswagen's name change announcement marked a dramatic acceleration in its emphasis on EV production in the wake of its competitor's recent EV rebranding initiatives. Dkt. 21 ¶ 103. The statements made in the press release related to the roll-out of the name change are actionable because they are both sufficiently specific to the Company's business strategy and concrete as to the Company's commitment to such a strategy. *Compare id.* ¶ 113 ("U.S. name change from Volkswagen of America to Voltswagen of America begins May 2021") *with Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993) ("The market gives the most credence to those predictions supported by specific statements of fact, and those statements are, of course, actionable if false or misleading" while "projections of future performance not worded as guarantees are generally not actionable.").

---

EVs with Home Depot's sale of electric drills, reasoning that the promotion of the electric drill does not signal to the market it has "given up on screwdrivers." *Id.* at 18-19. This Court need not accept the view that increasing production of EVs necessarily disparages production of gas-powered vehicles to accept that the entire premise of Volkswagen's movement towards an EV fleet rests on replacing demand for gas-powered vehicles with demand for electric. *See, e.g.*, Dkt. 21 ¶ 83 ("In January 2021, General Motors announced it would stop making gasoline-powered passenger cars, vans and SUVs by 2035. In February 2021, Jaguar announced it would go 'all electric' by 2025.). That is the entire reason why EVs reached consumers—to provide a more environmentally friendly, efficient transportation option. *Id.* ¶ 89 (Volkswagen stated, 'this efficient and fully-connected all-electric [ID.3] represents a milestone on the path towards zero-emission mobility for a broad consumer base.'"). The continued production of gas-powered vehicles is diametrically opposed to Volkswagen's "zero-emission" agenda. *See id.* ¶ 105 ("The ID.4 is the right car at the right time and is being sold by a dealer network that has really embraced the shift to electrification."). The same cannot be said for the distinguishing features of electric and manual screwdrivers—each allows the user to achieve the same objective of turning the head of a screw at different angles with varying torque, which is why they are commonly owned together. Producing more electric screwdrivers will not, on its own, naturally weaken the demand for manual screwdrivers because the two function together synergistically.

The announcement precipitated a significant public response.  It generated an investment recommendation from at least one analyst based on "VW's clear commitment to its EV brand and massive EV endeavors over the coming years." *Id.* ¶¶ 11, 118.  It convinced a Tesla director to tweet that Volkswagen was "absolutely serious" in "show[ing] their commitment to electric" and that the name change was "more than changing [a] corporate logo, e.g., GM." *Id.* ¶¶ 11, 119.  It sparked a flurry of social media activity, garnering 6,045 mentions and reaching 150 million people by the evening of April 1, 2021, constituting what Defendant Keogh described as "the biggest numbers we've ever seen" on social media. *Id.* ¶¶ 137-38, 160.  It resulted in an SEC investigation. *Id.* ¶ 143.  And perhaps most telling is the degree of outrage expressed by the public, including multiple law professors, journalists, and a former SEC chief economist. *Id.* ¶¶ 122-35.  These allegations reveal the effect of the alleged false statement on securities regulators and sophisticated members of the securities industry, which is a higher standard than that of a reasonable investor.

Had the announcement been immaterial, it would not have engendered such a spirited public response.  That response existed because the false statement "create[d] an impression of a state of affairs [at Volkswagen] that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.  Reasonable investors were led to believe that "Voltswagen" would be fastened to the exterior of all Volkswagen EVs while "VW" would remain on gas-powered vehicles; that EVs would be differentiated with a light blue color compared to the "iconic VW Dark Blue" that would remain on gas-powered vehicles; and that the new signage would "roll out to all Voltswagen properties and dealerships across the US." *Id.* ¶ 150.  These were not statements of puffery relating to "healthy growth," "achieving our objectives" and "competitive advantages." *In re Cable & Wireless, PLC*, 321 F. Supp. 2d at 767.  Nor do Plaintiffs allege a

false statement that generally reflects poorly on the perceived integrity of management. *See Greenhouse*, 392 F.3d at 660 (rejecting claim that a falsified education credential in a public filing rose to the level of materiality). Rather, Plaintiffs have alleged with sufficient particularity "the circumstances constituting fraud" and "the date, place and time" of the false statements, which directly implicated the short-term and long-term business strategies of Volkswagen, thereby significantly altering the "total mix" of information available to investors. *Johnson v. Wheeler*, 492 F Supp. 2d, 509 (D. Md. 2007).[13]

Taken together, these allegations lead this Court to conclude that "a reasonable jury could find it 'substantially likely' that a reasonable investor would believe that the disclosure of [the name change] (and nothing but the disclosure of the name change) would alter the 'total mix' of information available to the reasonable investor." *Greenhouse*, 392 F.3d at 657 (quoting *Morris*, 277 F. Supp. 2d at 629); *see also Gray v. Alpha & Omega Semiconductor, Ltd.*, No. 20-cv-2414, 2021 WL 4429499, at*7 (S.D.N.Y. Sep. 27, 2021) ("[A] complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.").

*Volkswagen AG Liability*

In *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), the Supreme Court determined that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and

---

[13] This Court also notes that publicly registered companies disclose name change announcements, once effected in a company's constitutional documents, as material announcements on Forms 8-K or 10-Q. *See, e.g.*, Form 10-Q, *Item 5*, Blackstone Inc. (Aug. 6, 2021); Form 8-K, *Item 5*, Voxx International Corporation (Dec. 6, 2011).

how to communicate it."  The Court held that a *Janus* defense is available in a private plaintiff Rule 10b-5 case even for the parent of a wholly-owned subsidiary insofar as the entities retain independent boards and the parent is acting in a "speechwriter" assisting capacity rather than as a "speaker who takes credit—or blame—for what is ultimately said."[14]  *Id.* at 143.

Here, Volkswagen AG allegedly owns 100% of the entity that published the alleged false statement, possesses and exercises authority to appoint all of the entity's directors and executive officers, directly monitors its day-to-day operations, financial reporting, accounting and regulatory actions, and participates in the preparation and dissemination of its public statements.  Dkt. 21 ¶ 186.  And when the Wall St. Journal investigated the seriousness of the name change, a Volkswagen AG official allegedly stated, "There will be no name change," further suggesting Volkswagen's role as the chief speaker in these circumstances.  *Id.* ¶¶ 13, 121, 153.  Indeed, one other district court has previously determined that Volkswagen AG exercises "ultimate authority" over VWGoA and its executives.  *In re Volkswagen Prods Liability Litig.*, 2017 WL 66281, at *18.  But here, unlike in the Northern District of California case where the plaintiffs alleged Volkswagen AG "also developed, reviewed, and approved the marketing and advising campaigns designed to sell the illegal cars," *Id.*  Plaintiffs have not alleged with particularity that Volkswagen AG provided final approval over the press release and its details.  Merely alleging a daily monitoring function and the participation in the preparation of public statements does not allow this Court to infer that Volkswagen AG "collaborated with the authors to such an extent that they controlled the [press release's] publication."  *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 104 (2d Cir. 2022).  In

---

[14]   The Court asks whether the allegations plausibly establish a shared identity between the corporate entities, much like two riders on a tandem bicycle; the peddling of one rider will propel the other riders but the rider in the front decides whether to brake or change direction.

other words, the Amended Complaint does not sufficiently allege that Individual Defendants and VWGoA more broadly "lacked final control over the [press release's] contents or did not make the ultimate decision as to what specific information to include." *Id.  But see In re Pfizer Inc. Sec. Litig.*, 19 F.3d 642, 657 (2d Cir. 2016) (finding a genuine dispute over whether a company had ultimate authority over another company's employees' statements where a fax stated that the company had to provide final sign-off alongside another company before such statements were published).

On this ground alone, Plaintiffs have not sufficiently alleged an actionable securities fraud claim against Volkswagen AG.  But given Plaintiffs' claim is not implausible as a matter of law, this Court will allow Plaintiffs to amend their allegations in a second amended complaint.

### 2.  Scienter

Defendants next argue that no allegations in the Amended Complaint identify an employee of Volkswagen AG; thus in Defendant's view merits dismissal of any claims against that entity. Next, they maintain that nothing about the "April Fools prank" made by VWGoA bore any connection to its financial performance or prospects and that all alleged circumstantial evidence lacked the requisite particularity to give rise to a "strong inference" that VWGoA acted with scienter.  Dkt. 23 at 20 (quoting *Yates*, 744 F.3d at 885).  As to the Individual Defendants, Defendants submit that because there are no allegations of any "sale of personally-held stock or insider trading" they cannot be held liable under § 10(b) and Rule 10b-5.  Defendants emphasize the high bar demanded by the PSLRA to adequately plead scienter and that knowingly making a false statement is not sufficient to show an "intent to mislead." *Id.* at 23 (quoting *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017)).

Plaintiffs ask this Court to take a wholistic view of the allegations in finding that scienter has been sufficiently pleaded.  They highlight the fact that Defendants not only knowingly issued a false statement to the public but that, when confronted by reporters, they continued to affirm the falsehood.  They contend that Defendants' reliance on *Maguire* overstates a rare exception for inadvertent misstatements.  And even if Defendants did not display "intent to deceive, manipulate, or defraud," Plaintiffs assert that Defendants' conduct meets the requisite degree of recklessness for an actionable 10b-5 claim.  Plaintiffs add that Defendants' retraction of the announcement is not exculpatory.

The PSLRA acts "[a]s a check against abusive litigation by private parties" and requires that a plaintiff in a private securities fraud action, for each act alleged, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" or "scienter."  *Maguire*, 876 F.3d at 546 (quoting 15 U.S.C. § 78u-4(b)(2)).  "[T]he term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  Courts in this circuit draws a "strong inference" from allegations "that a defendant benefited in a concrete and personal way from the fraud, engaged in deliberately illegal behavior, knew facts or had access to information suggesting his public statements were not accurate, or failed to check information that he had a duty to monitor."  *Carlucci*, 907 F. Supp. 2d at 729 (quoting *In re IBM Corp. Sec. Litig.*, 163 F. 3d 102, 107 (2d Cir. 1998) (citations omitted).

"At the pleading stage, alleging either intentional or severely reckless conduct is sufficient."  *Yates*, 744 F.3d at 884.  Motive may be probative of intentional conduct but "the inferential weight that may be attributed to any claim of motive must be evaluated in context."  *Id.* at 890; *see also Tellabs*, 551 U.S. at 325 ("[P]ersonal financial gain may weigh heavily in favor of

a scienter inference.").  To meet the standard of recklessness, the complaint must aver "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003).  The sort of "severe recklessness" required by the Supreme Court is "a slightly lesser species of intentional misconduct." *Id.* at 344 (quoting *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)).  Ultimately, the Fourth Circuit instructs courts to probe the complaint to determine whether a defendant "acted with wrongful intent." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 621 (4th Cir. 2008)

Thus, this Court must assess "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). "Proof of scienter need not be direct, but may be inferred from circumstantial evidence." *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994).  "[A]n inference of scienter can only be strong . . . when it is weighed against the opposing inferences that may be drawn from the facts in their entirety." *Cozzarelli*, 549 F.3d at 624.  "To survive a motion to dismiss in a § 10(b) complaint, 'the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.'" *Maguire*, 876 F.3d at 547 (quoting *Tellabs*, 551 U.S. at 324); *see also Yates*, 744 F.3d at 885 ("A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as an opposing innocent inference." (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).  If the Court finds that "the inference that defendants acted innocently, or even negligently, more compelling than the inference that they acted with the requisite scienter,"

the [C]ourt must dismiss the complaint. *Pub. Emps.' Ret. Ass'n of Co. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009).

### a. Individual Defendants

Beginning with the Individual Defendants, Plaintiffs have not alleged "specific facts of 'motive and opportunity' to defraud" for personal gain by Individual Defendants. *Philips v. LCI Intern., Inc.*, 190 F.3d 609, 621 (4th Cir. 1999); *see also Inst'l Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 279 (3d Cir. 2009) ("Corporate officers always have an incentive to improve the lot of their companies, but this is not, absent unusual circumstances, a motive to commit fraud."). But that inquiry is just one of several factors courts in this circuit consider; courts also weigh whether the individual defendants' allegedly fraudulent conduct involved "core operations" of the business, their "positions and level of personal involvement within the company," and "statements regarding compliance." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 606 (E.D. Va. 2015) (quoting *In re Genworth Fin. Inc. Secs. Litig.*, 103 F. Supp. 3d 759, 783-87 (E.D. Va. 2015)).

The Amended Complaint alleges that the EVs implicated in the press release represent a core business of Volkswagen. Dkt. 21 ¶ 88 (Volkswagen indicated in its 2020 Annual Report that EVs were a "core business"), ¶ 93 (Volkswagen AG CEO Herbert Diess stated "E-mobility has become a core business for us"), ¶ 96 (Diess tweets that "battery and charging has become core business of @VWGroup"). Moreover, according to Plaintiffs, the Individual Defendants held senior executive positions at VWGoA and were involved in the "drafting, producing, reviewing and/or disseminating" of the press release. *Id.* ¶¶ 35-36, 38. Further, the Individual Defendants confirmed the legitimacy of the name change to the press, which although not a statement regarding compliance, conveyed the same tone that such statement would evoke. *Id.* ¶¶ 112, 136.

This Court finds that under these considerations, coupled with other allegations in the Amended Complaint, evidence that the Individual Defendants acted with severe recklessness.

As to Defendant Keogh, Plaintiffs highlight his quote in the press release: "We have said, from the beginning of our shift to an electric future, that we will build EVs for the millions, not just millionaires.  This name change signifies a nod to our past as the peoples' car and our firm belief that our future is in being the peoples' electric car."  Dkt. 21 ¶ 113.  Plaintiffs further spotlight Defendant Keogh's admission, after the announcement had been retracted, that "the upside [of the name change] is, obviously, the social media response has been the biggest numbers we've seen."  *Id.* ¶ 138.  Defendant Gillies went so far as to confirm to inquiring journalists the seriousness of the press release, Dkt. 21 ¶ 128, only to backtrack the following day by calling the statement a "pre-April Fool's Day joke," *id.* ¶ 130.  And a Volkswagen AG spokesman, Christoph Ludewig, further confirmed, on March 31, 2022, that "from the start," Volkswagen sought to generate attention to the Company's "e-offensive" and "generate attention for an important corporate and industry topic in the USA."  *See* Dkt. 9-1 at 2-3.

There is no equally compelling contradictory inference for Defendant Gillies' initial statement to the press that aligns with this Court's investigation of the allegations in the Amended Complaint.  Defendants ask this Court to consider the inference that no Volkswagen employee contemplated "that the joke would influence investors in any way," that VWGoA "carried out the joke for 'marketing and public relations' reasons," and that "[n]othing about the joke was in any way tied to VWGoA's financial performance or prospects."  Dkt. 23 at 20-21.  Yet Defendants' position significantly downplays the recklessness of the stunt.  To be sure, one innocent inference—which Defendants do not raise—could be that the Company seriously intended to effectuate the name change, which Defendants specified would occur more than a month after the

announcement.  Dkt. 21 ¶ 130.  Then, the draft press release was mistakenly published a month premature, so the Company decided to republish a cleaned-up release hours later, and that only after internal corporate deliberations, it was decided the name change would *not* occur. Thus, at the time the Individual Defendants reassured media outlets that the name change was indeed serious, Dkt. 21 ¶ 157, it could have reflected the true intent of the Company at that time.  *Cf. Yates*, 744 F.3d at 888 ("A more logical and compelling inference is that [the defendants] were continuing to assess the scope of the problem before deciding on an appropriate course of action.").  Indeed, Defendant Keogh admitted to the press that the name change provided the largest social media response in the Company's history but added that "the intent wasn't to deceive the public." *See* Ben Foldy, *VW's U.S. Boss Takes Responsibility for "Voltswagen" Prank*, Wall St. J. (Apr. 1, 2021), https://tinyurl.com/56d7v3c3.  But this narrative requires too many far-fetched inferential leaps.  Rather it is more likely, based on the allegations, that the Individual Defendants acted in concert to push a name change for the express purpose of obtaining "free publicity" on social media regarding the newly announced ID.4, as an "e-offensive," and after a sloppy, mistimed announcement, used April Fools' Day as a scapegoat mechanism to the "joke campaign."  That campaign no doubt sought to generate buzz and demand for Volkswagen's first electric SUV marketed in North America. *See* Dkt. 21 ¶ 111.  These allegations are as close to a smoking gun as one could hope to have at the pleading stage.

Ultimately, Defendants push an "innocent" inference which, taking the allegations of circumstantial evidence in the Amended Complaint together, adequately pleads severe recklessness and is therefore actionable under § 10(b).  In light of allegations that the Company sought to "rebuild trust" with the public following "Dieselgate," the idea of intentionally fooling or manipulating the public in the first instance further supports that the Individual Defendants'

endorsement of the fake name change constituted severe recklessness.  Indeed, Defendant Keogh himself allegedly emphasized in an August 2020 interview, months before the name change announcement, that "you need to be a well-liked and well-trusted brand."  *Id.* ¶ 81.  And given the recent SEC action against Volkswagen's EV competitor Elon Musk for his misstatements about taking Tesla private, the standard of ordinary care was as clear-cut as ever at the time the Individual Defendants announced and reaffirmed the name change.  *See id.* ¶ 162.  Moreover, the allegations suggest that the Company and its officers, including Defendant Keogh, were posturing to compete with Tesla.  *Id.* ¶¶ 92-93.  A social media campaign powered by the name change announcement could help Volkswagen steal attention in the EV market away from Tesla.  While "holding an executive position alone does not necessarily lead one to infer that [such executives] knew that the alleged omissions were false or misleading," *Iron Workers Local 16 Pension fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 571, 592 (E.D. Va. 2006), the Individual Defendants allegedly reassured inquiring reporters of the seriousness of the name change.

Consciously doubling down on the "joke campaign" without insinuating that this was indeed a joke, further evidences an attempt to deceive the public for the purpose of better posturing the Company's EV sales.[15]  *See In re 2U, Inc. Sec. Class Action*, No. CV TDC-19-3455, 2021 WL 3418841, at *8 (D. Md. Aug. 5, 2021) ("[W]here a plaintiff identifies 'numerous allegedly misleading statements and omissions that were not caused by the use of imprecise language or the execution of a legitimate business decision,' such allegations may support a strong inference of

---

[15]  The fact that the SEC initiated an investigation into the name change does not add or take away from an inference of scienter.  *See Cozzarelli*, 549 F.3d at 628 n.2 (finding an allegation that the SEC is investigating defendants for fraud as "too speculative to add much, if anything, to an inference of scienter"); *Brophy v. Jiangbo Pharma., Inc.*, 781 F.3d 1296, 1307 (11th Cir. 2015) ("[T]here is no connection between the fact of an SEC investigation and [a defendant's] state of mind that a reviewing court may reasonably draw on the face of the complaint.").

scienter." (quoting *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 610 (4th Cir. 2015)));

*see also Avaya, Inc.*, 564 F.3d at 268 (finding scienter where individual defendants maintained

misleading statements following inquiries from analysts); *Tesla*, 477 F. Supp. 3d at 929 (finding

scienter when individual corporate defendant assured media that misleading statement was in fact

serious).  Calling a deceptive corporate tactic a "joke" as a euphemism for intentionally lying,

particularly after doubling down on the deception when probed, is exactly the sort of reckless

corporate behavior Congress meant to check in enacting the Exchange Act and protecting retail

investors.  15 U.S.C. § 78b.

Defendants rely heavily on the notion that even if the Individual Defendants did knowingly

misrepresent to the public the seriousness of the name change, more is required to show an "intent

to mislead."  *Maguire*, 876 F.3d at 548.  But *Maguire* speaks to an inapposite set of facts where a

defendant was alleged to have "kn[o]w[n] enough to realize that his characterization was

technically incorrect."  *Id.*  In this case, the Individual Defendants are alleged to have known full-

well they were telling a lie, dressed as a "joke," and that when given an opportunity to retract their

statements to the public, they doubled down by not only republishing the press release but also

reassuring inquiring minds.  Dkt. 21 ¶¶ 130, 136.  That Defendants "came clean" on their own

accord after roughly a 48 hour period of deceiving the public may certainly "weaken[]" the

inference that they intended the deception, *see Matrix Cap.*, 576 F.3d at 192; *see also Yates*, 744

F.3d at 888 ("find[ing] it significant that it was [the company]—and not some outside entity—that

ultimately disclosed" information correcting earlier inaccuracies), but it does not defeat the strong

inference of recklessness.  Neither in *Matrix* nor in *Yates* were the corrective disclosures preceded

first by knowing denials of material misrepresentations.  *See id.*[16]  Despite Defendants' recitals to other fact patterns in which the Fourth Circuit has affirmed allegations of securities fraud, this Court is unaware of any rule requiring revelation of an alleged fraud by third parties under § 10(b).  Plaintiffs' allegations allow this Court, at this stage of the litigation, to find that the Individual Defendants "knew facts or had access to information suggesting [their] public statements were not accurate," because the Individual Defendants later confirmed their understanding, *from the beginning*, that the name change and associated logistical changes were always meant to be a farse.  *See* Dkt. 21 ¶ 123; *Carlucci*, 907 F. Supp. 2d at 729 (quoting *In re IBM Corp. Sec. Litig.*, 163 F. 3d 102, 107 (2d Cir. 1998)) (citations omitted).

This Court finds that the circumstantial evidence underpinning Plaintiffs' claims permit an inference of scienter as to the Individual Defendants.  Considering the context of the Company's business goals and its competitive environment, the sheer sensibility of the name change announcement makes Plaintiffs' allegations of scienter "cogent and compelling."  *Maguire*, 876 F.3d at 547 (quoting *Tellabs*, 551 U.S. at 324).  Plaintiffs have met the exacting pleading standard of the PSLRA as to the scienter of the Individual Defendants because this Court draws a "strong inference of wrongful intent that is necessary to support [Plaintiffs'] securities fraud claims."

---

[16] Defendants appear to vacillate between the position that the name change retraction was and was not a corrective disclosure for purposes of securities law analysis.  *Compare* Dkt. 23 at 29 (referring to the name change retraction as an "alleged corrective disclosure" for purposes of arguing against allegations of loss causation) *with* Dkt. 36 at 15 (arguing against the view that "revealing a joke is a 'corrective disclosure'").  This Court finds no case law to support the position that the public retraction of a false statement cannot be treated as a "corrective disclosure" and instead deems the publication of the Company's statements to news outlets to constitute "the revelation of new facts suggesting [Defendants] perpetrated a fraud on the market."  *Singer*, 883 F.3d at 445; *see also In re Omnicom Grp., Inc. Secs. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) (finding that an alleged corrective disclosure must "reveal the falsity of an alleged misstatement").  This disclosure is different from the concealed risk theory in which "news from another source [outside the defendant company] revealed the company's fraud."  *Id.*

*Cozzarelli*, 549 F.3d at 621.  Given the prior corporate upheaval at Volkswagen and the publicly expressed desire to build trust with the public, the Individual Defendants' alleged conduct far surpasses negligence and represents "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff." *Ottmann*, 353 F.3d at 343.  And as already discussed, Plaintiffs and other more sophisticated market participants and observers were misled.

### b.  VWGoA and Volkswagen AG

"When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *Graer v. Am. Pub. Educ., Inc.*, 895 F. Supp. 2d 763, 787 (N.D. W. Va. 2011) ("And if the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents.").

It is possible to raise the required inference with regard to a corporate defendant without pleading an inference of scienter for an individual defendant employed directly by that corporation in what courts call "collective scienter."  *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008); *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995).  The Fourth Circuit, however, has not addressed its position on the theory of "collective scienter" liability.

Plaintiffs have sufficiently alleged that the Individual Defendants are authorized agents of VWGoA because, as already outlined, they have alleged each individual is "sufficiently knowledgeable about the company to know that the announcement was false." *Makor*, 513 F.3d

at 710; *Nordstrom*, 54 F.3d at 1436 (concluding that "corporate scienter relies heavily on the awareness of the directors and officers"). Thus, Plaintiffs have sufficiently pleaded scienter as to VWGoA.

But given this Court's earlier determination that Plaintiffs have not sufficiently pleaded Volkswagen AG exercised "ultimate authority" over VWGoA, this Court is unable to attribute the severe recklessness of the Individual Defendants to Volkswagen AG by way of a "collective scienter" theory. To be sure, a spokesman for Volkswagen AG confirmed knowledge from the beginning of the campaign that its purpose was to propagate a flurry of social media attention in what he called an "e-offensive." *See, e.g.*, Dkt. 9-1 at 2-3. Further, the name change announcement was "so important and so dramatically false that at least one corporate official from [Volkswagen AG] must have known of their falsity upon publication." *In re Volkswagen Prod. Liability Litig.*, 2017 WL 66281, at *16. But Plaintiffs have not pleaded that Volkswagen AG had final approval power over the alleged false statements.

In this case, the allegations allow this Court to draw a strong inference of scienter on the part of VWGoA but fall short as to the parent issuer.

3. Relationship to the Purchase or Sale of a Security Upon Which Investors May Reasonably Rely[17]

Plaintiffs argue that they have standing to bring a § 10(b) and Rule 10b-5 action against Defendants because VWGoA's alleged false statements bear a sufficient "connection" with the ADRs purchased by Plaintiffs. Because the Company took no steps to prevent future sales and "in practice depositary banks obtain the issuer's consent before establishing an unsponsored ADR

---

[17] This Court addresses the standing issue of the security itself alongside the "in connection with" inquiry into the relationship between the purchase of that security and the alleged false statements.

program," Dkt. 21 ¶ 65, Plaintiffs contend that Volkswagen likely approved of the distribution of ADRs to U.S. markets. Consequently, from Plaintiff's perspective, unsponsored ADRs should not be uniformly outside the reach of § 10(b).

Defendants maintain that they formally ended their sponsored ADR program in 2018 and that the current unsponsored ADR program reflects Volkswagen's hands-off approach to the purchase and sale of its ADRs in U.S. markets. They claim they chose to list their securities exclusively in foreign markets to avoid regulation and litigation in the United States, which the SEC has noted is a compelling reason for finding an inadequate connection under § 10(b). Defendants also argue that Plaintiffs have not alleged VWGoA was aware of the unsponsored ADR program. Defendants maintain that if the Court were to adopt Plaintiffs' view that Volkswagen provided its implied consent to the program by doing nothing in response to the creation of the ADR program, such a position would unreasonably subject foreign issuers to defend U.S. securities suits whether they affirmatively endorsed or ignored the unsponsored ADR program.

Section 10(b) provides civil remedies for private securities plaintiffs when those plaintiffs can show that the defendants engaged in some deceptive practice contrary to the federal securities rules and regulations "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." 15 U.S.C. § 78j(b). "The Supreme Court has consistently embraced an expansive reading of § 10(b)'s 'in connection with' requirement." *SEC v. Pirate Investor LLC*, 580 F.3d 233, 244 (4th Cir. 2009) (quoting *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008)). That broad reading requires courts to gauge whether the alleged fraudulent activity "touches" or "coincides" with a securities transaction. *Id*. (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006)). Courts may

consider: "(1) whether a securities sale was necessary to the completion of the fraudulent scheme; (2) whether the parties' relationship was such that it would necessarily involve trading in securities; (3) whether the defendant intended to induce a securities transaction; and (4) whether material misrepresentations were disseminated to the public in a medium upon which a reasonable investor would rely." *Id.* But none of these factors are considered mandatory in satisfying the "in connection requirement"; "[t]hey exist merely to guide the inquiry." *Id.* "[A] close fit with one factor may well be enough for a fraud to result in § 10(b) liability." *Id.* at 245; *see also SEC v. Zandford*, 535 U.S. 813, 819 (2002) ("Section 10(b) of the Securities Exchange Act . . . should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.").

"Where the fraud alleged involves public dissemination in a document . . . on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." *Pirate*, 580 F.3d at 249 (citing *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993)). "[I]t is irrelevant that the misrepresentations were not made for the purpose or the object of influencing the investment decisions of market participants." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 176 (3d Cir. 2000) (applying the same standard enunciated in *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) adopted and clarified by the Fourth Circuit in *Pirate*). Alleged misstatements contained in publicly available filings, including press releases, generally meet the "in connection with requirement." *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, No. CV CCB-18-2445, 2020 WL 571724, at *5 (D. Md. Feb. 4, 2020), *reconsideration denied,* 473 F. Supp. 3d 529 (D. Md. 2020). Reasonable investors may rely on these statements because "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic Inc. v. Levinson*, 485 U.S. 224, 246 n.24 (1988).

This Court finds the case law upon which Defendant relies to be unpersuasive for the general proposition that Plaintiffs plenarily lack standing to litigate a § 10(b) claim against a company in whose stock they did not directly purchase. In *Ontario Pub. Serv. Emply's Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004), the plaintiffs purchased stock in one issuer and argued that a false statement by another company that conducted business with the issuer inflated the issuer's stock price. The court reasoned that "statements by a non-issuer [regarding the security that is the subject of the suit] about a non-issuer" are not actionable under Rule 10b-5. *In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281, 305 (S.D.N.Y. 2005) (dissecting *Nortel*, 369 F.3d at 33). The Second Circuit has cautioned against reading *Nortel* broadly in such a way that "would place beyond the reach of Rule 10b-5 false statements made by underwriters, brokers, bankers, and non-issuer sellers." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 102 (2d Cir. 2007). In *Klein v. Altria Grp, Inc.*, 525 F. Supp. 3d 638, 658 (E.D. Va. 2021), the court held that *Nortel*'s limitations did not prevent the application of Rule 10b-5 to two companies—Altria and JUUL—involved in a "scheme." The court reasoned that the relationship between the two companies "would result in the merger of the[ir] advertisement and distribution resources" and further highlighted that the issuer took a "significant (though minority) stake" in the company alleged to have made a false statement.

Unlike in *Nortel*, the issuer here is alleged to control the entity responsible for making the alleged false statements. Dkt. 21 ¶ 186. Volkswagen AG allegedly owns 100% of the entity that published the alleged false statement, possesses and exercises authority to appoint all of the entity's directors and executive officers, directly monitors its day-to-day operations, financial reporting, accounting and regulatory actions, and participates in the preparation and dissemination of its public statements. *Id.* And like *Klein*, these allegations reveal that Volkswagen and the Company

47

operated in a manner that is anything but remote and that is far more closely-knit than the "scheme" between Altria and JUUL.[18]  For purposes of standing, Plaintiffs' fulsome allegations demonstrate the appropriateness of extending Rule 10b-5's reach to securities of a parent company, when that parent company exercises substantial involvement over the day-to-day operations of a wholly-owned subsidiary alleged to have violated federal securities laws.  If this were not so, issuers exercising such concrete control over their subsidiaries would never be legally responsible for the statements of their non-publicly traded wholly-owned subsidiaries.  That would reward issuers with a scapegoat mechanism through their unlisted subsidiaries to avoid § 10(b)'s remedial scheme.

This Court also finds that the distinction between a sponsored and unsponsored ADR program impacts the degrees of separation between the ADR and the foreign issuer, which implicates the "in connection with" analysis under § 10(b).  According to the SEC:

> Sponsored ADRs are those in which the non-U.S. company enters into an agreement directly with the U.S. depositary bank to arrange for recordkeeping, forwarding of shareholder communications, payment of dividends, and other services.  An unsponsored ADR is set up without the cooperation of the non-U.S. company and may be initiated by a broker-dealer wishing to establish a U.S. trading market.

SEC Investor Bulletin at 1-2.  In its amicus brief in the Toshiba Appeal, the SEC concedes that the fact an ADR program is unsponsored may be material to whether a plaintiff class can show the "in connection" requirement satisfied.  *See* SEC Brief, 2019 WL 2185128, at *17 ("if petitioner can show that it 'ch[o]se to list and transact [its] securities only in foreign markets precisely to avoid

---

[18]    This Court's determination as to Volkswagen AG's relationship to VWGoA for purposes of standing is separate and apart from its discussion of whether a material misrepresentation may be attributed to Volkswagen AG—the latter requiring a specific assessment of the allegations as they relate to Volkswagen's involvement in the publication of the alleged material misrepresentation.  In other words, this Court first must assess whether § 10(b) and Rule 10b-5 liability may ever attach to Volkswagen's unsponsored ADRs and, if so, whether the allegations of the Amended Complaint meet that standard.

U.S. securities regulation and litigation,' it would be more difficult for respondents to prove that petitioner's accounting fraud was "in connection with" domestic ADR purchases." (citation omitted)).[19]   The SEC's formal guidance confirms that a foreign issuer need not have any contact with a depositary bank offering an unsponsored ADR program.  68 Fed. Reg. at 54,645; *see also* Additional Form F-6 Eligibility Requirement Related to the Listed Status of Deposited Securities Underlying American Depositary Receipts, Securities Act Release No. 8287, Exchange Act Release No. 48,482, 68 Fed. Reg. 54,644, 54,645 (Sept. 17, 2003) (noting that the creation of an unsponsored ADR program "does not involve the formal participation or even require the acquiescence of, the foreign company whose securities will be represented by the ADRs"); Exemption from Registration Under Section 12(g) of the Securities Exchange Act of 1934 for Foreign Private Issuers, Exchange Act Release No. 58,465, 73 Fed. Reg. 52,752, 52,762 (Sept. 10, 2008) (clarifying that while the depositary bank must register unsponsored ADRs on Form F-6 with the SEC, the foreign issuer of the underlying reference securities traded abroad faces no filing obligations with the SEC).

That reality, however, does not preclude the possibility that Volkswagen, in this case, did approve of the unsponsored ADR program.  Plaintiffs have sufficiently pleaded Volkswagen's "connection to the ADR transactions" by systematically describing the nature of the ADRs and the contractual terms associated with owning such securities, Dkt. 21 ¶¶ 51-56, the specific depositary banks that have registered the ADRs with the SEC, *id.* ¶ 57, the details of said registration on Form F-6, *id.* ¶¶ 58-63, and the nature of the OTC markets in which the ADRs trade, *id.* ¶¶ 69-78—

---

[19]   Any discussion of being able to "show" some fact implies an investigation by the court that would occur upon the conclusion of discovery.

bedrock factors that establish the nature of the transactions involved.  *See Stoyas*, 896 F.3d at 951;

*Toshiba II*, 424 F. Supp. 3d at 828.

Plaintiffs have specifically identified that one of the depositary banks offering the ADRs

in this dispute confirmed to the SEC that best practice for it and other banks is to "obtain the

[foreign] issuer's consent before establishing an unsponsored ADR program."  Dkt. 21 ¶ 65

(quoting DB Comment Letter at 4).  As such, Plaintiffs provide a plausible basis that at least one

of the involved depositary banks "provided Volkswagen with an opportunity to object to and

prevent the establishment of such program," "obtained a letter of non-objection or other evidence

of consent from Volkswagen," and/or "took other actions intended to obtain Volkswagen's consent

to the sale of unsponsored ADSs in the United States."  *Id.* ¶ 66.  Whether or not such interactions

occurred is likely near impossible to know at the pleading stage, making it a question best answered

through discovery.  Indeed, Plaintiffs allege that Volkswagen's website "states that it reached the

approved registration limit for its ADR programs and decided not to renew them."  *Id.* ¶ 53.  But

that is a very different proposition than expressly disclaiming any responsibility for ADR programs

it has not approved with the purpose of avoiding U.S. securities regulation and litigation.[20]  After

---

[20] Volkswagen's prior ADR program involved Level I sponsored ADRs, which as a matter
of regulatory burdens to Volkswagen, did not differ from the unsponsored ADR program in which
Plaintiffs participated here.  *See* SEC Investor Bulletin at 2.  The only functional difference appears
to have been the fact that Volkswagen did not enter into an agreement directly with the U.S.
depositary banks "to arrange for recordkeeping, forwarding of shareholder communications,
payment of dividends, and other services."  *Id.* at 1-2.  Rather, a broker-dealer may form that
agreement directly with the U.S. depositary banks based on investor demand.  Whether the Level
1 ADR program is sponsored or unsponsored, the foreign issuer of the underlying shares retains
the same regulatory burden in U.S. markets.  It is *the U.S. depositary bank* which registers the
ADRs in both sponsored and unsponsored Level 1 ADR programs, *see* 17 C.F.R. § 230.466(a),
and the foreign issuer has no reporting requirements under the Exchange Act other than to meet
the requirements of 17 C.F.R. § 240.12g3-2(b) to continue to qualify as a "foreign private issuer."
Given that the regulatory burden on a foreign issuer is no different between an unsponsored ADR
program and a Level 1 sponsored ADR program, this Court notes that a § 10(b) claim against
Volkswagen in connection with its Level 1 sponsored ADRs survived a motion to dismiss.  *See In*

all, "the number of Volkswagen ADSs [] available for sale in the United States is limited by the number of Volkswagen shares that Volkswagen has issued and authorized for sale," and "[d]epositary banks are prohibited from selling Volkswagen shares that are not supported by underlying foreign shares of stock deposited and held by the depositary." *Id.* ¶ 58. Volkswagen therefore continues to receive the benefit of demand on its foreign shares from depositary banks seeking to distribute ADSs to U.S. markets by purchasing those foreign shares. Moreover, because Plaintiffs have implicated a specific depositary institution, which has publicly confirmed it requires the approval of the foreign issuer prior to launching an unsponsored ADR program, Plaintiffs' allegations provide a plausible basis that the alleged misstatement "touches" or "coincides" with "the purchase or sale of any other security in the United States." *Pirate*, 580 F.3d at 244.

This Court also reaffirms the principle that "publicly-disseminated press releases, research reports, and website representations that contain materially false and misleading statements regarding an issuer of securities satisfies the 'in connection with' requirement." *SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 258-59 (S.D.N.Y. 2014); *see also Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294 (3d Cir. 2005); *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993); *SEC v. DCI Telecomm., Inc.*, 122 F. Supp. 2d 495, 499-500 (S.D.N.Y. 2000). As

---

*re Volkswagen Prods Liability Litig.*, 2017 WL 66281, at *24. There, the court determined that "Volkswagen took affirmative steps to make its securities available to investors here in the United States" including arranging for the issuance of ADRs for the convenience of U.S. investors by entering into a deposit agreement with a New York bank. "As a result of Volkswagen's actions, the ADRs were and are offered to domestic investors on an OTC market located in the United States." *Id.* at *6. The court also considered allegedly false statements made by VWGoA in connection with the Volkswagen ADRs. The court's "in connection with" analysis as applied to Volkswagen's legacy Level I ADR program squares with this Court's chief concern here: whether Volkswagen provided its approval to any of the depositary banks to issue unsponsored ADRs purchased by Plaintiffs.

the Fourth Circuit requires, Plaintiffs have adequately averred that VWGoA publicly disseminated a press release on multiple occasions and that such announcement was material. Not only did the announcement itself detail an upcoming significant rebranding effort by the Company across North America, but it also generated a widespread public response. *See* Dkt. 21 ¶¶ 106-42. Given the alleged seriousness with which the market perceived the name change, it is entirely reasonable that investors would have relied upon the press release. *See id.* ¶¶ 11, 118 (alleging that at least one securities analyst published a bullish report on Volkswagen stock following the publication of the press release).

The problem remains, however, that Plaintiffs have not adequately demonstrated that Volkswagen AG may be held liable under § 10(b) because the Amended Complaint does not state with the level of particularity demanded by the PSLRA that Volkswagen confirmed the publication of the press release. This Court will not contravene *Janus* by holding that the statements of a non-publicly traded wholly-owned subsidiary and its employees may be actionable upon the parent issuer when the Amended Complaint fails to adequately plead that the alleged material misstatements may be attributed to the parent issuer. Without a plausible theory of liability ascribed to the issuer, Plaintiffs' purchase or sale of Volkswagen ADRs cannot be said to "touch[]" or "coincide" with the alleged false statements of the Individual Defendants and VWGoA.

In sum, Plaintiffs have sufficiently alleged that Volkswagen continues to play an active role in the unsponsored ADR program and that it was reasonable for investors to rely upon those alleged false statements. But they have not sufficiently pleaded that the alleged false statements by the Individual Defendants and VWGoA "coincide" with or "touch[]" the ADRs purchased by Plaintiffs because the issuer of the underlying securities has not been shown to be liable under § 10(b).

#### 4.  Economic Loss and Loss Causation

Defendants argue that while Plaintiffs traded in both common and preferred ADR stock, the Amended Complaint fails to plead any allegations related to the preferred ADR stock purchased by Lead Plaintiff.  In that vein, Defendants also note that Plaintiffs do not explain in the Amended Complaint why the price of the preferred and common diverged one day after Volkswagen confirmed the name change would not occur.  Defendants further highlight that the common shares actually traded at a higher price after the retraction of the name change; $36.30 by the end of March 31, compared to a closing price of $34.65 the day of the initial name change announcement, thus effectively discounting any causal link between the announcement and share price.  Lastly, according to Defendants, Plaintiffs have not alleged with "sufficient specificity" unusually high trading volume that would indicate a sell-off caused by the name change retraction.

Plaintiffs maintain that the Amended Complaint's allegations, when properly assessed in Plaintiffs' favor, support a theory of loss causation that is not facially implausible and that any skepticism there may be in this theory is best left following discovery.  Rather than focusing on price movements after the class period, Plaintiffs contend that by simply alleging a price drop in the ADRs at the time of the name change retraction, they have met their pleading burden at the motion-to-dismiss stage.  Plaintiffs add that any share increase following a corrective disclosure has no impact on their claims unless Defendants can show in discovery that the rally resulted from the same news as that which allegedly precipitated the initial decline in stock price.  Plaintiffs argue Defendants cannot make this showing because Volkswagen ADRs traded higher after the corrective disclosure due to macro-economic factors.  And while Plaintiffs argue that there is no required trading volume element to sufficiently pleading a loss causation claim, they insist that, on the day Volkswagen made the corrective disclosure, the trading volume of Volkswagen's ADSs

represented 340% of the average trading volume that year.  To address the divergence in stock price between the common and preferred shares, Plaintiffs note that the two securities feature divergent characteristics that make the differing impacts on their share prices reasonable: (1) preferred ADSs have no voting rights; (2) lower trading volume for preferred ADSs; and (3) lower liquidity for preferred ADSs.

A private securities class action plaintiff must plead that the defendant's "share price fell significantly after the truth became known" and further "allege a sufficiently direct relationship between [their] economic loss and the defendants['] fraudulent conduct." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).  While allegations of economic loss and loss causation need not be pleaded at the heightened particularized level of the PSLRA, *Teachers' Ret.*, 477 F.3d at 172, the allegations must be sufficiently specific to "enable the court to evaluate whether the necessary causal link exists." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011); *accord Dura*, 544 U.S. at 347 (noting that for a plaintiff that has suffered an economic loss, "it should not prove burdensome" to "provide a defendant with some indication of loss and the causal connection that the plaintiff has in mind").  "Speculation and conjecture, even a well-educated guess, in the context of market prognostication does not suffice to establish a fact" that may anchor a successful loss causation allegation. *Id.* at 477.  Rather, it is the plaintiff who shoulders the burden of "proving that the [alleged] act . . . of defendant [] caused the loss for which the plaintiff seek[s] to recover damages." *Teachers' Ret.*, 477 F.3d at 185.  Purchasing defendant's stock at an "artificially inflated purchase price" does not, on its own, adequately plead sustained damages. *Dura*, 544 U.S. at 347.

"To allege loss causation [] plaintiffs would have to allege that the market reacted to new facts disclosed that revealed previous representations to have been fraudulent." *Teachers' Ret.*,

477 F.3d at 187.  A stock price drop alone is insufficient to meet the pleading standard for loss causation, otherwise a plaintiff could proceed on such a theory and "effectively resurrect" what the Supreme Court discredited in *Dura.  Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008); *see also id.* (rejecting the euphemistic view that "a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud").  Instead, "[l]oss causation . . . requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011).

Plaintiffs must specifically show that the "misrepresentation or omission was one substantial cause of the investment's decline in value." *Singer v. Reali*, 883 F.3d 425, 445 (4th Cir. 2018).  When "the defendant company itself made a disclosure that publicly revealed for the first time that the company perpetrated a fraud on the market by way of a material misrepresentation or omission," plaintiffs must tie a decline in the stock price to the corrective disclosure. *Id.*; *see also In re Williams Sec. Litig.*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("Any reliable theory of loss causation that uses corrective disclosures will have to show both that corrective information was revealed and that this revelation [prompted] the resulting decline in price" rather than "some other negative information about the company.").

This Court finds that Plaintiffs have, collectively, pleaded economic loss and loss causation.[21]  In the Amended Complaint, Plaintiffs specifically allege that Lead Plaintiff purchased

---

[21]  As already noted, Lead Plaintiff's PSLRA certification notes that he purchased preferred stock on March 30, 2021 at $38.42 per share and sold such stock in part on April 1, 2021 for $36.06 per share and on April 12, 2021 for $34.90 per share.  Dkt. 9-2 at 2; Dkt. 9-3 at 2.  However, this Court takes judicial notice of the fact that the price of preferred stock never reached these figures and instead, these share prices appear to align with the price ranges of the ordinary shares.  *See* Dkt. 9-3 at 2 (classifying shares purchased by Lead Plaintiff as "VWAGY" which is the ticker for the ordinary shares).  The Amended Complaint and supporting documentation also suggest that

ADSs the day of the initial announcement and then sold them after the public retraction at a lower price than when they had purchased the securities.  *See* Dkt. 9-3.  The closing share price on March 29, 2021 of $34.65, following the initial name change announcement, reflected a 6.5% increase in the price of ordinary shares from the previous trading day closing price and a 67.9% increase in volume from the previous trading day.  Dkt. 23-1.  Following the republication of the name change announcement on March 30, 2021, the closing price for ordinary ADS climbed to $37.75, marking an 8.9% increase in price from the previous close and a cumulative 16.0% increase from the closing price on the last trading day before the initial name change announcement.  *Id.*  Volume also increased substantially on March 30, 2021, marking nearly a 400% increase from March 26, 2021, the last trading day preceding the name change announcement.  *Id.*[22]  On March 31, 2021, ordinary ADSs closed at $36.30 following the name change retraction, marking a 3.8% decrease in share price from the previous day.  *Id.*  The share price declined further to $35.58 by the close of trading on April 1, 2021, marking a cumulative 6.1% decrease in share price from the close of trading immediately prior to the name change announcement retraction.  *Id.*  The next trading day, April

---

Plaintiff Wells has not sold his stock.  *See* Dkt. 21 at 66 (indicating Plaintiff Wells only purchased common shares during the class period but providing no date of sale).  However, Section 21D(e) of the PSLRA provides a calculation of damages framework that does not require the plaintiff to have actually sold stock to make a § 10(b) claim.  *See* 15 U.S.C. § 78u-4(e)(1) (allowing for plaintiff to hold shares past 90-day period); *Ross v. Walton*, 668 F. Supp. 2d 32, 43 (D.D.C. 2009) (agreeing that a "sale of stock is not necessary" under the PSLRA); *Malin v. XL Cap. Ltd.*, No. 3:03-cv-2001, 2005 WL 2146089, at *4 (D. Conn. Sept. 1, 2005)) (same).

[22]  This Court's opinion does not turn on trading volume.  Despite Defendants' appeal, nothing in the Fourth Circuit's opinion in *Yates* purports to advance a rule that unusual trading volume is a hallmark litmus test for finding a corrective announcement proximately caused economic loss.  Trading volume only drove the court's analysis to the extent it reflected unusual trading activity by insiders—which is not alleged in this case.  *See Yates*, 744 F.3d at 891.  Nevertheless, this Court cannot ignore that increased trading volume around a corrective disclosure, supported by additional compelling allegations, serves to make the causal connection more plausible.

5, 2021, the closing share price rose to $37.16 but then began a steady decline over the following months until finally climbing back above the pre-name change retraction closing price on June 7, 2021. *Id.*

Insofar as the allegations of the Amended Complaint demonstrate a plausible circumstance in which the alleged misrepresentation impacted the "integrity of the market price" and a "subsequent economic loss," Plaintiffs have satisfied their pleading burden at this early stage in the case. *Erica P. John Fund*, 563 U.S. at 812. Under the applicable standard in assessing this case at the pleading stage, and  drawing all inferences in Plaintiffs' favor and accounting for the necessarily contextual analysis of a loss causation assessment, *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021), this Court finds that the declines in share price following the public revelation of the alleged false statement, could plausibly be understood to have impacted the share price after market close on March 30, 2021, *Dura*, 544 U.S. at 346-47. Plaintiffs have pleaded, with specificity, the timing and manner in which various news outlets, investment analysts, and academics publicized both the name change announcement and retraction. *See* Dkt. 21 ¶¶ 13, 107-16, 121-34.

In their reply brief, Defendants do not address persuasive authority from the Second Circuit law holding that "the fact that the price rebounded does not, at the pleading stage, negate the plaintiff's showing of loss causation." *Acticon AG v. China North East Petroleum Holdings Ltd.*, 692 F.3d 34, 39-40 (2d Cir. 2012). In *Acticon*, the Second Circuit agreed with a district court's reasoning that the ultimate determination of why the share price rebounds "requires the court to consider 'a competing theory of causation and raises factual questions not suitable for resolution on a motion to dismiss.'" *Id.* (quoting *Malin*, 2005 WL 2146089, at *4 n.5); *see also Carlucci*, 907 F. Supp. 2d at 724 (in the context of loss causation, provided the allegations lay a proper

groundwork for establishing proximate cause, "the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds" (quoting *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008)); *Municipal Mortg.*, 876 F. Supp. 2d at 647 (same).

The authority upon which Defendants rely is less persuasive. In *Metzler*, the Ninth Circuit did not find sufficient allegations of loss causation when a 10% price drop quickly rebounded because the pertinent disclosure contained other negative information about the corporate defendant in addition to the alleged misstatement. *Metzler*, 540 F.3d at 1065. Here, the alleged corrective disclosure deals entirely with the name change, and nothing in the announcement could plausibly warrant an inference that some other fact caused the decline in Volkswagen ADR value. *Acticon* also tempers the more expansive views propagated by the district court cases Defendant cites. *Acticon*, 692 F.3d at 41 (discussing the limitations of, *inter alia*, the opinions in *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011) and *In re Immucor, Inc. Sec. Litig.*, No. 1:09-cv-2351, 2011 WL 2619092, at *4 (N.D. Ga. June 30, 2011)). Those cases advance a rule in which a plaintiff cannot recover under the PSLRA if the stock price increases for some reason unrelated to the fraud. But *Acticon* clarifies that "it is improper to offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud if the stock recovers value for completely unrelated reasons . . . . In the absence of fraud, the plaintiff would have purchased the security at an uninflated price and would have also benefitted from the unrelated gain in stock price." 692 F.3d at 41.

While this Court acknowledges *Dura*'s forewarning that a lower price after a corrective disclosure may reflect alternative influencing events, 544 U.S. at 342-43, the specificity of the allegations surrounding the timing and distribution of the disclosure and the related changes in

ordinary share pricing and volume are enough for this Court to "assume that the price rose for reasons unrelated to its initial drop." *Acticon*, 692 F.3d at 40.  Nor is this Court persuaded that a single-digit percent loss, in and of itself, defeats a potential case for loss causation. *See Klein*, 525 F. Supp. 3d at 669 ("Although the [4.87% maximum drop] that Plaintiffs point to fall short of the double-digit drops seen in many securities fraud cases, at this stage Plaintiffs have pleaded sufficient loss causation. Discovery may reveal other intervening factors that ultimately undercut Plaintiffs' loss causation allegations, but the Court will resist making that factual determination at this stage of the litigation."); *see also Tesla*, 477 F. Supp. 3d at 931 (finding sufficient allegations of loss causation with a maximum price drop of 9%).  Allowing this case to proceed to discovery may well reveal whether the price drop reflects a significant or otherwise "modest" fall in the context of the ADRs average movements. *See Wochos*, 985 F.3d at 1197 (quoting *Metzler*, 540 F.3d at 1064-65).

At this stage in the litigation, Plaintiffs have sufficiently pleaded economic loss and loss causation; however, if Plaintiffs seek leave to file a Second Amended Complaint, the allegations should confirm whether Lead Plaintiff owned ordinary or preferred shares.

C.  Whether § 20(a) of the Exchange Act Applies to Volkswagen and the Individual Defendants

Defendants argue that because Plaintiffs cannot show § 10(b) liability, there can be no grounds to advance a § 20(a) claim.  Plaintiffs argue that they have sufficiently alleged § 10(b) liability as to Defendants and therefore they may also advance § 20(a) liability for Volkswagen AG and the Individual Defendants in their capacity as control persons of VWGoA.

"[S]ection 20(a) is the vehicle for imposing liability on control persons."[23]  *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018).  That liability depends on the liability of a controlled person

---

[23] Section 20(a) of the Exchange Act provides that:

under § 10(b).  *See Yates*, 744 F.3d at 894 n.8.  "Thus, if the complaint 'is legally insufficient with respect to the [section] 10(b) claim, the [derivative section] 20(a) claim must also fail.'"  *Singer*, 883 F.3d at 438 (quoting *id.*).

To plead a § 20(a) claim, "a plaintiff must allege (1) a predicate violation of [§ 10(b)], and (2) control by the defendant over the primary violator."  *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 627 (S.D.W. Va. 2012) (citations omitted).  "On a motion to dismiss, a Section 20(a) claim will . . . stand or fall based on the court's decision regarding the [§ 10(b)] claim."  *Kiken*, 155 F. Supp. 3d at 609 (quoting *Genworth*, 103 F. Supp. 3d at 791).  Thus, when a court finds that a plaintiff has adequately pleaded a primary violation under § 10(b), the § 20(a) claim survives the motion to dismiss as well.  *Id.*

Because Plaintiffs' Amended Complaint does not adequately allege that Volkswagen AG "directly or indirectly induce[d] the acts or acts constituting the violation or cause of action," and because Plaintiffs have not yet established § 10(b) liability against the Individual Defendants, this Court finds no grounds for § 20(a) liability.

## IV.  CONCLUSION

Ultimately, this Court is not necessarily persuaded that the incident giving rise to this litigation was an April Fool's joke gone wrong.  However, based on § 10(b) of the Securities and

---

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

Exchange Act and the Supreme Court's clear teachings governing the disposition of matters such as those raised herein, this Court cannot, based on the facts alleged in the Amended Complaint, allow the case to proceed.  Accordingly, it is hereby ORDERED that the Motion to Dismiss (Dkt. 22) is GRANTED and the Amended Complaint is DISMISSED without prejudice as to both counts of the Amended Complaint; and it is

FURTHER ORDERED that if Plaintiffs seek to further amend the Amended Complaint (Dkt. 21), Plaintiffs must file a Motion to Amend, with a proposed Second Amended Complaint attached, within fourteen (14) days of this Order, in which Plaintiffs clearly identify all proposed amendments to the Amended Complaint.

The Clerk is directed to forward copies of this Order to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
March 14, 2023

/s/

Rossie D. Alston, Jr.
United States District Judge